WHITNEY A. DAVIS, SBN 149523
MARIA S. ROSENFELD, SBN 186116
CHARTER DAVIS, LLP
1730 I Street, Ste. 240
Sacramento, CA 95814
(916) 448-9000
(916) 448-9009

ATTORNEYS FOR PLAINTIFF
RENWOOD WINERY, INC.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| RENWOOD WINERY INC. | Case No.: CV-08-02848 PJH |
| Plaintiff, | **DECLARATION OF WHITNEY A. DAVIS IN SUPPORT OF OPPOSITION ON BEHALF OF PLAINTIFF RENWOOD WINERY, INC. TO MOTION TO DISMISS/COMPEL ARBITRATION FILED ON BEHALF OF W.J. DEUTSCH & SONS LTD.** |
| vs. | |
| W.J. DEUTSCH & SONS LTD., a New York Corporation, and DOES 1-50 inclusive, | **Date: July 23, 2008**<br>**Time: 9:00 a.m.** |
| Defendants. | **The Honorable Phyllis J. Hamilton** |

I, WHITNEY A. DAVIS, upon oath, declare as follows:

1.      I am an attorney, licensed to practice law in the State of California and before this Court, and a shareholder in the firm Charter Davis LLP, attorneys of record for plaintiff RENWOOD WINERY INC. in the above captioned matter.  I have personal knowledge of the facts stated in this declaration and could and would, if called upon, testify competently to the same.  I am familiar with this file, its history, and the issues at hand in this motion.

2.    Attached as Exhibit A hereto is a true and correct copy of the March 2006 Services Agreement entered into in or around March 2006 by plaintiff and defendant herein.

3.    Attached as Exhibit B hereto is a true and correct copy of Renwood's June 2008 Demand for Arbitration in this matter submitted to JAMS on or about June 9, 2008.

4.    Attached as Exhibit C hereto, is a true and correct copy of the declaration of Robert Smerling.  The compendium of exhibits to which Mr. Smerling's declaration refers are on file in conjunction with RENWOOD's writ of possession/TRO/injunctive request papers.

5.    Attached as Exhibit D hereto is a true and correct copy of the JAMS Comprehensive Arbitration Rules as downloaded from the JAMS website at www.JAMSadr.com/rules/comprehensive/asp.

6.    Attached hereto as Exhibit E is a true and correct copy of WJD counsel's June 18, 2008 letter to JAMS.

7.    Attached hereto as Exhibit F is a true and correct copy of the June 10, 2008 electronic mail message from WJD CEO Peter Deutsch to Robert Smerling.

I declare, under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct and that this declaration was signed on June 30 2008 in Sacramento, California.

_____
WHITNEY A. DAVIS

DECLARATION OF WHITNEY A. DAVIS IN SUPPORT OF OPPOSITION ON BEHALF OF
PLAINTIFF RENWOOD WINERY INC. TO DEFENDANT WJD'S MOTION TO DISMISS/COMPEL
ARBITRATION
CASE NO. C-08-02848 PJH

**EXHIBIT A**

Execution Copy

# SERVICES AGREEMENT

I.
## THE PARTIES

A.    Renwood Winery, Inc., ("Renwood"), a California corporation, maintains its principal place of business at 8795 Folsom Boulevard, Sacramento, California, 95826.

B.    W.J. Deutsch & Sons, Ltd ("Deutsch"), a New York corporation, maintains its principal place of business at 108 Corporate Park Drive, White Plains, New York, 10604.

II.
## RECITAL

A.    Renwood produces distinctive brands of premium wines which it sells in the United States of America, Canada, the Caribbean Islands, Europe, and various locations worldwide through a broker and distributor network. These products bear the "Renwood®" name. Renwood possesses the required federal, state and local licenses to do so.

B.    Deutsch purchases, markets and sells premium wines at wholesale on behalf of wine producers through its own international and domestic distributor network, and possesses the required federal, state and local licenses to do so.

C.    By this agreement, Renwood hires Deutsch as its exclusive service provider to purchase, market, promote, sell and deplete Renwood® products on the terms and conditions set forth below. Except as set forth below, Deutsch accepts Renwood® as its exclusive Zinfandel brand and exclusive wine supplier from the regions designated below.

III.
## DEFINITIONS

A.    **Anniversary Date**: July 1, 2007, and each succeeding first of July during the term of this agreement.

B.    **Authorized Execution**: the execution of this contract pursuant to resolution by the governing body of each Party.

C.    **Condition of Breach**: a defined event that vests in the aggrieved Party a right to terminate performance on this agreement.

D.    **Contracted Products**: the Renwood® brand wine products that Deutsch acquires the exclusive right to market and sell, subject to the terms and limitations set forth below.

E.    **Deplete**: shall mean the sale of wine by a distributor to merchants that sell the wine to the final consumer.

Execution Copy

F.  **Effective Date**: April 1, 2006, so long as Authorized Execution of this agreement by all signatories, in counterpart or otherwise, facsimile or original, takes place by that date.

G.  **Renwood Distribution Facilities**: the facilities, of Renwood's choosing, at which title of Contracted Products transfers to Deutsch.

H.  **Renwood Retail Facilities**: Any merchant operation from which Renwood or its affiliates sell wine products directly to the final consumer.

I.  **Renwood Tasting Room(s):** Any merchant operation that offers tasting services and/or sells Renwood® products directly to the final consumer.

J.  **Retail**: a sale to a merchant that re-sells the product to the final consumer.

K.  **Territory**: the geographic area in which Deutsch shall enjoy the exclusive right to sell Contracted Products to licensed wholesalers, which area included the United States of America, its territories and possessions, the District of Columbia, Puerto Rico, the Virgin Islands and the Caribbean Islands, subject to those rights that Renwood retains as set forth below.

L.  **Transition Period:** The time period between the Effective Date and July 1, 2006.

M.  **Wholesale**: all sales by Deutsch other than **Retail** sales.

N.  **Deutsch Portfolio:** the group of wine brands Deutsch successfully developed, the brand control of which Deutsch will use as leverage with distributors to sell Renwood® wines.

IV.
TERM OF AGREEMENT

The agreement term is ten years from July 1, 2006. Absent termination, this agreement will automatically renew for up to two successive five year periods.

V.
CONTRACTED PRODUCTS AND SERVICES

A.  Products:

i. The Renwood products included in this agreement (**"Contracted Products"**) fall into the following Tiers:

a.  **Tier 1**: Proprietary brands:

Grandpere®
Grandmere®.

b.  **Tier 2**: Amador County:

Old Vine Zinfandel
Amador Barbera

Execution Copy

Fiddletown Zinfandel
Jack Rabbit Flat Zinfandel
Amador Syrah

c. **Tier 3**: Sierra Series/Select Series/Red Label:

Pinot Grigio
Viognier
Dry Rose
Syrah
Zinfandel
Barbera

d. **Tier 4**: Dessert:

Port
Orange Muscat
Amador Ice Zinfandel

ii.  Renwood will sell Contracted Products available within the
Territory to Deutsch. Products may be added to this provision,
transferred to other Tiers, or deleted from this provision only
by written consent of all Parties.

iii. Products outside the scope of this agreement include:

a.  All Renwood products that are not wine;
b.  All Renwood products that are not Contracted
Products;
c.  All Renwood products sold from a Renwood
Tasting Room, Renwood Retail Facility or via
electronic, telephonic or internet means to the
final consumers;
d.  Incidental auction sales and/or donated wine;
e.  Bulk wine products;
f.  All Renwood products sold via any means to
any person or entity outside of the Territory;
g.  All Renwood products, wherever delivered, that
are sold for resale on any common carrier,
airline, or cruise ship;
h.  All Santino brands, except, by agreement of the
parties, Deutsch may assist Renwood in certain
circumstances;
i.  All Renwood wine products that do not exist on
the Effective Date.

Execution Copy

    B.    Services:

        i.  Renwood abandoned its distributor network on the representation by Deutsch that Deutsch will exert its portfolio brand control to ensure priority distributor effort to meet or exceed Renwood Tier Sales Standards. Accordingly, Deutsch will provide wine marketing, sales, promotion and reporting services including, but not limited to:

                a.  With the prior advice and consent of Renwood. the retention of a talented and well-experienced brand manager;

                b.  The promotion of Renwood products at wine industry meetings, conventions, trade shows and press events;

                c.  With the prior advice and consent of Renwood, the composition of materials promoting Renwood products;

                d.  The sale of Renwood products in compliance with Tier Sales Standards;

                e.  Commercially reasonable cooperation and coordination with Renwood's lenders and vendors to the extent required by Renwood;

                f.  Upon commercially reasonable request by Renwood, Deutsch will arrange sales meetings, ride-alongs and inspections of selected distributors.

                g.  Arranging for the transportation and storage of Contracted Products, pursuant to industry standards applicable to premium wines, and similar to those employed for other Deutsch premium wine brands;

                h.  Deutsch will provide contact reports, order reports, marketing contribution usage reports and shipment summary reports to Renwood within 30 days of the end of the target month.

                i.  Deutsch will deliver sales, depletion, inventory and accounts sold reports to Renwood by the

Execution Copy

20th day following the month for which the categories were measured;

j.   Deliver to Renwood final, adjusted annual versions of all reports by the 30th day after July 1, 2007 and every year on that date thereafter.

k.   Within 90 days of July 1 of every year during the term of this agreement, Deutsch will deliver to Renwood [Deutsch's] audited Balance Sheets and Profit/Loss Statements;

l.   Deutsch will ensure that depletions of Contracted Products do not fall below 80% of the Tier Sales Standards.

ii.   The failure of Deutsch to perform the services above constitutes a Condition of Breach.

iii.   Transition Period:

1.   During this period, the Parties will begin to transition the distribution network, make announcements regarding the Deutsch/Renwood relationship, and commence performance of the obligations under this agreement.

2.   During this period, the Parties will be bound by the terms of this agreement.

3.   Further, all Tier Sales Standards and cure obligations/ guarantees will apply during the transition period, except that:

a.   Deutsch will guarantee, through cure procedure, 100% of the prior year's sales for the months of April, May and June, 2005 as set forth in **Schedule A.**

b.   Deutsch shall not be responsible for collecting accounts receivable from Renwood's distributor network that existed prior to the Effective Date.

Execution Copy

    c. In states where Deutsch is unable to post prices and register the brand by April 1, 2006, Renwood shall invoice the distributor. Within 30 days of collection by Renwood of the invoice amount from the distributor, Renwood shall forward Deutsch a copy of the invoice, payment to Deutsch of its services fee of 15%, and payment to Deutsch of the sample allowance of 1.5%.

## VI.
## MARKETING CONTRIBUTION

A. Renwood will remit to Deutsch a marketing contribution as set forth in **Schedule B** for verified sales of Contracted Products. The marketing contribution shall be the sole payment to Deutsch to defray the costs of all Special Price Allowances, Distribution Allowances, sales person incentives, printing (neck-hangars, shelf-talkers. case cards, coupons and redemption thereof, and other point-of-sale material), promotional expenses, and trade-show/wine show expenses.

B. Costs or allowances borne by Renwood due to special circumstances will be deducted from the next marketing contribution payment from Renwood to Deutsch. However, Renwood shall be responsible for the expenses its representatives incur to attend trade-shows or other industry functions. Deutsch will mail its marketing contribution claim and supporting documentation on the 15th day following each quarter to Renwood, on 30 day terms. Marketing contributions not exhausted by the end of the contract year shall be credited against Renwood's marketing contribution obligation for following year. Marketing contribution levels are subject to review at the end of the fifth year of this Service Agreement.

In addition, as a monthly sample allowance, from July 1, 2006 to July 1, 2007, Deutsch may take an additional 1.5% deduction from each sales invoice issued by Renwood. The Parties may extend or modify this provision after July 1, 2007.

As a sample allowance, Deutsch will also be entitled to a payment from Renwood equaling 1.5% of existing distributor inventory taken by Deutsch as of March 31, 2006. Deutsch assumes responsibility for all distributor samples used thereafter. For purposes of offset, Renwood will forward to Deutsch those sample allowance invoices applicable to samples used after April 1, 2006, but received by Renwood after that date.

Execution Copy

## VII.
## PRICING AND PAYMENT

A. Pricing:

    i. On 90 days notice to Deutsch, Renwood will set the price of the Contracted Products, FOB Renwood Winery or Renwood Distribution Facility, at the option of Renwood. Renwood covenants not to change the price of Sierra/Select Series/Red Label, Old Vine Zinfandel, Amador Syrah, Jack Rabbit Flat Zinfandel, Fiddletown Zinfandel for a period of two years from the Effective Date.

    ii. Sales invoices from Renwood to Deutsch will reflect only the FOB list price, with instructions to Deutsch to deduct 15% therefrom.

    iii. Deutsch will confer with Renwood to coordinate pricing of Contracted Products and use of corresponding marketing contributions. Pricing disputes shall be handled pursuant to the terms of the Dispute Resolution Procedure, set forth below, subject to the following agreed limitations:

        a. Price changes programmed prior to March 1, 2006 are not subject to dispute by Deutsch;

        b. Unless otherwise agreed to by the parties, prices shall never fall below those of the prior year;

        c. Deutsch cannot dispute price increases below 5% in any given year for any single product;

        d. Deutsch cannot contest the pricing of any new or different Renwood® product for a period of two years from its inclusion by modification to this agreement.

B. Payment:

Payment to Renwood by Deutsch will be made in U.S. dollars and will be wired or electronically transferred to Renwood's account as follows:

Wells Fargo Bank
5700 Folsom Blvd
Sacramento, CA 95829

| | |
|---|---|
| ABA Routing Number: | 121 042 882 |
| For Account: | Renwood Winery |
| Acct Number: | 008 766 2904 |

Execution Copy

i. Payment by Deutsch shall be made within 35 days of the date of invoice, which invoice date will not be earlier than the shipping date.

    a. Balances not paid by the 35-day deadline are deemed late, and will be charged interest at the rate of 18% per annum. Renwood™ will not pay service fees or marketing contributions while the account is past due, unless all of the past due balance is attributed to a bona fide dispute between the parties, and the parties have submitted the dispute for resolution as set forth below.

    b. A Condition of Breach is triggered upon a 60 day past due balance, at which time all receivables for Contracted Products revert to Renwood, and at which time Deutsch consents to the filing and satisfaction of stipulated Writs of Attachment and/or Execution against all Contracted Product inventory owned by Deutsch.

    c. This agreement shall serve as a security agreement for all Renwood products delivered to, or for the benefit of, Deutsch. The Parties agree that Renwood is a secured creditor of Deutsch. Deutsch will prepare, execute and deliver to Renwood, for the benefit of Renwood or its lenders/designees, appropriate UCC documents necessary to perfect a security interest in all Contracted Products in Deutsch's possession. Deutsch also agrees to provide all commercially reasonable and necessary financial documentation as requested by Renwood, its lenders or their respective designees.

## VIII.
## PERFORMANCE STANDARDS

A. On a best efforts basis, Deutsch will promote, market, distribute, sell and deplete Contracted Products in the Territory in a manner in keeping with Renwood's reputation in the marketplace.

Execution Copy

B. Deutsch and its distributors will annually schedule reasonable sales and marketing time, including visits to accounts for Renwood personnel, and will arrange for general, regional and team manager sales meetings and annual tastings of Renwood Contracted Products with Renwood personnel in attendance.

C. Deutsch shall be responsible for all distributors they utilize as of April 1, 2006. Deutsch shall have the discretion to use channels of distribution of its choice, subject to:

    i. existing contractual obligations Renwood owes to certain disclosed distributors, and subject to state and federal franchise laws;

    ii. Deutsch may not enter into any new agreements regarding Contracted Products until after April 1, 2006.

    iii. Renwood's determination that Deutsch's selection of distribution channels is traditional and appropriate for Renwood products.

    iv. After the end of the Transition Period, Renwood shall be notified 60 days before the effective date of any proposed change in Deutsch's distributor network. Deutsch shall indemnify and hold Renwood completely harmless from any liability, fines or loss of any kind due to any change in Deutsch's distributor network,

D. Tier Sales Standards:

    i. Deutsch will sell Renwood products on a nine (9) liter case equivalent, by Tier, pursuant to the five-year performance guarantees set forth on **Schedule C**.

    ii. Failure of Deutsch to meet each Tier Sales Standard is a Condition of Breach.

    iii. Within 15 days of notice by Renwood of a Condition of Breach of Tier Sales Standards, Deutsch must cure the Condition of Breach by purchasing sufficient Renwood products at the scheduled price on its own account, by tier. To cure sales deficits for Tier 1 Contracted Products (Proprietary), and Tier 4 (Dessert) Deutsch must purchase up to a level of 100% of the standard then applicable. To cure sales deficits for all other Tiers of Contracted Products, Deutsch must purchase up to a level of 85% of the standard then applicable. Deutsch shall be

Execution Copy

responsible for all storage costs incurred by Renwood so long
as the products Deutsch purchased for purposes of cure remain
at the Renwood Distribution Facility.

IX.
AGREEMENT TERMINATION

A.  Termination by Mutual Agreement:

1.  No provision of this agreement prevents the Parties from terminating
    this agreement by mutual agreement at any time on terms to be
    determined at the time of such agreement.

2.  The Parties agree that no stranger to this agreement has any interest in
    this agreement as a third party beneficiary, and warrants that no such
    rights or interests in the continued operation of this agreement have
    been, or will be transferred.

3.  In the event any third party claims any interest in this agreement, the
    Parties' mutually agree that their obligations of performance on this
    agreement are mutually terminated, absent the execution of a separate,
    mutual written agreement to the contrary.

4.  Upon the mutual termination of this agreement:

    a.  Unless otherwise agreed, Deutsch will
        immediately discontinue the use of Renwood
        trade names, trade labels, copyrights and other
        advertising media and shall remove all signs and
        displays relating thereto;

    b.  At Renwood's discretion, Renwood will
        repurchase from Deutsch those of its products
        that are in saleable condition on terms agreed to
        by the Parties, and offset by any amounts due
        and owing from Deutsch to Renwood;

    c.  Deutsch will cooperate in a commercially
        reasonable manner with Renwood to ensure an
        orderly transition of all contracted service
        functions to Renwood or its designee;

    d.  Deutsch will continue to deliver Renwood
        products to customers during all transition
        periods, and will take no detrimental action
        whatsoever to interfere with Renwood's

Execution Copy

<div style="margin-left:30%">

establishment of a substitute distributor network.

e.  Deutsch agrees that under any termination scenario (i.e. mutual, unilateral without breach, or unilateral with breach) Deutsch shall not increase its distributors' inventories beyond that required to meet the current Tier Sales Standard.

f.  Deutsch will satisfy all balances due, and will take no detrimental action whatsoever to interfere with Renwood's reputation, solvency, or cash flow, and will make all payments promptly required pursuant to this agreement, which payment covenants shall survive the mutual termination of this agreement

</div>

B.  Unilateral Termination without Breach by the Other Party:

1.  The Parties acknowledge that this agreement will fundamentally change the distribution network that Renwood has developed over many years. Further, the Parties acknowledge that, in the event Deutsch terminates this agreement, Renwood will suffer damage to its distribution network and cash flow that is not reasonably subject to calculation.

2.  The Parties acknowledge that unilateral termination will disrupt Renwood and Deutsch business operations to an extent not reasonably subject to calculation.

3.  Therefore, the Parties agree as follows:

<div style="margin-left:30%">

a.  In the event Deutsch unilaterally terminates this agreement in the absence of a Condition of Breach by Renwood, Deutsch shall pay to Renwood Liquidated Damages in the amount of $4 million if termination takes place before July 1, 2007, and that amount will increase by 20% annually on a compounded basis for the term of this agreement, except that the Liquidated Damages amount cannot exceed Renwood's gross sales for the prior 12 month period. All such damages amounts shall be offset by amounts Renwood owes to Deutsch under this agreement. Renwood has no obligation, in that event, to repurchase Renwood products in the

</div>

VERSION RWI-5                        11

Execution Copy

inventory of Deutsc . or its distributors.
Payment shall be made no more than 60 days
from the date of ma ling written notice of
termination.

b.   In the event Renwood unilaterally terminates
this agreement in the absence of a Condition of
Breach, Renwood shall pay to Deutsch
Liquidated Damages in the amount equivalent to
twelve (12) months of service fee as measured
by the prior 12 months sales history, less any
amounts Deutsch owes to Renwood. Renwood
shall also have the obligation to re-purchase
Renwood products in Deutsch's inventory at
Deutsch's laid-in cost. Payment shall be made
no more than 60 days from the date of mailing
written notice of termination.

C.   Unilateral Termination with Breach by the Other Party:

1.   Either party may terminate this Agreement by written notice for the
following reasons. in the absence of cure, with such termination to be
effective sixty (60) days after receipt of notice of breach (unless
provided otherwise below):

a)    The filing of a voluntary or involuntary petition in
bankruptcy, reorganization or a similar proceeding
concerning either party if not dismissed or vacated within
ninety (90) days from the date of filing;

b)    The appointment of a receiver or trustee for all or a
substantial part of the other party's property, provided such
appointment is not vacated within ninety (90) days from the
date of such appointment;

c)    The execution by the other party of an assignment for the
benefit of creditors;

d)    The suspension of business, liquidation, dissolution, or
termination of existence of the other party; the
condemnation, attachment or expropriation of all or a
material portion of the property of the other party;

e)    The failure of the other party to maintain, at all times, all
federal licenses, permits, approvals, and consents necessary
to perform its obligations hereunder, irrespective of the

Execution Copy

cause or reason for such failure, except that suspension of federal licenses or permits for period of less than ninety (90) days shall not be construed as a Condition of Breach;

f)   Misrepresentation of a material fact, or commission of a misdemeanor or felony in manufacturing, wine-making, selling, or related activities;

g)   The failure to fulfill any of the obligations in this Agreement;

h)   All Conditions of Breach otherwise provided for in the agreement;

i)   The failure to meet the Tier Sales Standards or cure through purchase within 15 days of notice;

j)   A substantial change in ownership and/or control of Deutsch;

2.   During the period in which the breaching party may cure the breach, if it can be cured, the *status quo ante* shall be preserved by the Parties, except for commercially reasonable measures taken to cure the breach. If the breaching party fails to timely cure the breach, then the other party may immediately terminate this agreement without consequence, and may recover damages for the breach in addition to reasonable costs of suit, attorney fees and/or mediator/arbitrator fees. If the defaulting party cures the breach within the cure period, then the agreement remains in force.

X.
ADDITIONAL TERMS, WARRANTIES AND COVENANTS

A.   Deutsch agrees to sell, promote, merchandise, and advertise Contracted Products to enhance the Renwood® brand and expand the markets for Contracted Products in the Territory in accordance with the Tier Sales Standards. Deutsch shall prominently display the Contracted Products at the major annual trade and wine shows in a manner consistent with Renwood's past practices.

B.   Within 30 days after the end of each month, Deutsch will supply to Renwood a report setting forth by product, vintage, Tier, state and distributor, on-premises, off-premises: 1) the accounts sold; 2) the quantities sold; 3) products depleted during the prior month; and 4) the prior month's ending inventories for each distributor and for Deutsch. In addition, the report shall contain the name of each retail account, as well as the total number of retail

Execution Copy

accounts, in which the products were sold during the prior month against the number of retail accounts that the products were sold in for monthly, quarterly and annual periods on a running three (3) year basis. All such reports shall be in a mutually agreeable computerized form such that the data may be utilized for market analysis purposes.

C.  Deutsch will not distribute or sell Contracted Products outside of the Territory or within the Territory for resale outside of the Territory, and shall take commercially reasonable measures to prevent extra-Territorial distribution or sale of Contracted Products by its distributors.

D.  Deutsch will defend, hold Renwood harmless from, and indemnify Renwood from any liability in connection with:

> 1.  Any claim, loss or expense (including reasonable attorneys fees and costs) arising from a Third Party claim alleging willful or negligent conduct, breach of an agreement, or breach of obligations arising from this agreement; and

> 2.  Any and all fines, levies, damages, and costs (including reasonable attorney fees) of judgments that Renwood suffers as a result of Deutsch's failure to comply with applicable laws in the Territory including, but not limited to, the payment of any sales taxes, license taxes and fees. Deutsch will pay all levies, excise taxes (except federal excise taxes imposed directly on Renwood), occupational taxes, and bonds, and shall maintain all appropriate licenses and permits in connection with shipments of Contracted Products to all portions of the Territory. Deutsch will not be responsible for judgments resulting from Renwood's failure to comply with applicable laws or pay applicable taxes with regard to Renwood Tasting Facilities or Retail Facilities.

E.  Under no circumstances will Deutsch ship or store Contracted Products, or allow its direct delivery customers to ship the products, in a manner likely to deteriorate product quality.

F.  Renwood may at any time (upon reasonable notice) inspect the products as sold and stored by Deutsch and distributors. Further, Renwood may contact any distributor, visit any retail account and will enjoy unfettered access to any Renwood product data furnished by distributors or retail accounts to Deutsch.

Execution Copy

G.  Renwood warrants that all Contracted Products it makes available to Deutsch under this agreement will be of good quality, are suitable for beverage consumption, and are properly packaged by Renwood in conformity with applicable laws, regulations, and requirements in force in the Territory. Renwood will hold Deutsch harmless from any and all fines, levies, damages, and costs of judgments that Deutsch may suffer as a result of Renwood's failure to comply with the provisions of this section.

H.  Deutsch will inform Renwood within seven days of notice of quality complaints and fully and completely cooperate with Renwood and the customer in complaint resolution.

I.  Renwood shall enjoy reasonable access to the Deutsch sales force, which is expected to taste the Contracted Products;

J.  Deutsch will present to Renwood on or before January 30th of each year the marketing plan and promotional schedule by which Deutsch plans to sell each Contracted Product, vintage and Tier for the next fiscal year commencing July 1.

K.  Deutsch currently sells Zinfandel wines made by three other suppliers (Kunde, Artesa, and Esser). Deutsch warrants that it will not sell the Zinfandel wines of those three other suppliers, beyond 10% of 2006 levels. With the above exception, Deutsch will not represent any other Zinfandel wine products, or any wines produced by wineries located in Amador, Alameda, Sacramento and the Delta Region, Stanislaus, San Joaquin, El Dorado, Tuolumne or Calaveras County.

L.  Deutsch will appoint a brand manager responsible for administering the Renwood wine program, subject to the approval of Renwood.

M.  Deutsch shall require the distributors it engages to do the following at all times:

> 1.  Maintain an inventory level of the Renwood products sufficient to satisfy projected sales within the particular distributor's territory for a minimum 60-day period based upon Deutsch's forecast for the following quarter; and

> 2.  Deutsch will notify Renwood within a reasonable period of any event within the distributor's territory that could result in projections for that territory varying more than 25% during any calendar quarter.

Execution Copy

N. Renwood will not ship or sell Contracted Products in the Territory, except as otherwise provided in this agreement.

O. Renwood will refer to Deutsch any and all orders and inquiries for Contracted Products that it may receive for shipment from distributors, retailers or other persons in the business of buying wine for resale in the normal course of trade for sale within the Territory. Deutsch and its distributors must respond to all inquiries in a prompt manner and will report the results to Renwood.

P. Unless the transfer of right will cause the breach of existing contracts or obligations, Renwood grants to Deutsch the first right of refusal (which right shall expire within 90 days of written notice) to accept and merge into this agreement wine products acquired or developed by Renwood Winery after the Effective Date that will bear the Renwood® brand and be depleted within the Territory;

Q. That during the term of this agreement, Renwood shall maintain product liability coverage concerning the sale of Contracted Products in the Territory in an amount of not less than five million ($5,000,000) dollars per occurrence naming Deutsch as an additional named insured.

R. All un-merchantable products suffering from quality deficiencies, packaging problems or errors found to be the fault of Renwood may be returned to Renwood for full credit (less marketing contributions and service fees) provided that notice of such deficiency, problem or error has been given to Renwood within 10 days of discovery of the deficiency.

S. Renwood owes no obligation to provide any credit for products rendered un-merchantable while in the possession and/or control of Deutsch or its customers. Deutsch is not entitled to claim any marketing contribution from Renwood for such products. Notice of the discovery of an un-merchantable product condition will be provided immediately to all parties. In addition to other conditions, a product shall be deemed un-merchantable in the event the containers or labels become unsightly or of less than first class condition. Deutsch will not sell un-merchantable products or otherwise dispose of such products or permit them to become the property of any insurer, carrier or salvage company in the absence of prior written consent of Renwood. Renwood reserves the right to have such un-merchantable products destroyed on site at Deutsch or the applicable storage facility, and obtain destruction records from Deutsch.

T. Within 30 days following the end of each contact year, Deutsch will provide Renwood with a "Final Contract Year Performance Statistics" report.

U. The Parties will meet and confer on the anticipated quantity and quality of that year's harvest and meaningfully discuss and consider the portion of that year's

Execution Copy

harvest, by variety, which should be made into wines produced and marketed under the Renwood® brand name. The parties will also mutually agree at that time on the methods and allocation of costs of promotion and selling by Deutsch.

V. Deutsch will obtain Renwood's permission before committing acts that could adversely affect Renwood with respect to existing contracts or the import, licensing or territorial registration requirements of any state, territory or political subdivision in the Territory. In the event that Deutsch takes action without obtaining Renwood prior written approval in any of these areas, Deutsch shall be responsible for all financial and other liability incurred by Renwood, including all recoverable damages (including attorney's fees and costs or the payments of fines to regulatory agencies or judgments in favor of distributors) in connection with the consequences of such action.

<div align="center">

XI.

INTELLECTUAL PROPERTY

</div>

A.    Renwood grants to Deutsch for the term of this Agreement a right to use the Renwood® trademarks solely within the Territory in connection with and for the purpose of promoting, advertising and selling the products pursuant to the terms of this Agreement. The use of Renwood® trademarks or other intellectual property shall be consistent with and supportive of the current brand image. This provision does not constitute an assignment of Renwood® trademarks or intellectual property.

B.    Deutsch further agrees:

1.    To use the Renwood® Brand Identity Package as described in the attached CD-rom;
2.    Not to remove the trademarks from the Products;
3.    Not to alter the trademarks in any manner;
4.    Not to use any trademark, trade name, or designation of origin other than the Renwood® trademarks and Deutsch's trade name in connection with the promotion, advertising, or sale of Contracted Products; and
5.    Not to use the Trademarks in connection with any products, goods, business or services other than Renwood® products.

C.    Renwood warrants that, to the best of its knowledge, it is the sole and exclusive owner of the Renwood® trademarks and intellectual property and has not assigned or licensed in the Territory any right or interest therein that would interfere or conflict with Deutsch's use thereof.

D.    Renwood also warrants that there are no known claims or demands in the Territory pertaining to such trademarks and intellectual property, and that

Execution Copy

no proceeding is pending or threatened against Renwood challenging Renwood's rights in respect thereof.

E.    In the event Deutsch becomes aware of any infringement of the trademarks, or any claim that the trademarks infringe the proprietary rights of a third party, Deutsch will immediately notify Renwood thereof in writing.

XII.
MISCELLANEOUS TERMS

A.  FORCE MAJEURE

The Parties will not be liable in any way for any Condition of Breach caused by events beyond their commercially reasonable control including, but not limited to, fire, flood, pests, riots, wars, terrorism, sabotage, strikes, lockouts, anomalous and unfavorable climate course, or any other unavoidable events or contingencies, including a national financial crisis of catastrophic proportions.

B.  NOTICE

All notices or other written communications required or referred to in this agreement shall be in writing an sent to the address of the recipient as it appears in the introductory paragraph to this Agreement (or such other address as such party shall have notified to the sender) by (in order of descending preferences (i) e-mail or facsimile transmission, (ii) DHL, Federal Express, or other reputable commercial carrier, or (iii) registered mail, return receipt requested, with all costs of delivery or transmission prepaid and shall be deemed given when actually received. Copies of all such notices shall be sent by email to the email addresses listed in the introductory paragraphs.

C.  SEVERABILITY

In the event any term or provision hereof is in violation of, or prohibited by the law of the State of California, such term or provision shall be deemed to be amended or deleted to conform to such law or regulation without invalidating or amending or deleting any other term of this agreement.

D.  WAIVER

The failure or omission by either party to insist upon or enforce any of the terms of this agreement shall not be deemed a waiver of such term unless the waiver is in writing by the party against whom the waiver is sought to be enforced. Waiver of one term will not be deemed a waiver of any other term. Waiver of a term on one occasion shall not be deemed a waiver of the same term at any other time.

E.  GOVERNING LAW AND DISPUTE RESOLUTION

Execution Copy

This agreement shall at all times be interpreted pursuant to California law.

Any dispute regarding the terms and operation of this agreement, and any controversy or claim arising from of this agreement, shall first be submitted to mediation in the City and County of Sacramento by a mutually agreeable mediator. All settlements are deemed to have been taken place pursuant to California Code of Civil Procedure section 664.6. The prevailing party in any action to enforce any such settlement shall be entitled to reasonable attorney fees and costs of enforcement.

In the event mediation does not resolve the claim or controversy, the parties will submit the matter to binding arbitration in the City and County of Sacramento, by a mutually-agreeable arbitrator, or in the event agreement cannot be reached, then to an arbitrator appointed by the Superior Court in and for the County of Sacramento. Attendant to such a proceeding, the parties shall enjoy rights of discovery per the California Code of Civil Procedure.

The arbitration proceedings shall take place pursuant to Comprehensive Rules and Procedures of JAMS or its successor then in effect, and judgment upon the award rendered by the arbitrator may be entered in any court of competent jurisdiction. The decision of the arbitrator shall be final and binding on the parties. The arbitrators are not empowered to award damages in excess of compensatory damages, but shall include in the final award an allocation of attorneys' fees, costs and expenses incurred in the arbitration to the prevailing party, whether or not such fees, costs and expenses would otherwise be recoverable under applicable statutes and rules of court.

The arbitrator shall render the award in writing, explaining the factual and legal basis for decision as to each of the principal controverted issues. The parties and each of them expressly agree that any petition to confirm, modify or enforce the arbitral award, shall be resolved in the Sacramento County Superior Court to which jurisdiction the parties hereby submit.

F.  CONFIDENTIALITY/PROTECTION OF INFORMATION EXCHANGED

Renwood and Deutsch agree that each needs accurate and timely information from the other on a regular basis to satisfy their obligations under this agreement. Each will protect and safeguard received from the other will not share it with any person or entity outside of Renwood's or Deutsch's organization unless prior written consent of all parties is obtained, disclosure is compelled by authorities or disclosure is necessary to enforce the terms of this Agreement. Both parties acknowledge that information received from the other would be useful to competitors, and if furnished to such competitors, would cause irreparable harm to the Parties in the marketplace.

G. NATURE OF AGREEMENT

The Parties acknowledge that they are dealing as independent contractors only. Neither party is granted any right or authority to act or hold itself out as the legal agent of

Execution Copy

the other, or to assume or create any obligations or responsibilities, express or implied, on behalf of or in the name of the other or any person or entity affiliated with the other or to bind the other in any manner whatsoever except as may otherwise be expressly agreed upon by the parties in writing for purposes of compliance with applicable state or federal laws or requirements.

## H.  ENTIRE AGREEMENT

This Agreement shall constitute the entire understanding by and between the parties as to the subject matter hereof, replacing and superseding all previous agreements and understandings between the parties hereto or their predecessors concerning such subject matter.  No modification of this Agreement shall be effective unless set forth in writing and signed by both parties.  All notices required by this Agreement shall be in writing and shall be deemed given on the date of delivery.

## I.  BINDING AGREEMENT AND EXECUTION IN COUNTERPARTS

This Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and assigns, provided that it may not be assigned by either party without the prior written consent of the other.  This Agreement may be executed in counterparts, and if so executed, shall be fully effective and enforceable in accordance with its terms.

Date: March 17, 06

Robert I. Smerling
Chairman and Chief Executive
Officer
Renwood Group, Inc

Date: _____

William Deutsch
Chairman
W.J. Deutsch & Sons, Ltd.

Date: _____

Peter Deutsch
President
W.J. Deutsch & Sons, Ltd.

Execution Copy

## SCHEDULE A

TRANSITION PERIOD SALES STANDARDS

(Attached)

## SCHEDULE B
MARKETING CONTRIBUTION
(Applies to Sales through June 30, 2011)

SIERRA SERIES/RED LABEL ZINFANDEL AND SYRAH –

$11 PER CASE DISTRIBUTOR ALLOWANCE

SIERRA SERIES/SELECT SERIES/RED LABEL (other):

$5 PER CASE DISTRIBUTOR ALLOWANCE

OLD VINE ZINFANDEL:

$20 PER CASE DISTRIBUTOR ALLOWANCE

FIDDLETOWN ZINFANDEL:

$20 PER CASE DISTRIBUTOR ALLOWANCE

## SCHEDULE C

FIVE-YEAR TIER SALES STANDARDS
(Attached, to reflect 15% increase over prior year's sales, compounded)

MAR. 19. 2006⌐12:27PM⊏⌐ W. J. DEUTSCH 914-251-0283          03/19/06 09:40A P.02
                                                              1:08:50  NO. 954 2006 P. 3   2/2

MAR. 17. 2006  2:54PM    W. J. DEUTSCH 914-251-0283              NO. 944    P. 21
Execution Copy

counterparts, and if so executed, shall be fully effective and enforceable in accordance with its terms.

Date: _____

Robert I. Smerling
Chairman and Chief Executive
Officer
Rexwood Group, Inc.

Date: _____

William Deutsch
Chairman
W.J. Deutsch & Sons, Ltd.

Date: __3/17/06__

Peter Deutsch
President
W.J. Deutsch & Sons, Ltd.

## SCHEDULE A

### TRANSITION PERIOD SALES STANDARDS

(Attached)

## SCHEDULE B
### MARKETING CONTRIBUTION
(Applies to Depletions through June 30, 2011)

SIERRA SERIES/RED LABEL ZINFANDEL AND SYRAH –

$11 PER CASE DISTRIBUTOR ALLOWANCE

SIERRA SERIES/SELECT SERIES/RED LABEL (other):

VERSION RW1-5                    20

MAR. 19. 2008 12:26PM    W. J. DEUTSCH 914-251-0785    03/19/06 P⁻:40A  P. ⁻01
NO. 954    P. 2

Execution Copy

counterparts, and if so executed, shall be fully effective and enforceable in accordance with its terms.

Date: _____

_____
Robert I. Smerling
Chairman and Chief Executive Officer
Renwood Group, Inc

Date: _8/17/0̸2_

_____
William Deutsch
Chairman
W.J. Deutsch & Sons, Ltd.

Date: _____

_____
Peter Deutsch
President
W.J. Deutsch & Sons, Ltd.

## SCHEDULE A

TRANSITION PERIOD SALES STANDARDS

(Attached)

## SCHEDULE B
MARKETING CONTRIBUTION
(Applies to Depletions through June 30, 2011)

SIERRA SERIES/RED LABEL ZINFANDEL AND SYRAH –

$11 PER CASE DISTRIBUTOR ALLOWANCE

SIERRA SERIES/SELECT SERIES/RED LABEL (other):

VERSION RW1-5                    20

Sales & Cases April / May / June 2005 b, roduct and Family (9L Equivalent)     Schedule .

| Product | | June 2005 Cases | June 2005 Sales | May 2005 Cases | May 2005 Sales | April 2005 Cases | April 2005 Sales |
|---|---|---|---|---|---|---|---|
| 1 | Grandmere | 30.0 | $4,500 | 67.5 | $10,125 | 48.5 | $7,275 |
| 2 | Grandpere | 92.5 | $17,760 | 111.0 | $21,312 | 62.0 | $11,904 |
| | Total Proprietary | 122.5 | $22,260 | 178.5 | $31,437 | 110.5 | $19,179 |
| 3 | Select Pinot Grigio | - | ($163) | - | $0 | - | $0 |
| 4 | Select Syrah Rose | 413.0 | $25,508 | 404.0 | $22,624 | 72.0 | $4,032 |
| 5 | Select Viognier | 352.0 | $25,344 | 697.0 | $50,184 | 246.0 | $17,712 |
| 6 | Sierra Barbera | 600.0 | $43,240 | 739.0 | $53,216 | 394.0 | $28,368 |
| 7 | Sierra Syrah | 656.0 | $43,496 | 496.0 | $35,712 | 318.0 | $22,896 |
| 8 | Sierra Zinfandel | 2,584.0 | $186,048 | 2,728.0 | $196,416 | 2,019.0 | $145,368 |
| | Total Sierra / Select | 4,605.0 | $323,474 | 5,064.0 | $358,152 | 3,049.0 | $218,376 |
| 9 | Amador Barbera | 60.0 | $7,200 | 112.0 | $13,440 | 52.0 | $6,240 |
| 10 | Amador Barbera 375 | 11.5 | $1,388 | 1.5 | $180 | 2.0 | $240 |
| 11 | Amador Sangiovese | 3.0 | $360 | 5.0 | $600 | - | $0 |
| 12 | Amador Syrah | 19.5 | $2,925 | 12.5 | $1,875 | 22.0 | $3,300 |
| 13 | Amador Viognier | 21.0 | $3,150 | 18.0 | $2,700 | - | $0 |
| 14 | D'Agostini Bras. | - | $0 | 17.0 | $3,060 | - | $0 |
| 15 | Fiddletown | 438.0 | $65,700 | 1,340.0 * | $201,000 | 49.0 | $7,350 |
| 16 | Fiddletown 375 | 40.5 | $6,075 | 2.5 | $375 | - | $0 |
| 17 | Jack Rabbit Flat | 80.0 | $14,400 | 51.0 | $9,180 | 23.0 | $4,140 |
| 18 | Old VIne | 2,583.7 | $314,160 | 1,931.3 | $235,020 | 1,154.0 | $140,172 |
| 19 | Old Vine 375 | 27.5 | $3,300 | 63.5 | $7,620 | 39.0 | $4,680 |
| | Total Amador County | 3,284.7 | $418,658 | 3,554.3 * | $475,050 | 1,341.0 | $166,122 |
| 20 | Ice Wine | 105.5 | $37,980 | - | $0 | - | $0 |
| 21 | Muscat | 27.0 | $5,256 | 57.5 | $11,040 | 18.0 | $3,456 |
| 22 | Port | 3.0 | $270 | 23.0 | $2,070 | 17.0 | $1,530 |
| | Total Dessert | 135.5 | $43,506 | 80.5 | $13,110 | 35.0 | $4,986 |
| | Grand Total | 8,147.7 | $807,898 | 8,877.3 * | $877,749 | 4,535.5 | $408,663 |

* Includes BevMo sale of 1,100 cases. WJDeutsch will receive a credit of 1,100 Fiddletown Zinfandel cases against

Transition Period Standards if it does not receive a comparable order from BevMo

Sales & Cases Jul 2005 to June 2006 i    roduct and Tier (9L Equivalent)    **Schedule C**

| Product | Jul-05 | | Aug-05 | | Sep-05 | | Oct-05 | | Nov-05 | | Dec-05 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cases | Dollars | Cases | Dollars | Cases | Dollars | Cases | Dollars | Cases | Dollars | Cases | Dollars |
| 1 Grandmere | 35.0 | $5,250 | 33.5 | $5,025 | 54.5 | $8,175 | 35.5 | $5,325 | 32.0 | $4,800 | 55.5 | $8,325 |
| 2 Grandpere | 31.5 | $6,048 | 45.0 | $8,640 | 34.8 | $6,734 | 112.5 | $21,600 | 40.0 | $7,680 | 63.5 | $12,000 |
| Total Proprietary | 66.5 | $11,298 | 78.5 | $13,665 | 89.3 | $14,909 | 148.0 | $26,925 | 72.0 | $12,480 | 119.0 | $20,325 |
| 3 Select Pinot Grigio | 653.0 | $47,016 | 335.0 | $23,986 | 216.0 | $15,433 | 452.0 | $32,544 | 177.0 | $12,744 | 95.0 | $6,840 |
| 4 Select Syrah Rose | 242.0 | $17,424 | 128.0 | $8,992 | 108.0 | $7,776 | 47.0 | $3,384 | 74.0 | $5,328 | 36.0 | $2,520 |
| 5 Select Viognier | 232.0 | $16,704 | 365.0 | $26,280 | 396.0 | $28,512 | 513.0 | $36,936 | 250.0 | $18,000 | 307.0 | $21,888 |
| 6 Sierra Barbera | 252.0 | $18,144 | 185.0 | $13,297 | 477.0 | $34,593 | 687.0 | $49,464 | 478.0 | $34,416 | 321.0 | $23,112 |
| 7 Sierra Syrah | 186.0 | $13,392 | 188.0 | $17,249 | 436.0 | $31,392 | 508.0 | $36,576 | 611.0 | $43,992 | 519.0 | $37,296 |
| 8 Sierra Zinfandel | 1,126.0 | $81,072 | 885.0 | $63,674 | 1,986.0 | $142,992 | 3,170.0 | $228,240 | 2,989.0 | $215,208 | 1,973.0 | $142,004 |
| Total Sierra / Select | 2,691.0 | $193,752 | 2,086.0 | $153,478 | 3,619.0 | $260,698 | 5,377.0 | $387,144 | 4,579.0 | $329,688 | 3,251.0 | $233,660 |
| 9 Amador Barbera | 42.0 | $5,040 | 106.0 | $12,720 | 46.0 | $5,184 | 155.0 | $18,600 | 75.0 | $9,000 | 54.0 | $6,360 |
| 10 Amador Barbera 375 | - | $0 | 5.5 | $660 | 1.0 | $120 | - | $0 | - | $0 | 2.0 | $240 |
| 11 Amador Sangiovese | - | $0 | - | $0 | - | $0 | - | $0 | - | $0 | - | $0 |
| 12 Amador Syrah | 4.0 | $600 | 8.5 | $1,275 | 2.5 | $375 | 33.5 | $5,025 | 2.5 | $375 | 2.5 | $375 |
| 13 Amador Viognier | 13.0 | $1,950 | - | $0 | 7.0 | $1,050 | 1.0 | $150 | - | $0 | 9.0 | $1,350 |
| 14 D'Agostini Bros. | - | $0 | 13.0 | $2,340 | - | $0 | 112.0 | $20,160 | - | $0 | - | $0 |
| 15 Fiddletown | 17.0 | $2,550 | 1,090.0 | $163,500 | 287.0 | $43,050 | 1,717.0 | $183,600 | 42.0 | $6,327 | 58.0 | $8,700 |
| 16 Fiddletown 375 | 4.5 | $675 | 3.5 | $525 | 6.0 | $900 | 29.0 | $4,350 | - | $0 | - | $0 |
| 17 Jack Rabbit Flat | 7.5 | $1,364 | 58.5 | $10,724 | 61.0 | $11,224 | 65.5 | $12,052 | 32.0 | $5,888 | 33.0 | $6,072 |
| 18 Old Vine | 540.3 | $67,920 | 1,045.7 | $125,512 | 1,139.7 | $139,560 | 2,070.7 | $251,340 | 2,418.7 | $292,260 | 1,425.0 | $173,700 |
| 19 Old Vine 375 | 13.0 | $1,560 | 35.5 | $4,260 | 15.0 | $1,800 | 80.0 | $9,600 | 32.5 | $3,900 | 19.0 | $2,280 |
| Total Amador County | 641.3 | $81,659 | 2,366.2 | $321,516 | 1,565.2 | $203,263 | 4,263.7 | $504,877 | 2,602.7 | $317,750 | 1,602.5 | $199,077 |
| 20 Ice Wine | 23.5 | $8,460 | 87.5 | $31,500 | 47.5 | $17,100 | 97.5 | $35,100 | 64.0 | $23,040 | 17.5 | $5,939 |
| 21 Muscat | 41.3 | $7,920 | 34.5 | $6,624 | - | $0 | - | $0 | 2.5 | $480 | 5.0 | $960 |
| 22 Port | 17.0 | $1,530 | 11.0 | $1,002 | 5.0 | $450 | 14.0 | $1,260 | 43.0 | $3,870 | 24.0 | $2,160 |
| Total Dessert | 81.8 | $17,910 | 133.0 | $39,126 | 52.5 | $17,550 | 111.5 | $36,360 | 109.5 | $27,390 | 46.5 | $9,059 |
| Totals | 3,480.6 | $304,619 | 4,663.7 | $527,785 | 5,326.0 | $496,420 | 9,900.2 | $955,306 | 7,363.2 | $687,308 | 5,019.0 | $462,121 |

**Sales Growth**
**Standards By Year**

| | Cases | Dollars | Cases | Dollars | Cases | Dollars | Cases | Dollars | Cases | Dollars | Cases | Dollars |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year Ended June 2007 | 4,003.0 | $350,312 | 5,363.0 | $606,953 | 6,125.0 | $570,883 | 11,385.0 | $1,098,602 | 8,468.0 | $790,404 | 5,772.0 | $531,439 |
| Year Ended June 2008 | 4,603.0 | $402,859 | 6,167.0 | $697,996 | 7,044.0 | $656,515 | 13,093.0 | $1,263,392 | 9,738.0 | $908,965 | 6,638.0 | $611,155 |
| Year Ended June 2009 | 5,293.0 | $463,288 | 7,092.0 | $802,695 | 8,101.0 | $754,992 | 15,057.0 | $1,452,901 | 11,199.0 | $1,045,310 | 7,634.0 | $702,828 |
| Year Ended June 2010 | 6,087.0 | $532,781 | 8,156.0 | $923,099 | 9,316.0 | $868,241 | 17,316.0 | $1,670,836 | 12,879.0 | $1,202,107 | 8,779.0 | $808,252 |
| Year Ended June 2011 | 7,000.0 | $612,698 | 9,379.0 | $1,061,564 | 10,713.0 | $998,477 | 19,913.0 | $1,921,461 | 14,811.0 | $1,382,423 | 10,096.0 | $929,490 |

Note: Standards are calculated at 15% increase year over year. For simplicity sake only monthly totals are shown on the schedule, but it is implicit that the Standards are applied product by product and tier by tier

Sales & Cases Jul 2005 to June 200_ _y Product and Tier (9L Equivalent)    **Schedule C**

** Note that March to June numbers are for 2005

| Product | Jan-06 | | Feb-06 | | Mar-05 ** | | Apr-05 ** | | May-05 ** | | Jun-05 ** | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cases | Dollars | Cases | Dollars | Cases | Dollars | Cases | Dollars | Cases | Dollars | Cases | Dollars | Cases | Dollars |
| 1 Grandmere | 50.5 | $8,214 | 30.5 | $5,124 | 19.0 | $2,850 | 48.5 | $7,275 | 67.5 | $10,125 | 30.0 | $4,500 | 492.0 | $74,988 |
| 2 Grandpere | 71.5 | $14,528 | 23.5 | $6,344 | 196.0 | $37,632 | 62.0 | $11,904 | 111.0 | $21,312 | 92.5 | $17,760 | 883.8 | $172,182 |
| Total Proprietary | 122.0 | $22,742 | 54.0 | $11,468 | 215.0 | $40,482 | 110.5 | $19,179 | 178.5 | $31,437 | 122.5 | $22,260 | 1,375.8 | $247,170 |
| 3 Select Pinot Grigio | 387.0 | $27,864 | 138.0 | $11,952 | - | $0 | - | $0 | - | $0 | - | ($163) | 2,453.0 | $178,217 |
| 4 Select Syrah Rose | 21.0 | $1,512 | 39.0 | $2,916 | 114.0 | $6,496 | 72.0 | $4,032 | 404.0 | $22,624 | 413.0 | $25,508 | 1,699.0 | $107,612 |
| 5 Select Viognier | 165.0 | $11,880 | 313.0 | $21,024 | 515.0 | $37,080 | 246.0 | $17,712 | 697.0 | $50,184 | 352.0 | $25,344 | 4,351.0 | $311,544 |
| 6 Sierra Barbera | 336.0 | $24,192 | 303.0 | $22,608 | 685.0 | $49,320 | 394.0 | $28,368 | 739.0 | $53,216 | 600.0 | $43,240 | 5,457.0 | $393,970 |
| 7 Sierra Syrah | 374.0 | $26,928 | 501.0 | $37,080 | 702.0 | $50,544 | 318.0 | $22,896 | 496.0 | $35,712 | 656.0 | $43,496 | 5,495.0 | $396,553 |
| 8 Sierra Zinfandel | 1,996.0 | $143,712 | 2,060.0 | $145,296 | 1,964.0 | $141,408 | 2,019.0 | $145,368 | 2,728.0 | $196,416 | 2,584.0 | $186,048 | 25,480.0 | $1,831,438 |
| Total Sierra / Select | 3,279.0 | $236,088 | 3,353.0 | $239,976 | 3,982.0 | $284,848 | 3,049.0 | $218,376 | 5,064.0 | $358,152 | 4,605.0 | $323,474 | 44,935.0 | $3,219,334 |
| 9 Amador Barbera | 96.0 | $11,520 | 44.0 | $5,280 | 85.0 | $10,200 | 52.0 | $6,234 | 112.0 | $13,440 | 60.0 | $7,200 | 792.0 | $110,784 |
| 10 Amador Barbera 375 | 6.0 | $720 | 5.0 | $600 | | | 2.0 | $240 | 1.5 | $180 | 11.5 | $1,388 | 34.5 | $4,148 |
| 11 Amador Sangiovese | - | $0 | - | $0 | 7.0 | $840 | - | $0 | 5.0 | $600 | 3.0 | $360 | 15.0 | $1,800 |
| 12 Amador Syrah | 14.0 | $2,100 | 1.5 | $225 | 20.0 | $3,000 | 22.0 | $3,300 | 12.5 | $1,875 | 19.5 | $2,925 | 143.0 | $21,450 |
| 13 Amador Viognier | 14.0 | $2,100 | 32.0 | $600 | 4.0 | $600 | - | $0 | 18.0 | $2,700 | 21.0 | $3,150 | 119.0 | $13,650 |
| 14 D'Agostini Bros | - | $0 | - | $0 | | | - | $0 | 17.0 | $3,060 | - | $0 | 142.0 | $29,560 |
| 15 Fiddletown | 331.0 | $49,650 | 108.0 | $17,250 | 319.0 | $47,850 | 49.0 | $7,350 | 1,340.0 | $201,000 | 438.0 | $65,700 | 5,796.0 | $796,527 |
| 16 Fiddletown 375 | 3.0 | $450 | 2.0 | $300 | 10.5 | $1,575 | - | $0 | 2.5 | $375 | 40.5 | $6,075 | 101.5 | $15,225 |
| 17 Jack Rabbit Flat | 36.5 | $6,716 | 22.5 | $5,244 | 87.0 | $15,660 | 23.0 | $4,140 | 51.0 | $9,180 | 80.0 | $14,400 | 557.5 | $102,664 |
| 18 Old Vine | 1,817.0 | $218,980 | 1,399.7 | $168,840 | 1,622.0 | $194,640 | 1,154.0 | $140,172 | 1,931.3 | $235,020 | 2,583.7 | $314,160 | 19,147.8 | $2,322,104 |
| 19 Old Vine 375 | 29.0 | $3,480 | 41.0 | $4,980 | 40.0 | $4,800 | 39.0 | $4,680 | 63.5 | $7,620 | 27.5 | $3,300 | 435.0 | $52,260 |
| Total Amador County | 2,346.5 | $295,716 | 1,655.7 | $203,319 | 2,194.5 | $279,165 | 1,341.0 | $166,122 | 3,554.3 | $475,050 | 3,284.7 | $418,658 | 27,418.3 | $3,466,172 |
| 20 Ice Wine | 10.5 | $3,780 | 3.0 | $1,080 | 16.0 | $5,760 | - | $0 | - | $0 | 105.5 | $37,980 | 472.5 | $169,739 |
| 21 Muscat | 29.0 | $5,568 | 28.5 | $6,336 | 45.5 | $8,736 | 18.0 | $3,456 | 57.5 | $11,040 | 27.0 | $5,256 | 288.8 | $56,376 |
| 22 Port | 23.0 | $2,070 | 16.0 | $1,440 | 40.5 | $3,672 | 17.0 | $1,530 | 23.0 | $2,070 | 3.0 | $270 | 236.5 | $21,324 |
| Total Dessert | 62.5 | $11,418 | 47.5 | $8,856 | 102.0 | $18,168 | 35.0 | $4,986 | 80.5 | $13,110 | 135.5 | $43,506 | 997.8 | $247,439 |
| Totals | 5,810.0 | $565,964 | 5,110.2 | $463,619 | 6,493.5 | $622,663 | 4,535.5 | $408,663 | 8,877.3 | $877,749 | 8,147.7 | $807,898 | 74,726.9 | $7,180,115 |

**Sales Growth**

**Standards By Year**

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year Ended June 2007 | 6,682.0 | $650,859 | 5,877.0 | $533,162 | 7,468.0 | $716,062 | 5,216.0 | $469,962 | 10,209.0 | $1,009,411 | 9,370.0 | $929,082 | 85,938.0 | $8,257,131 |
| Year Ended June 2008 | 7,684.0 | $748,488 | 6,759.0 | $613,136 | 8,588.0 | $823,471 | 5,998.0 | $540,456 | 11,740.0 | $1,160,823 | 10,776.0 | $1,068,444 | 98,828.0 | $9,495,700 |
| Year Ended June 2009 | 8,837.0 | $860,761 | 7,773.0 | $705,106 | 9,876.0 | $946,992 | 6,898.0 | $621,524 | 13,501.0 | $1,334,946 | 12,392.0 | $1,228,711 | 113,653.0 | $10,920,054 |
| Year Ended June 2010 | 10,163.0 | $989,875 | 8,939.0 | $810,872 | 11,357.0 | $1,089,041 | 7,933.0 | $714,753 | 15,526.0 | $1,535,188 | 14,251.0 | $1,413,018 | 130,702.0 | $12,558,063 |
| Year Ended June 2011 | 11,687.0 | $1,138,356 | 10,280.0 | $932,503 | 13,061.0 | $1,252,397 | 9,123.0 | $821,966 | 17,855.0 | $1,765,466 | 16,389.0 | $1,624,971 | 150,307.0 | $14,441,772 |

Note:   Standards are calculated at 15% increase year over year. For simplicity sake only monthly totals are
shown on the schedule, but it is implicit that the Standards are applied product by product and tier by tier

**EXHIBIT B**

1  Whitney A. Davis, SBN 149523
   CHARTER DAVIS, LLP
2  1730 I Street, Suite 240
   Sacramento, California 95814
3  Telephone: 916.448.9000

4  Attorneys for Petitioner Renwood Winery, Inc.

5

6                          JUDICIAL ARBITRATION

7                        AND MEDIATION SERVICE

8

9  RENWOOD WINERY, INC                  Case No. 1130003656

10            Petitioner,               DEMAND FOR ARBITRATION

11       v.

12  W.J. DEUTSCH & SONS, LTD.,

13            Respondent.

14

15

16

17                              I.

18                   GENERAL ALLEGATIONS

19       1.     Renwood Winery, Inc., (hereinafter "Renwood") owns and operates a winery

20  located in Amador County, California.  Renwood has produced several varieties of award-

21  winning premium wines for more than a decade. In 2005, Renwood's in-house sales and

22  marketing staff sold approximately 100,000 cases of wine domestically.  Although, Renwood is

23  a small winery by industry standards, it controls many of the old vine Zinfandel grapes in

24  California, and dominates the Premium Zinfandel wine categories.  The hand-crafted wines are

25  produced in small lots, which distinguishes the brand from other producers.  For this reason,

26  Renwood received overtures from wine marketing and sales firms wishing to represent the

27  winery and thereby add a premium producer to their product line.

28

                                     1

2.    In like fashion, in the Spring of 2006, industry-leading wine marketeer W.J. Deutsch & Sons, Ltd. ("Deutsch"), approached Renwood and proposed that Deutsch obtain the exclusive right to sell Renwood products domestically, thereby obviating the need for Renwood to employ its own sales force.  Deutsch cited its great success with other major brands, as achieved through its 120 person sales force, and promised to provide Renwood with greatly increased sales and positive exposure for this premium brand.  Deutsch wanted to take this already-successful brand to unprecedented on-premise and off-premise sales levels through Deutsch's distribution channels. [1]

3.    Deutsch reported to Renwood that it had taken an obscure winery in Australia (Yellow Tail) from 200,000 cases per year in sales to almost 8 million cases per year in 5 years. According to Deutsch, this achievement was unprecedented in the wine industry, and provided Deutsch with the credibility and marketing leverage to place Renwood's premium products on more wine lists and selling establishments than ever before.  Renwood selected Deutsch in light of its success with Yellow Tail, its industry expertise, its reportedly formidable marketing and sales staff, its extensive and well-established distributor network, and its proven ability to leverage its market strength and contacts to place Renwood wine in diverse distribution channels throughout the country.

4.    Renwood's pre-contract distributor network took more than a decade to build. Renwood's coveted "by-the-glass" marketing efforts likewise took years to become effective. Because of this, Renwood was concerned about the risks posed by transferring sales, marketing and distribution duties to salesmen and distributors unfamiliar with the brand.  Renwood made this concern explicit in the Services Agreement with Deutsch: *"Renwood abandoned its distributor network on the representation by Deutsch that Deutsch will exert its portfolio brand*

---

[1] "On-Premise" sales are those made predominantly to restaurants, where the wine is consumed on the premises.  Increases in these sales are primarily achieved through placement of products into restaurants to be sold "by the glass," and by convincing the establishment to place more of the product line on their wine list.  "Off-Premise" sales are those made to liquor stores, grocery stores, etc., where the customer purchases the bottles of wine and consumes them elsewhere, or "off-premise."

2

1 | *control to ensure priority distributor effort to meet or exceed Renwood Tier Sales Standards."*

2 | *See* Agreement at V.B(i).

3 |      5.     In addition to Deutsch's "priority distributor effort" promise, the parties agreed

4 | in writing that Deutsch would perform very defined marketing tasks and use its best efforts to

5 | promote, market, and distribute Renwood's wines "in a manner in keeping with Renwood's

6 | reputation in the marketplace." *Id.* at VIII.A.  This provision, along with the tier-specific

7 | performance goals set by the parties, reflected the requirement that Deutsch "enhance" the

8 | distinctive and high-quality Renwood brand. *Id.* at X.A.

9 |      6.     Renwood reposed trust and confidence in Deutsch by granting to Deutsch the

10 | exclusive right to perform the business-critical tasks of protecting, promoting, and enhancing

11 | the Renwood brand.

12 |      7.     The parties expressly eliminated Renwood's risk of loss by including a sales

13 | guarantee in the Services Agreement. *Id.* at VIII.D.  A monthly performance standard was

14 | established for the four "tiers" of wine that Renwood produced.  *Id.* at Schedule C.  Deutsch

15 | guaranteed 15% year-over-year growth in monthly sales for a period of five years. If Deutsch's

16 | sales did not meet the standard, it promised to "cure" by purchasing the deficit from Renwood,

17 | by tier. *Id.*

18 |      8.     The parties executed the Services Agreement in March, 2006.  Deutsch took over

19 | the marketing, selling, and distribution of Renwood's wines in April of 2006, and took credit for

20 | a 1,100 case sale booked in March. Since that time, with only one exception, Deutsch failed to

21 | achieve the required tier sales performance in any of the subsequent months.  In fact, Deutsch's

22 | sales have fallen short by many thousands of cases. Months after the transition to Deutsch, some

23 | distributors had not even received introductory sales meeting from Deutsch, forcing Renwood to

24 | conduct these meetings at its own expense.

25 |      9.     Due to these lost sales, Renwood suffered a loss in shareholder value; a loss in its

26 | ratings and a loss of brand awareness and recognition in the marketplace. Deutsch's failure to

27 | meet the performance standards is the consequence of Deutsch ignoring many of the marketing

28 | obligations it agreed to perform. Making matters worse, some of the marketing efforts that

1   Deutsch managed to exert served to actually harm Renwood's reputation. In this regard,

2   Renwood's damages greatly exceed the monetary amount of the untimely cure payments

3   Deutsch made to Renwood.

4        10.    Prior to the execution of the Services Agreement, Deutsch requested and was

5   provided Renwood's financial statements. Deutsch hired a financial analyst to scrutinize the

6   cash flow, operating debt, and other detailed financial information. This information clearly

7   illustrated this small winery's monthly dependence on cash flow from wine sales.

8        11.    Deutsch drafted the first iteration of the Services Agreement, employed a wine

9   and spirits expert attorney to revise the later drafts, and was the party most experienced in the

10  drafting and performance of marketing and distribution agreements for wine.

11       12.    The resulting Services Agreement clearly states that Renwood's transmittal of a

12  Notice of Breach of the tier sales standards starts a 15-day period in which Deutsch must cure

13  the breach. There is no provision in the Services Agreement that in any manner limits

14  Renwood's breach notice to only an annual basis.

15       13.    Due to Deutsch's dismal sales performance, the time for Deutsch to cure came

16  quickly. The first cure demand was met with arguments about the base-year sales upon which

17  the guarantee was based. Then, the cure payments were delayed beyond the 15-day period

18  because Deutsch contended that a 35-day period applied after presentment of the cure invoice.

19  In a particularly malicious act, Deutsch then cured a disastrous month's sales performance by

20  purchasing wine not by tier, but by buying only one or two products. They did so because

21  Deutsch receives a significant marketing contribution from Renwood for the sales of some

22  wines, and no contribution from others. Deutsch cured by buying wines with the greatest

23  marketing contribution, while the other products (affording no contribution) were left to remain

24  in Renwood's inventory. The result of this tactic was to throw Renwood's vintage of the over-

25  bought product gravely out of balance, portending the exhaustion of the supply before the new

26  vintage becomes available.    To add insult to injury, Deutsch was not using the marketing

27  contributions at the distributor level to support the case price. Instead, and in contravention of

28  the terms of the Services Agreement, Deutsch banked the marketing contributions until they

1   decided to spend inordinately large sums of money on unauthorized and ill-conceived

2   promotions and use some of Renwood's marketing money to offset expenses for the Yellow

3   Tail advertising agency. While Deutsch earned interest on the banked marketing contributions,

4   sales support evaporated at the distributor level and sales plummeted. Deutsch's continuing

5   breach of the cure provisions, mishandling of the marketing contributions and degradation of the

6   brand constituted a malicious attempt to undermine Renwood's business and make Renwood

7   vulnerable to a distress sale.

8       All of the foregoing and following facts and allegations are incorporated in each of the

9   cross-claims asserted herein.

10                                  **II.**

11                      **FIRST CAUSE OF ACTION**

12                          **Breach of Contract**

13      14.     In reliance on Deutsch's representations, oral and written promises, and its

14   expertise and stature in the industry, Renwood reposed special trust and confidence in Deutsch.

15   By agreeing to serve, and by serving, as Renwood's exclusive marketer and distributor of

16   Renwood's wines, Deutsch accepted the burden of those critical responsibilities and accepted

17   control over the future sales of Renwood's wines.

18      15.     When accepting that control, Deutsch knew that Renwood would abandon its

19   distributor network in favor of Deutsch's network. Deutsch also knew that re-aggregating

20   Renwood's distributor network once disbanded was, if not impossible due to marketplace

21   realities, prohibitively costly for Renwood.

22      16.     Deutsch also knew that its marketing of the Renwood brand would be the sole

23   means to maintain and enhance Renwood's brand identity and awareness among consumers and

24   that, as Renwood's exclusive marketer, its marketing services were critical to the success of

25   Renwood's business.

26      17.     Since April of 2006, Deutsch has been, and has held itself out as, Renwood's

27   exclusive agent with regard to marketing, selling, and distributing Renwood's wine in

28   communications and relations with beverage distributors, retailers, and the beverage industry as

1    a whole.

2    18.    Deutsch breached its contractual obligations to Renwood by its acts as described

3    herein, including, but not limited to, the subjects of the Notices of Breach attached hereto and

4    incorporated by this reference, as well as: (1) WJD's false statement to beverage distributors

5    that Deutsch purchased Renwood, (2) WJD's failure to use its best efforts to market Renwood's

6    wine, (3) WJD's failure to seek Renwood's input into the manner of marketing its various

7    wines, (4) WJD's failure to timely and accurately make its cure payments, (5) WJD submitting

8    fraudulent marketing contribution claims, (6) WJD lying about the source of wine depletions to

9    improper charge marketing allowances, (7) WJD selling its own cure inventory before it has met

10    the Sales Performance Standards, and (8) WJD failing to meet the Sales Performance standards.

11

12    19.    Deutsch's promise "to ensure priority distributor effort to meet or exceed

13    Renwood Tier Sales Standards," requires Deutsch to perform numerous, specific tasks. Deutsch

14    has failed to perform many of those tasks and failed to perform others as they are described in

15    the Agreement or to use its best efforts to perform those tasks. Renwood has fully performed all

16    of the obligations it is required to under the Agreement.

17    20.    Deutsch breached the Agreement by failing to use its best efforts to promote,

18    enhance, and sell Renwood's wines. Deutsch further breached the Services Agreement by

19    failing to properly and timely cure the sales guarantee deficits.

20    21.    Deutsch further breached the Agreement by failing, at least; (9) to assign a

21    competent brand manager to oversee the marketing and distribution of Renwood's wines, (10)

22    to seek and gain Renwood's prior-approval of that brand manager, (11) to timely replace that

23    brand manager, (12) to inform and educate Deutsch's distributors and retail purchasers about

24    Renwood's wines, (13) to coordinate sales meetings and ride-alongs with Deutsch's distributors,

25    (14) to consult with Renwood regarding the appropriate marketing of Renwood's various types

26    of wines, (15) to use Renwood's marketing contribution solely to promote, enhance, and sell

27    Renwood's wines, (16) to market Renwood's wines in States where Renwood had established

28    consumer recognition, (17) by mismanaging Renwood's promotions, (18) by disrupting

1  Renwood's high quality, premium wine business with Costco, (19) by deploying the "Find the

2  Wren" marketing campaign without prior approval from Renwood, and (20) by failing to ensure

3  that depletions of Renwood's wines did not fall below 80% of the tier-specific performance

4  standards.

5       22.    Deutsch further breached the Agreement by failing to, at least: (21) provide

6  Renwood with marketing reports, specifically, with "contact reports, order reports, marketing

7  contribution usage reports and shipment summary reports" within 30 days of the end of each

8  month, and (22) to provide Renwood with sales reports, specifically, with "sales, depletion,

9  inventory and accounts sold reports" by the 20th day following the month for which the

10  categories were measured.

11       23.    Deutsch further breached the Agreement by failing to, at least: (23) distinguish

12  for accounting purposes between its sales of wine from the inventory purchased from Renwood

13  to cure the failure to meet the performance standards from the wine Deutsch was obligated to

14  sell to meet those performance standards; and (24) to timely order from Renwood, and to timely

15  pay Renwood, for the amount of wine Deutsch was obligated to purchase to cure its failure to

16  meet the performance standards.

17       24.    As a direct result of these of the Agreement by Deutsch, Renwood has suffered

18  damage to its business and to its Renwood brand in a monetary amount significantly greater

19  than the amount Deutsch has paid to Renwood in cure payments.

20

21  **SECOND CAUSE OF ACTION**

22  **Breach of the Covenant of Good Faith and Fair Dealing**

23       25.    By its conduct as described herein, Deutsch has breached the covenant of good

24  faith and fair dealing inherent in the parties' Agreement.

25       26.    As result of this breach, Renwood has been denied the benefits it bargained for in

26  the Agreement.  Renwood has suffered damage to its business and to its Renwood brand in a

27  monetary amount significantly greater than the amount Deutsch has paid to Renwood in cure

28  payments.

**THIRD CAUSE OF ACTION**

**Promissory Fraud**

27.    Deutsch represented to Renwood: (1) that it possessed the requisite expertise to market Renwood's premium wines in an manner that would protect, promote, and enhance the Renwood brand and its awareness among consumers, (2) that it intended to use that expertise, on a best efforts basis, to ensure a "priority distributor effort to meet or exceed Renwood Tier Sales Standards;" (3) that Deutsch would timely cure deficits resulting from its sales guarantee; and (4) that Deutsch would in good faith discharge the obligations it owed under the Services Agreement. The fact that Deutsch possessed the ability and intention to perform these critically important functions is the touchstone and essence of the parties' Agreement.

28.    These representations by Deutsch, however, were and are false. Deutsch does not possess the described requisite expertise. Assuming that Deutsch possesses the requisite expertise, it entered the Agreement with no intention of performing its obligations under the Agreement—as is evidenced by its conduct described herein. Deutsch, in fact, has not performed those obligations.

29.    Deutsch knew at the time it negotiated the Agreement that these representations were false. Deutsch, nonetheless, intentionally made the misrepresentations to induce Renwood to enter into the Agreement.

30.    At the very least, Deutsch made its misrepresentations negligently.

31.    Renwood was unaware that Deutsch's representations were false. Due to Deutsch's industry expertise, its considerable marketing staff, its extensive and well-established distributor network, and its proven ability to place wine in many retail outlets throughout the country, Renwood reasonably relied upon Deutsch's misrepresentations to enter into the Agreement.

32.    Deutsch's misrepresentations constitute deceit, specifically, but not exclusively, promissory fraud, intentional misrepresentation, and negligent misrepresentation.

33.    As a result of Deutsch's deceit, Renwood has suffered damage to its business and to its Renwood brand in a monetary amount significantly greater than the amount Deutsch has

1  paid to Renwood in cure payments.

2  **FOURTH CAUSE OF ACTION**

3  **Defamation- False Light**

4  34.   Deutsch informed various beverage distributors that it purchased Renwood

5  Winery.  Deutsch's assertion was made in a letter to those distributors and, on information and

6  belief, orally as well.  The assertion is false.

7  35.   Deutsch knowingly published this falsehood at a time that Renwood was exerting

8  efforts to: 1) become a publicly-traded company; 2) incur debt to purchase other wineries; and

9  3) consolidate winery operations into a package that afforded increased shareholder value

10  through a stock purchase.  The publication was timed perfectly to inflict injury on Renwood.

11  The publication took place on the heels of Renwood's insistence that Deutsch comply with the

12  cure provisions of the sales guarantee.  The publication injured Renwood's reputation by,

13  among other reasons, conveying the falsehood that Renwood is no longer an independent, on-

14  going concern, and the inference that Renwood management was no longer in control of the

15  company.  Deutsch, moreover, had reason to know that the distributors it notified would

16  republish the falsehood and that those republications would damage Renwood's reputation

17  further, in the eyes of wine industry leaders, vendors, distributors, potential equity investors,

18  shareholders, lenders and promoters of the public offering.

19  36.   Deutsch's publication of the falsehood constitutes defamation per se.   The

20  falsehood is directed specifically at Renwood's ability to conduct its business with wine

21  distributors and retailers, now and in the future, and is only consistent with an effort to devalue

22  Renwood and to undermine its business.

23  37.   In addition to the reputational damage suffered, Renwood's ability to re-

24  aggregate a distributor network after termination of the Agreement has been damaged in light of

25  the false impression that Renwood is no longer an independent, on-going concern.

26

27

28

9

## FIFTH CAUSE OF ACTION

### Interference with Prospective Economic Relations

38.     The Agreement provides that it will terminate either by mutual agreement or upon the occurrence of certain events.  In either case, the Agreement contemplates that at some point Deutsch will no longer serve as Renwood's exclusive marketer and distributor.

39.     Deutsch is acutely aware that the relationships formed between a winery and its distributors is valuable and critical to the well-being of the winery's business.  Deutsch knows of the relationships Renwood had with its distributors, currently has with other distributors via the Deutsch network, and could have with still others when the Agreement terminates.

40.     By its conduct as described herein, Deutsch intentionally, or at least negligently, has interfered with Renwood's ability to re-aggregate a distributor network for its wines. Renwood's relations with its previous and potentially future wine distributors has been significantly damaged by Deutsch publishing the false statement that it purchased Renwood, by its failure to inform and educate distributors about the Renwood brand, by its failure to maintain Renwood's brand presence in the States where it previously had consumer recognition, by its threats and heavy-handed communications to distributors dissuading them from ordering direct from Renwood, and by its failure to use its best efforts to maintain sales of Renwood's wines throughout the country.    Further, the degraded sales performance combined with the defamatory statements has effectively derailed any public offering.

41.     As a direct result of Deutsch's interference with Renwood's prospective economic relations, Renwood has suffered damage to its business and to its Renwood brand in a monetary amount significantly greater than the amount Deutsch has paid to Renwood in cure payments.

ARBITRATION DEMAND OF RENWOOD WINERY, INC.

**SIXTH CAUSE OF ACTION**

**Unfair Business Practices**

42.    By its conduct as described herein, Deutsch engaged in common law unfair competition and has violated Business & Professions Code section 17200 et seq.

43.    As a direct result of Deutsch's acts of unfair competition, Renwood suffered actual and certain monetary losses and loss of shareholder value.

**SEVENTH CAUSE OF ACTION**

**Fraud – Marketing Contributions**

44.    As of March 31, 2008, distributor Southern Wine & Spirits reported to BDN the depletion of 50 cases of Red Label wines and 1,386 cases of Private Label wines to BevMo.

45.    Deutsch pulled that depletion data from the BDN database using its DIVER computer software package.

46.    Deutsch manipulated its DIVER report to combine the Red Label and Private Label case depletion volume under only the Red Label sku's.

47.    On April 25, 2008, WJD sent its Quarterly Marketing Contribution invoice to Renwood including the manipulated DIVER data, demanding marketing allowances for Private Label wines for which they knew they could receive no marketing contribution.

48.    On May 1, 2008, WJD employee Francois Magnant (Renwood's Brand Manager) was not truthful when providing his e-mail response to Robert Smerling of Renwood about the facts behind the spike in Red Label sales to BevMo;

49.    Later on May 1, 2008, WJD employee Francois again sent

ARBITRATION DEMAND OF RENWOOD WINERY, INC.

1  the manipulated DIVER data to Renwood to explain the Red Label sales spike;

2      50.    On May 2, 2008, Robert Smerling sent correspondence to

3

4  Peter and William Deutsch concerning the manipulated data and demanded an explanation.

5      51.    On May 5, 2008, Peter Deutsch sent correspondence to

6

7  Robert Smerling tacitly admitting that WJD unilaterally decided to count the Private Label cases

8  for performance purposes, but was silent on the issue of counting those cases for purposes of

9  charging Renwood a marketing contribution.

10      52.    The difference between the marketing contribution

11

12  demanded by WJD, and that which would be due had WJD not manipulated DIVER is $22,000.

13      53.    By counting those cases for depletion credit against the 80%

14

15  depletion standard in the Services Agreement, WJD took depletion credits from Renwood of in

16  excess of $140,000.

17      **54.**    By counting those cases for sales credit against the Sales

18  Performance Standard, WJD took sales credit from Renwood of in excess of $140,000.

19

20      **55.**    WJD did manipulated the data in the same manner to

21  defraud Renwood for the fourth calendar quarter of 2007.  WJD's fraud cost Renwood not less

22  than $2,000 in fraudulent marketing contributions that WJD collected, and sales/depletion

23  credits according to proof.  This caused a serious problem with Renwood largest customer

24  Southern Wine & Spirits because of Peter's accusation that it was done on SWS behest and that

25  Deutsch was innocent, when the data show that SWS is innocent and that Deutsch altered the

26  data.

27

28

## EIGHTH CAUSE OF ACTION

### Declaratory Relief

**56.**     A controversy exists between the parties regarding the cure interval (i.e. monthly, quarterly, annually) and the amount by which Tiers 2 & 3 must be cured (i.e. 85% versus 100% with 15% of the cure coming from any tier).

**57.**     A controversy also exists regarding whether Deutsch must buy-out the remaining years of the sales guarantee due to their breach and non-performance of the Services Agreement.

**58.**     Renwood has performed all of its obligations under the Services Agreement, and Deutsch has not done so. They owe Renwood over $3,000,000 which is severely past due.

**59.**     Renwood therefore seeks a declaration of the rights and liabilities of the parties as follows:

    **a.**   That Deutsch has breached the contract and has failed to perform same by using its best efforts to sell and market Renwood wines;

    **b.**   That Deutsch has engaged in Unfair Business Practices as defined by California Business & Professionals Code section 17200 et. seq. by engaging in predatory business practices through manipulating sales data, using the cure procedure to delay payment; and by selling from its cure inventory before satisfying its sales performance guarantee under the Services Agreement.

    **c.**   That the Services Agreement is terminated due to the Breach of same by

Deutsch;

    **d.**    That Deutsch is responsible to buy-out the remaining years of the sales guarantee, according to proof, at a future value of not less than $37 million;

    **e.**    That Deutsch is responsible to satisfy all cures on a monthly basis to the date of termination;

    **f.**    That Deutsch is responsible to cure Tiers 2 & 3 at 100%, with 85% of the cure coming from purchases within those Tiers, from the date the contract was entered, to the date of termination;

    **g.**    That Deutsch is responsible to provide restitution to Renwood for the fraudulent marketing contributions at three times the amount taken in unearned marketing contributions.

**THEREFORE**, Renwood prays for the following relief;

1.    That Renwood be awarded all damages recoverable at law or in equity in an amount according to proof;

2.    That Renwood be awarded its attorneys' fees and costs;

3.    That Renwood be provided declaratory relief as set forth above;

4.    That Renwood be awarded treble damages for each fraudulent act it in which it engaged;

5.    That WJD be ordered to pay all cures owed to Renwood.

6.    That WJD be ordered to pay the reasonable value of all future guarantee payments, of no less than $37 million.

7.    That WJD be ordered to compensate Renwood for a loss of good will in Renwood Winery, Inc. at a valuation of not less than $40 million.

8.    That WJD be ordered to reimburse Renwood for all Marketing Contributions paid by Renwood that were improperly spent or held by WJD, an amount not less than $1 million.

9. For all other relief that is proper and just.

DATED: June 2, 2008                    CHARTER DAVIS, LLP

                                       _____
                                       WHITNEY A. DAVIS, SBN #149523

ARBITRATION DEMAND OF RENWOOD WINERY, INC.

**EXHIBIT C**

1  WHITNEY A. DAVIS, SBN 149523
   MARIA S. ROSENFELD, SBN 186116
2  CHARTER DAVIS, LLP
   1730 I Street, Ste. 240
3  Sacramento, CA  95814
   (916) 448-9000
4  (916) 448-9009

5  ATTORNEYS FOR DEFENDANT
   RENWOOD WINERY, INC.

6

7                    UNITED STATES DISTRICT COURT

8            FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10

11  RENWOOD WINERY INC.              )  Case No.:  CV 08 2848 JCS
                                     )
12                                   )
                                     )
13                                   )
            Plaintiff,               )
14                                   )  **AFFIDAVIT OF ROBERT SMERLING**
         vs.                         )
15                                   )  **Date:**
                                     )  **Time:**
16                                   )  **Dept:**
   W.J. DEUTSCH & SONS LTD.,  a New  )
17  York Corporation, and DOES 1-50  )
   inclusive,                        )
18                                   )
                                     )
19          Defendants.              )
                                     )
20                                   )
                                     )
21                                   )
                                     )
22                                   )
                                     )
23  ────────────────────────────────

24

25

26

27

28

                    AFFIDAVIT OF ROBERT SMERLING

WHITNEY A. DAVIS. SBN 149523
MARIA S. ROSENFELD. SBN 186116
CHARTER DAVIS. LLP
1730 I Street. Ste. 240
Sacramento. CA 95814
(916) 448-9000
(916) 448-9009

ATTORNEYS FOR DEFENDANT
RENWOOD WINERY, INC.

**ENDORSED**

JUN 0 9 2008

Clerk of the Napa Superior Court
S. FERINA
By: _____
Deputy

IN THE SUPERIOR COURT IN THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF NAPA

RENWOOD WINERY INC.

Plaintiff,

vs.

W.J. DEUTSCH & SONS LTD.,  a New
York Corporation. and DOES 1-50
inclusive,

Defendants.

Case No.: 

**AFFIDAVIT OF ROBERT SMERLING IN
SUPPORT OF APPLICATION FOR:**

(1)EX PARTE WRIT OF POSSESSION,
(2)TEMPORARY RESTRAINING ORDER
PENDING HEARING ON WRIT OF
POSSESSION,
(3) WRIT OF POSSESSION
(4) PRELIMINARY INJUNCTION

Date: June 9, 2008
Time : 11:30a
Dept: C

AFFIDAVIT OF ROBERT I. SMERLING

I, ROBERT I. SMERLING, do hereby declare:

1.     That I am a person above the age of 18 years.  I have personal knowledge of the facts and circumstances set forth below, and if called upon to do so could and would competently testify thereto.

2.     I am the founder of Renwood Winery, Inc ("Renwood").  I also act as Chairman of the Board and Chief Executive Officer of Renwood,

3.     On April 30, 2008, Renwood's Marketing Manager Danica Ratkovich brought a sales data reporting problem to my attention concerning our marketing partners, W.J. Deutsch & Sons ("WJD").  Ms. Ratkovich found case sales discrepancies and potential evidence of data manipulation by WJD which would cause them great financial benefit.

4.     WJD is the 4th largest wine marketing company in the U.S.A.  They represent Yellow Tail (America's largest wine brand) and Georges DeBoeuf (America's largest French wine brand) and that they have recorded annual sales of over $400 million as compared to Renwood's 9 million.

**The Services Agreement**:

5.     Renwood and WJD executed a wine sales and service agreement in March of 2006. (See *"Services Agreement"*, **Exhibit A** to *Evidentiary Exhibits*).

6.     The agreement requires Renwood to produce 16 wines organized in four tiers (Section V(A), at pp. 2-3), and requires WJD to exert its "best efforts" to market and sell those wines (Section VIII(A), at p. 8).

7.     The agreement also contained a sales performance standard that WJD had to meet monthly.  WJD guaranteed 15% growth over Renwood's prior year's sales on a monthly basis.  In other words, the sales requirement for October of 2007 was 15%

1    higher than the sales requirement for October, 2006. which was 15% higher than the
2    actual sales of October, 2005.

3    8.    The guarantee had to be met by tier for every month during the first five years of
4    the contract. The monthly performance standards were pre-calculated monthly and
5    annually for a five-year period and were set forth a *Schedule C* to the *Services*
6    *Agreement*. (Section VIII(D), at p. 9-10, and *Schedule C* appended to the contract.)
7    This means that if WJD did not se 15% more wine in a given month than that same
8    month the year before, WJD was        breach and had to buy the wine itself to cure the
9    breach.  WJD was required to : re by purchase within 15 days of demand by
10   Renwood. The *Services Agreeme* did not limit when or how often Renwood could
11   call for a cure, but Renwood's pra ice was to make sure that WJD cured monthly, if
12   necessary.

13   9.    Additionally, WJD had to ens e that depletions of distributor inventory could
14   not fall below 80% of the sales pe rmance standard. (Section V(B)(i)(1), at p. 5)

15   10.   The Services Agreement re ired that Renwood pay WJD a marketing
16   contribution for its top selling win . (Section VI, at p. 6 and *Schedule B* appended
17   to the contract). WJD could only nd a marketing contribution bill quarterly based
18   upon depletions from distributor i entory. These allowances applied to 8 specific
19   wines: $5 per case on all Red La l wines except the Zinfandel and Syrah, which
20   were $11 per case. The Old Vin Zinfandel and Fiddletown Zinfandel allowances
21   were $20 per case. WJD would p vide Renwood with a DIVER report with their
22   quarterly marketing allowance inv ice showing the depletions of these wines, then
23   they would demand their marketing allowance.

24   11.   The database from which DIVER draws its data is maintained by an independent
25   third party called BDN, which in turn, is provided *its* data by each licensed
26   distributor on a daily basis as each order is shipped. This system is the standard for
27   the wine and alcohol industry and is used by federal and local authorities to monitor

28

1  and track sales for regulation purposes. DIVER is a software package that allows
2  subscribers to collect and organize data into a form that is usable.

3  12.    The 16 Renwood wines or "sku's" that are covered by the *Services Agreement*
4  are grouped by tiers in the *Services Agreement* (Section V at pp. 2-3) and in the
5  Performance Standards set forth in *Schedule C*. WJD designed its DIVER reports to
6  likewise reflect sales by product and by tier. Tier 1 contains Proprietary wines; Tier
7  2 consists of the "Amador County" wines; Tier 3 consists of "Red Label/Sierra
8  Series" value wines; and Tier 4 contains dessert wines. Tiers 2 & 3 represent 85%
9  of Renwood's annual domestic sales historically.

10  13.    WJD was required to fulfill its monthly and annual sales obligations pursuant to
11  the figures set forth on *Schedule C*. (Section VIII(D)(i) and (ii)). One-hundred
12  percent (100%) of any shortfall in Tiers 1&4 had to be cured only from those tiers.
13  However, for flexibility purposes, only 85% of the shortfall from Tiers 2&3 had to
14  be cured from those tiers. Because of market fluctuations and market timing,
15  Renwood gave WJD some flexibility to make up the remaining shortfall from Tier 2
16  or Tier 3 (15%) from any other tier. I personally spent dozens of hours analyzing
17  data to determine how much flexibility to allow WJD on Tiers 2&3, and engaged in
18  protracted discussions with WJD on this very subject. This flexibility component to
19  the guarantee came to be known as the "any tier" line item on the cure invoices
20  Renwood would eventually send to WJD.

21  14.    As another accommodation to WJD, during the first three months of the
22  relationship (the "Transition Period") the *Service Agreement* provided that WJD
23  only had to meet 100% of the prior year's sales for April, May and June 2006.
24  Therefore, the 15% increase would not be applied until July, 2006.

25
26
27
28

1  **The Transition Period**:

2

3  15.  The Renwood fiscal year runs from July 1 to June 30. The Transition Period took
4       place in April, May and June, 2006. Fiscal Year 2007 commenced on July 1, 2006.
5       During the Transition Period, WJD experienced a $300,000 shortfall out of the $2.1
6       million sales standard.  The shortfall included a 1,100-case sale to Beverages &
7       More that Renwood closed before the WJD agreement was signed.  WJD gave
8       themselves credit for the sale they never made, but Renwood did not.  Sales data
9       reporting from WJD was delayed at the outset, so it took months for Renwood to
10      realize that WJD included the 1,100 cases in the sales data for the Transition period.
11      Renwood invoiced WJD for the 1,100 cases, but WJD has refused to pay it.

12 16.  I reviewed and approved Renwood's first cure notices sent after the Transition
13      Period.  WJD created a conflict because it tried to borrow July 2006 sales to make
14      up the $300,000 deficit from June in order to meet its cure obligations.  Renwood
15      protested WJD's actions as it violated accounting principles.  By WJD borrowing
16      sales from July 2006 to cure the Transition Period shortfall, WJD start fiscal year
17      2007 with a shortfall.

18 17.  WJD's President, Peter Deutsch, forbade Renwood personnel from discussing the
19      terms of the Services Agreement with WJD sales personnel.

20 18.  The shortfall ballooned to $2.5 million by the end of November, 2007, merely
21      seven months into the contract. The WJD cure inventory grew dramatically.  Their
22      decision to ship from the WJD cure inventory instead of from Renwood's inventory
23      caused larger monthly shortfalls.

24

25

26

27

28

**Arbitration. Shipment and Payment Changes**:

19. In the year before hiring WJD, Renwood shipped about 96,000 cases of wine and collected the proceeds directly from the distributors. By the end of WJD's first year of service, in June of 2007, WJD had only sold about $3 million of the $8.217 million performance standard.

20. As the first year progressed WJD fell further and further behind the sales performance standards. In the Fall of 2006, after just 6 months of sales WJD demanded that Renwood accep annual cure payments. After I declined on Renwood's behalf, WJD starte to disrupt shipment and payment procedures dramatically.

21. Then, WJD filed for arbitra on regarding the cure and sales guarantee in November, 2006, only 7 months to the agreement. The arbitration was eventually cancelled after the parties entere into mediation. An interim operating agreement resulted from the mediation tha gave WJD a reduced sales goal. (See *Interim Agreement*, **Exhibit B** to the E *ientiary Exhibits*) Renwood later allowed that interim agreement to expire a: : Renwood realized that WJD could not even achieve the agreement's modifiec ales goals.

22. Before WJD filed for arbitrat: n, they paid Renwood regular invoices within 35 days generally. Cure invoices we : paid late.

23. *After* filing for arbitration, h¢ /ever, WJD unilaterally declared that they could cure by merely "acknowledging" the cure amount in 15 days, and not pay for it. WJD would place an order for the cure goods 10 to 15 days thereafter, and then pay Renwood 35 days after their order is *shipped*. WJD also manipulated the shipping date by refusing to accept goods within the 15 day cure period. This departure from the prior contractual arrangement moved Renwood's cash flow back between 50-60 days. This action by WJD actually removed two months of income out of Renwood's annual sales, placing Renwood in jeopardy with lender covenants.

24.   If Renwood would have shipped the goods to a distributor instead of WJD, WJD would have had to pay Renwood for the same wine about 60 days earlier.

25.   WJD thus began to use the cure as a way to stretch-out payment terms another 60 days.  By then, WJD maintained. a huge "cure" inventory of Renwood wine, then filled distributor orders from WJD's inventory before ordering from Renwood's inventory.  A true and correct cop of my letter to WJD prohibiting this conduct is attached as **Exhibit M** to the E idential Exhibits. This stymied cash flow to Renwood. Despite Renwood's of ction, and lengthy discussion through a year of mediation, WJD continued this re practice until the interim agreement with reduced sales and cure figures v signed.  When Renwood rejected the interim agreement in February of 2008, V ) stopped even acknowledging the cure demands of Renwood, stated again that the ure was annual and not monthly, and started to sell-off its cure inventory in lieu selling from Renwood's stock.    See true and correct copies of *Cure Demands.* **xhibit N** to the *Evidentiary Exhibits*, and *Cure Analysis*, **Exhibit O** to the *Eviden ry Exhibits.*

26.   Attached to the *Evidentiary E: bits* as **Exhibit C** is a true and correct copy of two spreadsheets I asked Dani Ratkovich to prepare showing a comparative shipment history as between Ren od's inventory and WJD' cure inventory.  The data for the spreadsheets were o ined from both Renwood's inventory database and WJD DIVER reports.

27.   When the comparative shipme trends of the two inventories are compared to contractual events between the co panies, the timing of WJD's decisions regarding curing and payment track with cha ges in the WJD/Renwood relationship.

28.   For example, from July to Jan ary of 2007, WJD shipped 8,974 cases from its cure inventory as compared to abo t 28,000 cases from Renwood's inventory.

29.   In January, 2007, settlement talks failed and the parties were bound for litigation.  Shipment trends changed dramatically.  From February 2007 to the end of the fiscal

year in June, 2007, WJD shipped about 23,000 cases from its cure inventory, as compared to about 5,500 cases from Renwood's inventory.

30.   The parties abandoned arbitration in favor of mediation, which failed in February of 2008.  To date in Fiscal 2008, WJD has shipped about 44,000 cases from its cure inventory as compared to 12,680 cases from Renwood's inventory.

31.   Since WJD stopped acknowledging cures in 2008, the only money flowing to Renwood from distributor sales would be new case sales that WJD could not fill from its own cure inventory.  When WJD would run out of a specific wine that was ordered from a customer, it would then place an order from Renwood.  (See *Letter from WJD re Exhaustion of Grandpere*, **Exhibit D** to the *Evidentiary Exhibits*).

**WJD Falsifying Data**:

32.   WJD contracted to be the exclusive wholesaler for 16 Renwood wines.  In January, 2007, Renwood created seven new wines to solve distinct problems created by WJD poor marketing:  four wines designed for restaurants ("Tahoe Series"), and three wines made exclusively for beverage retailer Beverages & More ("BevMo Private Label").  At the annual marketing meeting in January 2007 held at Renwood's corporate offices in Sacramento, I personally offered WJD's President Jim Mello the opportunity to include those seven new wines in the Services Agreement as Contracted Products.  He abruptly declined.  Renwood was left to market those wines on their own, which meant that the wines would *not* be included in the Services Agreement and would not be counted toward WJD sales performance standards, marketing allowances or depletion requirements.  Payment and collection of these wines would be Renwood's responsibility.

33.   This meeting took place at the same time both parties were preparing for arbitration; when WJD had an enormous cure inventory that it owned; and at a time

1    when WJD was not selling enough of the wines it had already contracted with
2    Renwood to sell.

3    34.    Left to sell the seven wines its own, on behalf of Renwood I decided to use
4    Southern Wine & Spirits as the direct distributor as they were already calling on
5    BevMo for WJD on the 16 contracted Renwood wines.

6    35.    Southern agreed to purchase the 3 BevMo wines directly from Renwood Winery.
7    This meant that all sales and marketing data, bills, and revenue would be sent to
8    Renwood directly without WJD involvement.    This procedure worked until WJD
9    intervened to divert the Private Label orders to WJD, and redirect the sales and
10   depletion data through DIVER.

11   36.    BevMo runs a promotion called the "Nickel Sale" for the months of March and
12   October every year.    The promotional terms provide that if the customer buys the
13   first bottle at full price, they can bu  the second bottle for an additional 5 cents.

14   37.    Renwood has been a top-selle  in the Nickel Sale historically.    It was again
15   invited in October 2007 to offer three wines in the Nickel Sale, more than the entire
16   WJD portfolio combined.

17   38.    For the October 2007 Nickel Sale, Renwood's Private Label was available.
18   Southern placed orders directly to Renwood for the three Private Label wines to be
19   shipped to BevMo for the October Nickel Sale.    Even though WJD was not
20   contractually entitled to handle the BevMo sale of Private Label wines due to the
21   rejection of those wines months before, I was asked by Roy Danis, National Sales
22   Manager for WJD, for a reduced 10% commission to handle the three Private Label
23   wines.    As a gesture of good faith to assist in the pending mediation between WJD
24   and Renwood, I reached a side agreement with Mr. Danis with confirming
25   correspondence. The deal would cover only the Fall 2007 and Spring 2008 Nickel
26   Sales, and expressly provided that the Private Label sales would not be counted
27   toward the WJD sales performance standard, nor would a marketing allowance be

28

paid. True and correct copies of the *Renwood Side Agreement Letter*, and *BevMo Confirming e-mails* are attached as **Exhibit E** to the *Evidentiary Exhibits*)

39. WJD accepted the terms through Roy Danis. The Nickel Sale in October 2007 was a great success with the Private Label wines.

40. After the October, 2007 Nickel Sale, I received DIVER reports from WJD that showed all Renwood sales and depletions from the wines contracted under the Services Agreement, but with a separate break-out for the "side deal" Private Label sales and depletions for BevMo's Nickel Sale.

41. In contrast, after the March 2008 Nickel Sale, I noticed that DIVER failed to report the three Private Label wines sales. I ask Danica Ratkovich to contact Southern, and they provided me with the Private Label data.

42. Then, on April 25, 2008, the WJD DIVER depletion report was sent to Renwood attached to the WJD First Quarter Marketing Contribution demand. The DIVER report did not contain categories for the Private Label wines. What I *did* notice was a dramatic increase in sales on Red Label Zin, Red Label Syrah and Old Vine. (See *March 2008 Marketing Allowance Invoice*, **Exhibit F** to the *Evidentiary Exhibits*).

43. WJD receives a marketing contribution from Renwood for depletions of Red Label Syrah at $11 per case; Red Label Zinfandel at $11 per case, and Renwood Old Vine Zinfandel at $20 per case. Since WJD cannot charge a marketing allowance for the Private Label wines sold to BevMo, it is proper that no Private Label wines appeared on the WJD report sent to Renwood with the invoice for the marketing allowance.

44. On April 30, 2008, I sent an e-mail to WJD's Brand Manager for Renwood, Francois Magnant. I asked Francois to explain the uncharacteristic increase in depletions on the Red Label wines. (See *BevMo Fraud e-mail string re: Francois*, **Exhibit G** to the *Evidentiary Exhibits*). Francois' response was as follows:

> "*Robert,*

*knowing that Renwood is a high priority brand in the WJD portfolio and that WJD's Fiscal Year ends in March, SWS CA made an all-out effort to maximize sales for the month of March. BevMo has historically been a supporter of Renwood and SWS executed on maximizing sales at BevMo on Red Label tier and Old Vine Zin.*

*Best,*
*François*

*François Magnant*
*Brand Manager, Renwood, [YellowTail] Reserve & Sparkling*
*W. J. Deutsch & Sons, ltd.*

*Office: 914-251-3292"*

45.    The "SWS" to which Francois referred I understand to be Southern Wine & Spirits, the distributor that services the BevMo account for both WJD and Renwood. I understood Francois' response to confirm that the large increase in depletions were attributable to the Red Label and Old Vine products being sold in volume at the end of WJD's fiscal year, which I knew to be around March 31, 2007.

46.    Because the sudden increase in depletions took place at the same time of the March 2008 Nickel Sale, and because the Private Label wines no longer appeared on WJD's DIVER report in a separate category, I sought independent corroboration of WJD's story about the Red Label increases.

47.    To do so, I asked Danica Ratkovich to obtain and cross-reference the "Accounts Sold" report from WJD to Renwood that shows what WJD sold to BevMo in 2008 (Attached as **Exhibit H** to the *Evidentiary Exhibits*); with the "Accounts Sold" report that was reported by distributor SWS as being sold to BevMo for the same period (Attached as **Exhibit I** to the *Evidentiary Exhibits*).  The WJD report did not show a category for Private Label.  The SWS report did.

48.    Ms. Ratkovich provided me with a data worksheet she created (Attached as **Exhibit J** to the *Evidentiary Exhibits*).  As the worksheet reflects, SWS sold 1842.8 cases of Renwood wines to BevMo for the first three months of 2008, including the

1    Private Label wines. Of that total, WJD reported depletion of 689 cases of Red label
2    Syrah. However, for the same 689 cases sold to BevMo, SWS reported depletion of
3    16 cases of Red Label Syrah, and depletion of 673 Private Label Petite Sirah. On the
4    Zinfandel sku, WJD reported Red Label Zin depletions at 754 cases. However, for
5    the same 754 cases sold to BevMo, SWS reported depletions of 745 cases of Private
6    Label Lodi Zinfandel and only 9 cases of the Red Label Zin. On another sku, WJD
7    reported Old Vine Zinfandel depletions at 333 cases. However, SWS reported
8    depletion of 308 cases of Private Label OFV Zinfandel and only 25 cases of Old
9    Vine.

10   49.    Both the WJD DIVER report to Renwood, and the WJD demand for the first
11   quarter marketing contribution shows that WJD combined the Red Label Syrah sales
12   with the Private Label Petite Sirah sales and called them all Red Label Syrah sales.
13   WJD also did so for Private Label Lodi Zinfandel and the Red Label Zinfandel
14   wines. WJD likewise did so for Private Label OFV Zinfandel and the Old Vine
15   Zinfandel wines.

16   50.    I concluded the following from this data:

17          -    As of March 31, 2008, SWS reported to BDN the depletion of 50 cases
18               of Red Label wines and 1,386 cases of Private Label wines to BevMo;
19

20          -    WJD pulled that depletion data from the BDN database using DIVER;
21

22          -    WJD manipulated its DIVER report to exclude the Private Label
23               category and combined the Red Label and Private Label case depletion
24               volume under only the Red Label sku's;
25

26          -    On April 25, 2008, WJD sent its Quarterly Marketing Contribution
27               invoice to Renwood including the manipulated DIVER data, demanding
28               marketing allowances for Private Label wines for which they knew they

-11-
AFFIDAVIT OF ROBERT J. SMERLING

could receive no marketing contribution (See *WJD Marketing Allowance Invoice*, **Exhibit F** to the *Evidentiary Exhibits*);

- On May 1, 2008, WJD employee Francois Magnant (Renwood's Brand Manager) was not truthful when providing his e-mail response about the facts behind the spike in Red Label sales to BevMo; (See *BevMo Fraud e-mail string re: Francois*, **Exhibit G** to the *Evidentiary Exhibits*).

- Later on May 1, 2008, when I pressed Francois about the issue, he again sent the manipulated DIVER data to me without further explanation about the Red Label sales spike; (See *BevMo Fraud e-mail string re: Francois*, **Exhibit G** to the *Evidentiary Exhibits*).

- On May 2, 2008, I sent correspondence to WJD owners Peter and William Deutsch concerning the manipulated data and demanding an explanation. (See *BevMo Fraud e-mail string re: Francois*, **Exhibit G** to the *Evidentiary Exhibits*).

- On May 5, 2008, Peter Deutsch sent correspondence to me which I took to tacitly admit that WJD unilaterally decided to count the Private Label cases for performance purposes, but it was silent on the issue of counting those cases for purposes of the marketing contribution. (See *BevMo Fraud e-mail string re: Francois*, **Exhibit G** to the *Evidentiary Exhibits*).

- The difference between the marketing contribution demanded by WJD, and that which would be due had WJD not manipulated DIVER is $22,000.

- By counting those cases for depletion credit against the 80% depletion standard in the Services Agreement, I estimate that WJD took depletion credits from Renwood in excess of $140,000.

- By counting those cases for sales credit against the Sales Performance Standard, I estimate that WJD took sales credit from Renwood of in excess of $140,000.

- Through my recent review of the same paperwork for the prior quarter, consisting of October, November and December 2007, I discovered that WJD engaged in the same manipulation and fraud. I estimate that WJD took more than $2,000 of marketing allowance for Private Label sales not due to them. (See *Fourth Quarter (OND) Marketing Contribution Claim Analysis*, **Exhibit K** to the *Evidentiary Exhibits*).

- At no point before the signing of this declaration has Renwood received an amended Marketing Contribution demand from WJD.

**The Diverted BevMo Order**:

51.    Since the Private Label wines fell outside the *Services Agreement*, WJD could not stock their warehouse or those of its distributors with the wines. Only Renwood kept the Private Label wines. BevMo ordered the Private Label wines for sale only during the Nickel Sale.

52.    SWS acted as the distributor for Renwood on the Private Label wines for the Nickel Sales in October of 2007 and March of 2008. Renwood also offered a reduced 10% commission to WJD via a side deal for marketing support.

53.  To ensure prompt payment, order accuracy and appropriate customer service to BevMo, Renwood demanded that Private Label wines be ordered by SWS directly from Renwood, instead of through WJD.  This protocol was followed by all concerned during the October 2007 Nickel Sale.

54.  However, weeks after the March 2007 Nickel Sale had ended, SWS faxed an order dated 4/30/2008 to WJD for 270 cases of Private Label wines worth about $60,000. (See *April 30, 2008 BevMo Invoice*, **Exhibit L** to the *Evidentiary Exhibits*). The order was diverted at WJD's request in order to set-up future claims for commission, depletion credits, and sales performance standard credits and continue to control Renwood's cash flow which was seriously hurt when WJD ceased cure payments in January.  I know this because the SWS representative responsible for sending the order to WJD, Steve Colburn, admitted to me that a WJD Western Sales Representative had specifically requested that he do so.

**The Irreparable Harm to Renwood**:

*Diverted Invoices*:

55.  WJD has not paid Renwood for months, and is instead deducting amounts
     due to Renwood from fraudulent marketing contribution claims.

56.  WJD is selling just enough wine from Renwood inventory to allow itself to offset its marketing contribution claims against the dollars it owes Renwood for the few sales it makes.  All other sales are made from WJD cure inventory, allowing WJD to receive that sales revenue, and not Renwood.  At the same time, WJD is not acknowledging Renwood cure demands, and is therefore not paying Renwood any money, and not re-stocking the WJD cure inventory that it is depleting.

57.  If the diversion of BevMo orders by WJD is permitted to continue, WJD will collect the sales revenues from those sales and retain it for offset against whatever money it contends Renwood owes it for marketing contributions or commissions.

58.    WJD has no contractual right to collect the sales revenue from BevMo sales of Private Label wines.

59.    By WJD cutting off sales revenue from contracted wines, the further theft, delay or diversion of non-contracted BevMo orders and revenues will eliminate enough revenue to prevent Renwood from funding its harvest of grapes for the next vintage. The grapes of an entire vintage will be ruined. Renwood's wines cannot be made with grapes from other vineyards, nor could Renwood buy grapes to replace them as the unique Grandpere and estate grapes, blended into many of the other Renwood wines, can only be grown at Renwood. Renwood owns the only recognized Grandpere zinfandel vineyard in the world.

*Sales Inventory Priority*:

60.    WJD is selling out its enormous cure inventory before selling from Renwood inventory, and at the same time, WJD has not cured contract breaches of the sales performance standard for many months. WJD is past due on cure invoices totaling approximately $2.5 million.

61.    Renwood has a security interest in that cure inventory.

62.    The sale of wine from the WJD cure inventory before satisfying monthly sales requirements or cure demands constitutes an unfair business practice, in that WJD has used the cure to delay payment and breach the contract.

63.    WJD is well aware of Renwood's lender covenants. WJD's decision to cut-off Renwood's cash flow will cause effective June, 2008 a breach of lender covenants and a default on all vineyard loans. All credit has been essentially exhausted. What this means is that, absent court intervention to stop these unfair business practices, Renwood will not be able to fund its harvest.

64.    Even if Renwood could harvest its own grapes, the grapes cannot be crushed and placed into bottles. Renwood cannot purchase the bottles. Even *if* the grapes could be crushed, Renwood's tanks are full to capacity until the wine is bottled. Further, a full tank farm would mean that Renwood cannot fulfill grape contracts with its

1  suppliers. The grapes cannot be purchased, and even if they could, they cannot be

2  crushed due to the full tanks. If Renwood does not fulfill those grape contracts, it

3  will lose those contracts for the foreseeable future.

4  65.    By removing a vintage, Renwood will have no inventory to sell. By preventing

5  the purchase of bottles, Renwood will have no place to put the wine for future sales,

6  even if it could find a way to harvest the grapes.

7  66.    The irreparable injury to Renwood that is being caused by WJD's inventory sales

8  scheme is the loss of a vintage, the loss of long-term grape contracts, and the end of

9  the Renwood brand.

10    I declare under penalty of perjury in accordance with the laws of the State of

11  California that the foregoing is true and correct. Executed this 4th day of June, 2008,

12  at Sacramento, California.

ROBERT I. SMERLING

**EXHIBIT D**



**JAMS, THE RESOLUTION EXPERTS**

# COMPREHENSIVE ARBITRATION RULES & PROCEDURES

*EFFECTIVE MARCH 26, 2007*

## JAMS COMPREHENSIVE ARBITRATION RULES & PROCEDURES

JAMS provides arbitration and mediation services from 23 Resolution Centers located throughout the United States. Its arbitrators and mediators hear and resolve some of the nation's largest, most complex and contentious disputes, utilizing JAMS Rules and Procedures as well as the rules of other domestic and international arbitral institutions.

JAMS arbitrators and mediators are full-time neutrals who come from the ranks of retired state and federal judges and prominent attorneys. These highly trained and experienced ADR professionals are dedicated to the highest ethical standards of conduct.

Parties wishing to write a pre-dispute JAMS arbitration clause into their agreement should review the sample arbitration clauses on Page 4. These clauses may be modified to tailor the arbitration process to meet the parties' individual needs.



**THE RESOLUTION EXPERTS**

**www.jamsadr.com • 1.800.352.JAMS**

## Table of Contents

Standard Commercial Arbitration Clause* . . . . . . . . 4

Standard Commercial Arbitration Clause Naming
JAMS or Another Provider* . . . . . . . . . . . . . . . . . . . . 4

Rule 1.  Scope of Rules. . . . . . . . . . . . . . . . . . . . . . . . 6

Rule 2.  Party-Agreed Procedures . . . . . . . . . . . . . . 6

Rule 3.  Amendment of Rules . . . . . . . . . . . . . . . . . 7

Rule 4.  Conflict with Law . . . . . . . . . . . . . . . . . . . . 7

Rule 5.  Commencing an Arbitration . . . . . . . . . . . 7

Rule 6.  Preliminary and Administrative
Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Rule 7.  Number of Arbitrators and
Appointment of Chairperson. . . . . . . . . . . 9

Rule 8.  Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Rule 9.  Notice of Claims . . . . . . . . . . . . . . . . . . . . 10

Rule 10. Changes of Claims . . . . . . . . . . . . . . . . . . 11

Rule 11. Interpretation of Rules and
Jurisdictional Challenges . . . . . . . . . . . . . 11

Rule 12. Representation . . . . . . . . . . . . . . . . . . . . . 12

Rule 13. Withdrawal from Arbitration . . . . . . . . . . 12

Rule 14. Ex Parte Communications . . . . . . . . . . . . . 13

Rule 15. Arbitrator Selection and
Replacement. . . . . . . . . . . . . . . . . . . . . . . . 13

Rule 16. Preliminary Conference . . . . . . . . . . . . . . 14

Rule 17. Exchange of Information . . . . . . . . . . . . . 15

Rule 18. Summary Disposition of a
Claim or Issue . . . . . . . . . . . . . . . . . . . . . . 16

Rule 19. Scheduling and Location
of Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . 16

Rule 20. Pre-Hearing Submissions . . . . . . . . . . . . . 17

Rule 21. Securing Witnesses and Documents
for the Arbitration Hearing . . . . . . . . . . . 17

Rule 22. The Arbitration Hearing. . . . . . . . . . . . . . 18

Rule 23. Waiver of Hearing . . . . . . . . . . . . . . . . . . . 20

Rule 24. Awards . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Rule 25. Enforcement of the Award . . . . . . . . . . . 22

Rule 26. Confidentiality and Privacy . . . . . . . . . . . 22

Rule 27. Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Rule 28. Settlement and Consent Award . . . . . . . . 23

Rule 29. Sanctions . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Rule 30. Disqualification of the
Arbitrator as a Witness or Party
and Exclusion of Liability . . . . . . . . . . . . . 23

Rule 31. Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Rule 32. Bracketed (or High-Low)
Arbitration Option . . . . . . . . . . . . . . . . . . 25

Rule 33. Final Offer (or Baseball)
Arbitration Option . . . . . . . . . . . . . . . . . . 25

Rule 34. Optional Arbitration
Appeal Procedure. . . . . . . . . . . . . . . . . . . . 26

## Standard Arbitration Clauses Referring To The JAMS Comprehensive Arbitration Rules

### Standard Commercial Arbitration Clause*

*Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in (insert the desired place of arbitration), before (one) (three) arbitrator(s). The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures (Streamlined Arbitration Rules and Procedures). Judgment on the Award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.*

*(Optional) Allocation of Fees and Costs: The arbitrator may, in the Award, allocate all or part of the costs of the arbitration, including the fees of the arbitrator and the reasonable attorneys' fees of the prevailing party.*

Sometimes contracting parties may want their agreement to allow a choice of provider organizations (JAMS being one) that can be used if a dispute arises. The following clause permits a choice between JAMS or another provider organization at the option of the first party to file the arbitration.

### Standard Commercial Arbitration Clause Naming JAMS or Another Provider*

*Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in (insert the desired place of arbitration), before (one) (three) arbitrator(s). At the option of the first to commence an arbitration, the arbitration shall be administered either by JAMS pursuant to its (Comprehensive Arbitration Rules and Procedures) (Streamlined Arbitration Rules and Procedures), or by (name an alternate provider) pursuant to its (identify the rules that will govern). Judgment on the Award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.*

*(Optional) Allocation of Fees and Costs: The arbitrator may, in the Award, allocate all or part of the costs of the arbitration, including the fees of the arbitrator and the reasonable attorneys' fees of the prevailing party.*

*The drafter should select the desired option from those provided in the parentheses.

## Case Management Fees

JAMS charges a nominal Case Management Fee for cases. For arbitrations the Case Management Fee is:

| Hearing Length | Fee |
|---|---|
| 1 to 3 days . . . . . . . . . . . . . . . . . . | $400 per party, per day |

*(1 day is defined as 10 hours of professional time)*

Time in excess of initial 30 hours . . . . . . . . . . . . . . 10% of professional fees

JAMS neutrals set their own hourly, partial and full day rates. For information on individual neutral's rates and the Case Management Fee, please contact JAMS at 800-352-JAMS. The Case Management Fee structure is subject to change.

## Streamlined Rules

JAMS provides clients with the option to select a simplified arbitration process for those cases where the claims and counterclaims are below $250,000. JAMS Streamlined Arbitration Rules & Procedures are designed to minimize the arbitration costs associated with these cases while providing a full and fair hearing for all parties.

All of the JAMS Rules, including the Comprehensive Arbitration Rules set forth below, can be accessed at the JAMS website: www.jamsadr.com.

# JAMS Comprehensive Arbitration Rules & Procedures

*NOTICE: These Rules are the copyrighted property of JAMS. They cannot be copied, reprinted or used in any way without permission of JAMS, unless they are being used by the parties to an arbitration as the rules for that arbitration. If they are being used as the rules for an arbitration, proper attribution must be given to JAMS. If you wish to obtain permission to use our copyrighted materials, please contact JAMS at 949-224-1810.*

## Rule 1.   Scope of Rules

(a)  The JAMS Comprehensive Arbitration Rules and Procedures ("Rules") govern binding Arbitrations of disputes or claims that are administered by JAMS and in which the Parties agree to use these Rules or, in the absence of such agreement, any disputed claim or counterclaim that exceeds $250,000, not including interest or attorneys' fees, unless other Rules are prescribed.

(b)  The Parties shall be deemed to have made these Rules a part of their Arbitration agreement whenever they have provided for Arbitration by JAMS under its Comprehensive Rules or for Arbitration by JAMS without specifying any particular JAMS Rules and the disputes or claims meet the criteria of the first paragraph of this Rule.

(c)  The authority and duties of JAMS are prescribed in the agreement of the Parties and in these Rules, and may be carried out through such representatives as it may direct.

(d)  JAMS may, in its discretion, assign the administration of an Arbitration to any of its offices.

(e)  The term "Party" as used in these Rules includes Parties to the Arbitration and their counsel or representatives.

## Rule 2.   Party-Agreed Procedures

The Parties may agree on any procedures not specified herein or in lieu of these Rules that are consistent with the applicable law and JAMS policies (including, without limitation, Rules 15(i), 30 and 31). The Parties shall promptly notify JAMS of any such Party-agreed procedures and shall confirm such procedures in writing. The Party-agreed procedures shall be enforceable as if contained in these Rules.

## Rule 3.   Amendment of Rules

JAMS may amend these Rules without notice. The Rules in effect on the date of the commencement of an Arbitration (as defined in Rule 5) shall apply to that Arbitration, unless the Parties have specified another version of the Rules.

## Rule 4.   Conflict with Law

If any of these Rules, or a modification of these Rules agreed on by the Parties, is determined to be in conflict with a provision of applicable law, the provision of law will govern, and no other Rule will be affected.

## Rule 5.   Commencing an Arbitration

(a)  The Arbitration is deemed commenced when JAMS confirms in a Commencement Letter one of the following:

(i)  The submission to JAMS of a post-dispute Arbitration agreement fully executed by all Parties and that specifies JAMS administration or use of any JAMS Rules; or

(ii)  The submission to JAMS of a pre-dispute written contractual provision requiring the Parties to arbitrate the dispute or claim and which specifies JAMS administration or use of any JAMS Rules or which the Parties agree shall be administered by JAMS; or

(iii)  The oral agreement of all Parties to participate in an Arbitration administered by JAMS or conducted pursuant to any JAMS Rules, confirmed in writing by the Parties; or

(iv)  A court order compelling Arbitration at JAMS.

(b)  The Commencement Letter shall confirm that one of the above requirements for commencement has been met, that JAMS has received all payments required under the applicable fee schedule, and that the claimant has provided JAMS with contact information for all Parties along with evidence that the Demand has been served on all Parties. The date of commencement of the Arbitration is the date of the Commencement Letter.

(c)  If a Party that is obligated to arbitrate in accordance with subparagraph (a) of this Rule fails to agree to participate in the Arbitration process, JAMS shall confirm in writing that Party's failure to respond or participate and, pursuant to Rule 22(j), the Arbitrator, once appointed, shall schedule, and provide appropriate notice of a Hearing or other opportunity for the Party demanding the Arbitration to demonstrate its entitlement to relief.

(d) The definition of "commencement" in these Rules is not intended to be applicable to any legal requirement, such as the statute of limitations or a contractual limitations period. The term "commencement" as used in this Rule is intended only to pertain to the operation of this and other rules (such as Rule 3, 9(a), 9(c), 13(a), 17(a), 31(a).) The tolling of the statute of limitations or a contractual limitations period shall be regarded by JAMS to occur upon the date of service of a demand for arbitration; compliance with Rule 5(a) (i), (ii), (iii) or (iv) as appropriate; and payment of any fee required of that party under the applicable fee schedule.

## Rule 6.  Preliminary and Administrative Matters

(a) JAMS may convene, or the Parties may request, administrative conferences to discuss any procedural matter relating to the administration of the Arbitration.

(b) At the request of a Party and in the absence of Party agreement, JAMS may determine the location of the Hearing, subject to Arbitrator review. In determining the location of the Hearing such factors as the subject matter of the dispute, the convenience of the Parties and witnesses and the relative resources of the Parties shall be considered.

(c) If, at any time, any Party has failed to pay fees or expenses in full, JAMS may order the suspension or termination of the proceedings. JAMS may so inform the Parties in order that one of them may advance the required payment. An administrative suspension shall toll any other time limits contained in these Rules, applicable statutes or the Parties' agreement.

(d) JAMS does not maintain a duplicate file of documents filed in the Arbitration. If the Parties wish to have any documents returned to them, they must advise JAMS in writing within 30 days of the conclusion of the Arbitration. If special arrangements are required regarding file maintenance or document retention, they must be agreed to in writing and JAMS reserves the right to impose an additional fee for such special arrangements.

(e) Unless the Parties' agreement or applicable law provides otherwise, JAMS may consolidate Arbitrations in the following instances:

(i) If a Party files more than one Arbitration with JAMS, and if JAMS determines that the Arbitrations so filed have common issues of fact or law, JAMS may consolidate the Arbitrations and refer them to a single Arbitrator.

(ii) Where a Demand or Demands for Arbitration is or are submitted naming Parties already involved in another Arbitration or Arbitrations pending under these Rules, JAMS may decide that the new case or cases will be consolidated into one or more of the pending proceedings and referred to one of the Arbitrators already appointed.

(iii) Where a Demand or Demands for Arbitration is or are submitted naming parties that are not identical to the Parties in the existing Arbitration or Arbitrations, JAMS may decide that the new case or cases will be consolidated into one or more of the pending proceedings and referred to one of the Arbitrators already appointed.

When rendering its decision, JAMS will take into account all circumstances, including the links between the cases and the progress already made in the existing Arbitrations.

Where a third party seeks to participate in an Arbitration already pending under these Rules or where a Party to an Arbitration under these Rules seeks to compel a third party to participate in a pending Arbitration, the Arbitrator will decide on such request, taking into account all circumstances the Arbitrator deems relevant and applicable.

Unless applicable law provides otherwise, where JAMS decides to consolidate a proceeding into a pending Arbitration, the Parties to the consolidated case or cases will be deemed to have waived their right to designate an Arbitrator.

## Rule 7.  Number of Arbitrators and Appointment of Chairperson

(a) The Arbitration shall be conducted by one neutral Arbitrator unless all Parties agree otherwise. In these Rules, the term "Arbitrator" shall mean, as the context requires, the Arbitrator or the panel of Arbitrators in a tripartite Arbitration.

(b) In cases involving more than one Arbitrator the Parties shall agree on, or in the absence of agreement JAMS shall designate, the Chairperson of the Arbitration Panel. If the Parties and the Arbitrator agree, the Chairperson may, acting alone, decide discovery and procedural matters.

(c) Where the Parties have agreed that each Party is to name one Arbitrator, the Arbitrators so named shall be neutral and independent of the appointing Party unless the Parties have agreed that they shall be non-neutral.

## Rule 8.   Service

(a)  Service by a Party under these Rules is effected by providing one signed copy of the document to each Party and two copies in the case of a sole Arbitrator and four copies in the case of a tripartite panel to JAMS. Service may be made by hand-delivery, overnight delivery service or U.S. mail. Service by any of these means is considered effective upon the date of deposit of the document. Service by electronic mail or facsimile transmission is considered effective upon transmission, but only if followed within one week of delivery by service of an appropriate number of copies and originals by one of the other service methods.

(b)  In computing any period of time prescribed or allowed by these Rules for a Party to do some act within a prescribed period after the service of a notice or other paper on the Party and the notice or paper is served on the Party only by U.S. Mail, three (3) calendar days shall be added to the prescribed period.

## Rule 9.   Notice of Claims

(a)  If a matter has been submitted for Arbitration after litigation has been commenced in court regarding the same claim or dispute, the pleadings in the court case, including the complaint and answer (with affirmative defenses and counterclaims), may be filed with JAMS within fourteen (14) calendar days of the date of commencement, and if so filed, will be considered part of the record of the Arbitration. It will be assumed that the existence of such pleadings constitutes appropriate notice to the Parties of such claims, remedies sought, counterclaims and affirmative defenses. If necessary, such notice may be supplemented pursuant to Rule 9(b).

(b)  If a matter has been submitted to JAMS prior to or in lieu of the filing of a case in court or prior to the filing of an answer, the Parties shall give each other notice of their respective claims, remedies sought, counterclaims and affirmative defenses (including jurisdictional challenges). Such notice may be served upon the other Parties and filed with JAMS, in the form of a Demand for Arbitration, response or answer to demand for Arbitration, counterclaim or answer or response to counterclaim. Any pleading shall include a short statement of its factual basis.

(c)  Notice of claims, remedies sought, counterclaims and affirmative defenses may be served simultaneously, in which case they should be filed with JAMS within fourteen (14) calendar days of the date of commencement of the Arbitration, or by such other date as the Parties may agree. The

responding Parties may, however, in their sole discretion, wait to receive the notice of claim before serving any response, including counterclaims or affirmative defenses. In this case, the response, including counterclaims and affirmative defenses, should be served on the other Parties and filed with JAMS within fourteen (14) calendar days of service of the notice of claim. If the notice of claim has been served on the responding Parties prior to the date of commencement, the response, including counterclaims and affirmative defenses, shall be served within fourteen (14) calendar days from the date of commencement.

(d)  Any Party that is a recipient of a counterclaim may reply to such counterclaim, including asserting jurisdictional challenges. In such case, the reply must be served on the other Parties and filed with JAMS within fourteen (14) calendar days of having received the notice of counterclaim. No claim, remedy, counterclaim or affirmative defense will be considered by the Arbitrator in the absence of prior notice to the other Parties, unless all Parties agree that such consideration is appropriate notwithstanding the lack of prior notice.

## Rule 10. Changes of Claims

After the filing of a claim and before the Arbitrator is appointed, any Party may make a new or different claim against a Party or any third Party that is subject to Arbitration in the proceeding. Such claim shall be made in writing, filed with JAMS and served on the other Parties. Any response to the new claim shall be made within fourteen (14) calendar days after service of such claim. After the Arbitrator is appointed, no new or different claim may be submitted except with the Arbitrator's approval. A Party may request a Hearing on this issue. Each Party has the right to respond to any new claim in accordance with Rule 9(c).

## Rule 11. Interpretation of Rules and
## Jurisdictional Challenges

(a)  Once appointed, the Arbitrator shall resolve disputes about the interpretation and applicability of these Rules and conduct of the Arbitration Hearing. The resolution of the issue by the Arbitrator shall be final.

(b)  Whenever in these Rules a matter is to be determined by "JAMS" (such as in Rules 6; 11(d); 15(d), (f) or (g); or 31(d)), such determination shall be made in accordance with JAMS administrative procedures.

(c)  Jurisdictional and arbitrability disputes, including disputes over the existence, validity, interpretation or scope of

the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.

(d)  Disputes concerning the appointment of the Arbitrator shall be resolved by JAMS.

(e)  The Arbitrator may upon a showing of good cause or *sua sponte*, when necessary to facilitate the Arbitration, extend any deadlines established in these Rules, provided that the time for rendering the Award may only be altered in accordance with Rules 22(i) or 24.

## Rule 12. Representation

(a)  The Parties may be represented by counsel or any other person of the Party's choice. Each Party shall give prompt written notice to the Case Manager and the other Parties of the name, address, telephone and fax numbers, and email address of its representative. The representative of a Party may act on the Party's behalf in complying with these Rules.

(b)  Changes in Representation. A Party shall give prompt written notice to the Case Manager and the other Parties of any change in its representation, including the name, address, telephone and fax numbers, and email address of the new representative. Such notice shall state that the written consent of the former representative, if any, and of the new representative, has been obtained and shall state the effective date of the new representation.

## Rule 13. Withdrawal from Arbitration

(a)  No Party may terminate or withdraw from an Arbitration after the issuance of the Commencement Letter (see Rule 5) except by written agreement of all Parties to the Arbitration.

(b)  A Party that asserts a claim or counterclaim may unilaterally withdraw that claim or counterclaim without prejudice by serving written notice on the other Parties and on the Arbitrator. However, the opposing Parties may, within fourteen (14) calendar days of service of notice of the withdrawal of the claim or counterclaim, request that the Arbitrator order that the withdrawal be with prejudice. If such a request is made, it shall be determined by the Arbitrator.

## Rule 14. *Ex Parte* Communications

No Party may have any *ex parte* communication with a neutral Arbitrator regarding any issue related to the Arbitration. Any necessary *ex parte* communication with a neutral Arbitrator, whether before, during or after the Arbitration Hearing, shall be conducted through JAMS. The Parties may agree to permit *ex parte* communication between a Party and a non-neutral Arbitrator.

## Rule 15. Arbitrator Selection and Replacement

(a)  Unless the Arbitrator has been previously selected by agreement of the Parties, JAMS may attempt to facilitate agreement among the Parties regarding selection of the Arbitrator.

(b)  If the Parties do not agree on an Arbitrator, JAMS shall send the Parties a list of at least five (5) Arbitrator candidates in the case of a sole Arbitrator and ten (10) Arbitrator candidates in the case of a tripartite panel. JAMS shall also provide each Party with a brief description of the background and experience of each Arbitrator candidate. JAMS may replace any or all names on the list of Arbitrator candidates for reasonable cause at any time before the Parties have submitted their choice pursuant to subparagraph (c) below.

(c)  Within seven (7) calendar days of service upon the Parties of the list of names, each Party may strike two (2) names in the case of a sole Arbitrator and three (3) names in the case of a tripartite panel, and shall rank the remaining Arbitrator candidates in order of preference. The remaining Arbitrator candidate with the highest composite ranking shall be appointed the Arbitrator. JAMS may grant a reasonable extension of the time to strike and rank the Arbitrator candidates to any Party without the consent of the other Parties.

(d)  If this process does not yield an Arbitrator or a complete panel, JAMS shall designate the sole Arbitrator or as many members of the tripartite panel as are necessary to complete the panel.

(e)  If a Party fails to respond to a list of Arbitrator candidates within seven (7) calendar days after its service, JAMS shall deem that Party to have accepted all of the Arbitrator candidates.

(f)  Entities whose interests are not adverse with respect to the issues in dispute shall be treated as a single Party for purposes of the Arbitrator selection process. JAMS shall determine whether the interests between entities are adverse for purposes

of Arbitrator selection, considering such factors as whether the entities are represented by the same attorney and whether the entities are presenting joint or separate positions at the Arbitration.

(g) If, for any reason, the Arbitrator who is selected is unable to fulfill the Arbitrator's duties, a successor Arbitrator shall be chosen in accordance with this Rule. If a member of a panel of Arbitrators becomes unable to fulfill his or her duties after the beginning of a Hearing but before the issuance of an Award, a new Arbitrator will be chosen in accordance with this Rule unless, in the case of a tripartite panel, the Parties agree to proceed with the remaining two Arbitrators. JAMS will make the final determination as to whether an Arbitrator is unable to fulfill his or her duties, and that decision shall be final.

(h) Any disclosures regarding the selected Arbitrator shall be made as required by law or within ten (10) calendar days from the date of appointment. The obligation of the Arbitrator to make all required disclosures continues throughout the Arbitration process. Such disclosures may be provided in electronic format, provided that JAMS will produce a hard copy to any Party that requests it.

(i) At any time during the Arbitration process, a Party may challenge the continued service of an Arbitrator for cause. The challenge must be based upon information that was not available to the Parties at the time the Arbitrator was selected. A challenge for cause must be in writing and exchanged with opposing Parties who may respond within seven (7) days of service of the challenge. JAMS shall make the final determination as to such challenge. Such determination shall take into account the materiality of the facts and any prejudice to the Parties. That decision will be final.

(j) Where the Parties have agreed that a Party-appointed Arbitrator is to be non-neutral, that Party-appointed Arbitrator shall not be subject to disqualification.

## Rule 16. Preliminary Conference

At the request of any Party or at the direction of the Arbitrator, a Preliminary Conference shall be conducted with the Parties or their counsel or representatives. The Preliminary Conference may address any or all of the following subjects:

(a) The exchange of information in accordance with Rule 17 or otherwise;

(b) The schedule for discovery as permitted by the Rules, as agreed by the Parties or as required or authorized by applicable law;

(c) The pleadings of the Parties and any agreement to clarify or narrow the issues or structure the Arbitration Hearing;

(d) The scheduling of the Hearing and any pre-Hearing exchanges of information, exhibits, motions or briefs;

(e) The attendance of witnesses as contemplated by Rule 21;

(f) The scheduling of any dispositive motion pursuant to Rule 18;

(g) The premarking of exhibits; preparation of joint exhibit lists and the resolution of the admissibility of exhibits;

(h) The form of the Award; and

(i) Such other matters as may be suggested by the Parties or the Arbitrator.

The Preliminary Conference may be conducted telephonically and may be resumed from time to time as warranted.

## Rule 17. Exchange of Information

(a) The Parties shall cooperate in good faith in the voluntary and informal exchange of all non-privileged documents and other information relevant to the dispute or claim immediately after commencement of the arbitration. They shall complete an initial exchange of all relevant, non-privileged documents, including, without limitation, copies of all documents in their possession or control on which they rely in support of their positions, names of individuals whom they may call as witnesses at the Arbitration Hearing, and names of all experts who may be called to testify at the Arbitration Hearing, together with each expert's report that may be introduced at the Arbitration Hearing, within twenty-one (21) calendar days after all pleadings or notice of claims have been received. The Arbitrator may modify these obligations at the Preliminary Conference.

(b) Each Party may take one deposition of an opposing Party or of one individual under the control of the opposing Party. The Parties shall attempt to agree on the time, location and duration of the deposition, and if the Parties do not agree these issues shall be determined by the Arbitrator. The ne-

cessity of additional depositions shall be determined by the Arbitrator based upon the reasonable need for the requested information, the availability of other discovery options and the burdensomeness of the request on the opposing Parties and the witness.

(c) As they become aware of new documents or information, including experts who may be called upon to testify, all Parties continue to be obligated to provide relevant, non-privileged documents, to supplement their identification of witnesses and experts and to honor any informal agreements or understandings between the Parties regarding documents or information to be exchanged. Documents that were not previously exchanged, or witnesses and experts that were not previously identified, may not be considered by the Arbitrator at the Hearing, unless agreed by the Parties or upon a showing of good cause.

(d) The Parties shall promptly notify JAMS when a dispute exists regarding discovery issues. JAMS shall arrange a conference with the Arbitrator, either by telephone or in person, and the Arbitrator shall decide the dispute. With the written consent of all Parties, and in accordance with an agreed written procedure, the Arbitrator may appoint a special master to assist in resolving a discovery dispute.

## Rule 18. Summary Disposition of a Claim or Issue

(a) The Arbitrator may permit any Party to file a Motion for Summary Disposition of a particular claim or issue, either by agreement of all interested Parties or at the request of one Party, provided other interested Parties have reasonable notice to respond to the request.

(b) JAMS shall facilitate the Parties' agreement on a briefing schedule and record for the Motion. If no agreement is reached, the Arbitrator shall set the briefing and Hearing schedule and contents of the record.

## Rule 19. Scheduling and Location of Hearing

(a) The Arbitrator, after consulting with the Parties that have appeared, shall determine the date, time and location of the Hearing. The Arbitrator and the Parties shall attempt to schedule consecutive Hearing days if more than one day is necessary.

(b) If a Party has failed to participate in the Arbitration process, the Arbitrator may set the Hearing without consulting

with that Party. The non-participating Party shall be served with a Notice of Hearing at least thirty (30) calendar days prior to the scheduled date unless the law of the relevant jurisdiction allows for or the Parties have agreed to shorter notice.

## Rule 20. Pre-Hearing Submissions

(a) Subject to any schedule adopted in the Preliminary Conference (Rule 16), at least fourteen (14) calendar days before the Arbitration Hearing, the Parties shall exchange a list of the witnesses they intend to call, including any experts, a short description of the anticipated testimony of each such witness, an estimate of the length of the witness's direct testimony, and a list of exhibits. In addition, at least fourteen (14) calendar days before the Arbitration Hearing, the Parties shall identify all exhibits intended to be used at the Hearing and exchange copies of such exhibits to the extent that any such exhibit has not been previously exchanged. The Parties should pre-mark exhibits and shall attempt to resolve any disputes regarding the admissibility of exhibits prior to the Hearing. The list of witnesses, with the description and estimate of the length of their testimony and the copies of all exhibits that the Parties intend to use at the Hearing, in pre-marked form, should also be provided to JAMS for transmission to the Arbitrator, whether or not the Parties have stipulated to the admissibility of all such exhibits.

(b) The Arbitrator may require that each Party submit concise written statements of position, including summaries of the facts and evidence a Party intends to present, discussion of the applicable law and the basis for the requested Award or denial of relief sought. The statements, which may be in the form of a letter, shall be filed with JAMS and served upon the other Parties, at least seven (7) calendar days before the Hearing date. Rebuttal statements or other pre-Hearing written submissions may be permitted or required at the discretion of the Arbitrator.

## Rule 21. Securing Witnesses and Documents for the Arbitration Hearing

(a) At the written request of a Party, all other Parties shall produce for the Arbitration Hearing all specified witnesses in their employ or under their control without need of subpoena. The Arbitrator may issue subpoenas for the attendance of witnesses or the production of documents either prior to or at the Hearing. Pre-issued subpoenas may be used in jurisdictions that permit them. In the event a Party or a subpoenaed person objects to the production of a witness or other evidence, the Party or subpoenaed person may file an objection with the

Arbitrator, who will promptly rule on the objection, weighing both the burden on the producing Party and witness and the need of the proponent for the witness or other evidence. The Arbitrator, in order to hear a third party witness, or for the convenience of the Parties or the witnesses, may conduct the Hearing at any location unless the Arbitration agreement specifies a mandatory Hearing location.

(b) Any JAMS office may be designated a Hearing location for purposes of the issuance of a subpoena or subpoena *duces tecum* to a third party witness, unless the Arbitration agreement specifies a mandatory Hearing location. The subpoena or subpoena *duces tecum* shall be issued in accordance with the applicable law of the designated Hearing location and shall be deemed issued under that law. Objections to any subpoena or subpoena *duces tecum* shall be made and determined by the Arbitrator.

## Rule 22. The Arbitration Hearing

(a) The Arbitrator will ordinarily conduct the Arbitration Hearing in the manner set forth in these Rules. The Arbitrator may vary these procedures if it is determined reasonable and appropriate to do so.

(b) The Arbitrator shall determine the order of proof, which will generally be similar to that of a court trial.

(c) The Arbitrator shall require witnesses to testify under oath if requested by any Party, or otherwise in the discretion of the Arbitrator.

(d) Strict conformity to the rules of evidence is not required, except that the Arbitrator shall apply applicable law relating to privileges and work product. The Arbitrator shall consider evidence that he or she finds relevant and material to the dispute, giving the evidence such weight as is appropriate. The Arbitrator may be guided in that determination by principles contained in the Federal Rules of Evidence or any other applicable rules of evidence. The Arbitrator may limit testimony to exclude evidence that would be immaterial or unduly repetitive, provided that all Parties are afforded the opportunity to present material and relevant evidence.

(e) The Arbitrator shall receive and consider relevant deposition testimony recorded by transcript or videotape, provided that the other Parties have had the opportunity to attend and cross-examine. The Arbitrator may in his or her discretion consider witness affidavits or other recorded testimony even if the other Parties have not had the opportunity to cross-

examine, but will give that evidence only such weight as the Arbitrator deems appropriate.

(f) The Parties will not offer as evidence, and the Arbitrator shall neither admit into the record nor consider, prior settlement offers by the Parties or statements or recommendations made by a mediator or other person in connection with efforts to resolve the dispute being arbitrated, except to the extent that applicable law permits the admission of such evidence.

(g) The Hearing or any portion thereof may be conducted telephonically with the agreement of the Parties or in the discretion of the Arbitrator.

(h) When the Arbitrator determines that all relevant and material evidence and arguments have been presented, the Arbitrator shall declare the Hearing closed. The Arbitrator may defer the closing of the Hearing until a date agreed upon by the Arbitrator and the Parties, to permit the Parties to submit post-Hearing briefs, which may be in the form of a letter, and/or to make closing arguments. If post-Hearing briefs are to be submitted, or closing arguments are to be made, the Hearing shall be deemed closed upon receipt by the Arbitrator of such briefs or at the conclusion of such closing arguments.

(i) At any time before the Award is rendered, the Arbitrator may, *sua sponte* or on application of a Party for good cause shown, re-open the Hearing. If the Hearing is re-opened and the re-opening prevents the rendering of the Award within the time limits specified by these Rules, the time limits will be extended until the reopened Hearing is declared closed by the Arbitrator.

(j) The Arbitrator may proceed with the Hearing in the absence of a Party that, after receiving notice of the Hearing pursuant to Rule 19, fails to attend. The Arbitrator may not render an Award solely on the basis of the default or absence of the Party, but shall require any Party seeking relief to submit such evidence as the Arbitrator may require for the rendering of an Award. If the Arbitrator reasonably believes that a Party will not attend the Hearing, the Arbitrator may schedule the Hearing as a telephonic Hearing and may receive the evidence necessary to render an Award by affidavit. The notice of Hearing shall specify if it will be in person or telephonic.

(k) (i) Any Party may arrange for a stenographic or other record to be made of the Hearing and shall inform the other Parties in advance of the Hearing. The requesting Party shall

bear the cost of such stenographic record. If all other Parties agree to share the cost of the stenographic record, it shall be made available to the Arbitrator and may be used in the proceeding.

(ii) If there is no agreement to share the cost of the stenographic record, it may not be provided to the Arbitrator and may not be used in the proceeding unless the Party arranging for the stenographic record either agrees to provide access to the stenographic record at no charge or on terms that are acceptable to the Parties and the reporting service.

(iii) If the Parties agree to an Optional Arbitration Appeal Procedure (see Rule 34), they shall ensure that a stenographic or other record is made of the Hearing and shall share the cost of that record.

(iv) The Parties may agree that the cost of the steno-graphic record shall or shall not be allocated by the Arbitrator in the Award.

## Rule 23. Waiver of Hearing

The Parties may agree to waive the oral Hearing and submit the dispute to the Arbitrator for an Award based on written submissions and other evidence as the Parties may agree.

## Rule 24. Awards

(a) The Arbitrator shall render a Final Award or a Partial Final Award within thirty (30) calendar days after the date of the close of the Hearing as defined in Rule 22(h) or, if a Hearing has been waived, within thirty (30) calendar days after the receipt by the Arbitrator of all materials specified by the Parties, except (i) by the agreement of the Parties, (ii) upon good cause for an extension of time to render the Award, or (iii) as provided in Rule 22(i). The Arbitrator shall provide the Final Award or the Partial Final Award to JAMS for issuance in accordance with this Rule.

(b) Where a panel of Arbitrators has heard the dispute, the decision and Award of a majority of the panel shall constitute the Arbitration Award.

(c) In determining the merits of the dispute the Arbitrator shall be guided by the rules of law and equity agreed upon by the Parties. In the absence of such agreement, the Arbitrator shall be guided by the rules of law and equity that the Arbitrator deems to be most appropriate. The Arbitrator may grant any remedy or relief that is just and equitable and within the

scope of the Parties' agreement, including but not limited to specific performance of a contract.

(d) In addition to a Final Award or Partial Final Award, the Arbitrator may make other decisions, including interim or partial rulings, orders and Awards.

(e) Interim Measures. The Arbitrator may take whatever interim measures are deemed necessary, including injunc-tive relief and measures for the protection or conservation of property and disposition of disposable goods. Such interim measures may take the form of an interim Award, and the Arbitrator may require security for the costs of such measures. Any recourse by a Party to a court for interim or provisional relief shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate.

(f) The Award of the Arbitrator may allocate Arbitration fees and Arbitrator compensation and expenses unless such an allocation is expressly prohibited by the Parties' agreement. (Such a prohibition may not limit the power of the Arbitrator to allocate Arbitration fees and Arbitrator compensation and expenses pursuant to Rule 31(c).)

(g) The Award of the Arbitrator may allocate attorneys' fees and expenses and interest (at such rate and from such date as the Arbitrator may deem appropriate) if provided by the Parties' agreement or allowed by applicable law.

(h) The Award will consist of a written statement signed by the Arbitrator regarding the disposition of each claim and the relief, if any, as to each claim. Unless all Parties agree otherwise, the Award shall also contain a concise written statement of the reasons for the Award.

(i) After the Award has been rendered, and provided the Par-ties have complied with Rule 31, the Award shall be issued by serving copies on the Parties. Service may be made by U.S. Mail. It need not be sent certified or registered.

(j) Within seven (7) calendar days after issuance of the Award, any Party may serve upon the other Parties and on JAMS a request that the Arbitrator correct any computational, typo-graphical or other similar error in an Award (including the reallocation of fees pursuant to Rule 31(c)), or the Arbitrator may *sua sponte* propose to correct such errors in an Award. A Party opposing such correction shall have seven (7) calendar days in which to file any objection. The Arbitrator may make any necessary and appropriate correction to the Award within

fourteen (14) calendar days of receiving a request or seven (7) calendar days after the Arbitrator's proposal to do so. The corrected Award shall be served upon the Parties in the same manner as the Award.

(k) The Award is considered final, for purposes of either an Optional Arbitration Appeal Procedure pursuant to Rule 34 or a judicial proceeding to enforce, modify or vacate the Award pursuant to Rule 25, fourteen (14) calendar days after service is deemed effective if no request for a correction is made, or as of the effective date of service of a corrected Award.

## Rule 25. Enforcement of the Award

Proceedings to enforce, confirm, modify or vacate an Award will be controlled by and conducted in conformity with the Federal Arbitration Act, 9 U.S.C. Sec 1 et seq. or applicable state law.

## Rule 26. Confidentiality and Privacy

(a) JAMS and the Arbitrator shall maintain the confidential nature of the Arbitration proceeding and the Award, including the Hearing, except as necessary in connection with a judicial challenge to or enforcement of an Award, or unless otherwise required by law or judicial decision.

(b) The Arbitrator may issue orders to protect the confidentiality of proprietary information, trade secrets or other sensitive information.

(c) Subject to the discretion of the Arbitrator or agreement of the Parties, any person having a direct interest in the Arbitration may attend the Arbitration Hearing. The Arbitrator may exclude any non-Party from any part of a Hearing.

## Rule 27. Waiver

(a) If a Party becomes aware of a violation of or failure to comply with these Rules and fails promptly to object in writing, the objection will be deemed waived, unless the Arbitrator determines that waiver will cause substantial injustice or hardship.

(b) If any Party becomes aware of information that could be the basis of a challenge for cause to the continued service of the Arbitrator, such challenge must be made promptly, in writing, to the Arbitrator or JAMS. Failure to do so shall constitute a waiver of any objection to continued service of the Arbitrator.

## Rule 28. Settlement and Consent Award

(a) The Parties may agree, at any stage of the Arbitration process, to submit the case to JAMS for mediation. The JAMS mediator assigned to the case may not be the Arbitrator or a member of the Appeal Panel, unless the Parties so agree pursuant to Rule 28(b).

(b) The Parties may agree to seek the assistance of the Arbitrator in reaching settlement. By their written agreement to submit the matter to the Arbitrator for settlement assistance, the Parties will be deemed to have agreed that the assistance of the Arbitrator in such settlement efforts will not disqualify the Arbitrator from continuing to serve as Arbitrator if settlement is not reached; nor shall such assistance be argued to a reviewing court as the basis for vacating or modifying an Award.

(c) If, at any stage of the Arbitration process, all Parties agree upon a settlement of the issues in dispute and request the Arbitrator to embody the agreement in a Consent Award, the Arbitrator shall comply with such request unless the Arbitrator believes the terms of the agreement are illegal or undermine the integrity of the Arbitration process. If the Arbitrator is concerned about the possible consequences of the proposed Consent Award, he or she shall inform the Parties of that concern and may request additional specific information from the Parties regarding the proposed Consent Award. The Arbitrator may refuse to enter the proposed Consent Award and may withdraw from the case.

## Rule 29. Sanctions

The Arbitrator may order appropriate sanctions for failure of a Party to comply with its obligations under any of these Rules. These sanctions may include, but are not limited to, assessment of costs, exclusion of certain evidence, or in extreme cases determining an issue or issues submitted to Arbitration adversely to the Party that has failed to comply.

## Rule 30. Disqualification of the Arbitrator as a Witness or Party and Exclusion of Liability

(a) The Parties may not call the Arbitrator, the Case Manager or any other JAMS employee or agent as a witness or as an expert in any pending or subsequent litigation or other proceeding involving the Parties and relating to the dispute that is the subject of the Arbitration. The Arbitrator, Case Manager and other JAMS employees and agents are also incompetent to testify as witnesses or experts in any such proceeding.

(b) The Parties shall defend and/or pay the cost (including any attorneys' fees) of defending the Arbitrator, Case Manager and/or JAMS from any subpoenas from outside Parties arising from the Arbitration.

(c) The Parties agree that neither the Arbitrator, Case Manager nor JAMS is a necessary Party in any litigation or other proceeding relating to the Arbitration or the subject matter of the Arbitration, and neither the Arbitrator, Case Manager nor JAMS, including its employees or agents, shall be liable to any Party for any act or omission in connection with any Arbitration conducted under these Rules, including but not limited to any disqualification of or recusal by the Arbitrator.

## Rule 31. Fees

(a) Each Party shall pay its *pro-rata* share of JAMS fees and expenses as set forth in the JAMS fee schedule in effect at the time of the commencement of the Arbitration, unless the Parties agree on a different allocation of fees and expenses. JAMS agreement to render services is jointly with the Party and the attorney or other representative of the Party in the Arbitration. The non-payment of fees may result in an administrative suspension of the case in accordance with Rule 6(c).

(b) JAMS requires that the Parties deposit the fees and expenses for the Arbitration prior to the Hearing and the Arbitrator may preclude a Party that has failed to deposit its *pro-rata* or agreed-upon share of the fees and expenses from offering evidence of any affirmative claim at the Hearing. JAMS may waive the deposit requirement upon a showing of good cause.

(c) The Parties are jointly and severally liable for the payment of JAMS Arbitration fees and Arbitrator compensation and expenses. In the event that one Party has paid more than its share of such fees, compensation and expenses, the Arbitrator may award against any other Party any such fees, compensation and expenses that such Party owes with respect to the Arbitration.

(d) Entities whose interests are not adverse with respect to the issues in dispute shall be treated as a single Party for purposes of JAMS assessment of fees. JAMS shall determine whether the interests between entities are adverse for purpose of fees, considering such factors as whether the entities are represented by the same attorney and whether the entities are presenting joint or separate positions at the Arbitration.

## Rule 32. Bracketed (or High-Low) Arbitration Option

(a) At any time before the issuance of the Arbitration Award, the Parties may agree, in writing, on minimum and maximum amounts of damages that may be awarded on each claim or on all claims in the aggregate. The Parties shall promptly notify JAMS and provide to JAMS a copy of their written agreement setting forth the agreed-upon maximum and minimum amounts.

(b) JAMS shall not inform the Arbitrator of the agreement to proceed with this option or of the agreed-upon minimum and maximum levels without the consent of the Parties.

(c) The Arbitrator shall render the Award in accordance with Rule 24.

(d) In the event that the Award of the Arbitrator is between the agreed-upon minimum and maximum amounts, the Award shall become final as is. In the event that the Award is below the agreed-upon minimum amount, the final Award issued shall be corrected to reflect the agreed-upon minimum amount. In the event that the Award is above the agreed-upon maximum amount, the final Award issued shall be corrected to reflect the agreed-upon maximum amount.

## Rule 33. Final Offer (or Baseball) Arbitration Option

(a) Upon agreement of the Parties to use the option set forth in this Rule, at least seven (7) calendar days before the Arbitration Hearing, the Parties shall exchange and provide to JAMS written proposals for the amount of money damages they would offer or demand, as applicable, and that they believe to be appropriate based on the standard set forth in Rule 24 (c). JAMS shall promptly provide a copy of the Parties' proposals to the Arbitrator, unless the Parties agree that they should not be provided to the Arbitrator. At any time prior to the close of the Arbitration Hearing, the Parties may exchange revised written proposals or demands, which shall supersede all prior proposals. The revised written proposals shall be provided to JAMS, which shall promptly provide them to the Arbitrator, unless the Parties agree otherwise.

(b) If the Arbitrator has been informed of the written proposals, in rendering the Award the Arbitrator shall choose between the Parties' last proposals, selecting the proposal that the Arbitrator finds most reasonable and appropriate in light of the standard set forth in Rule 24(c). This provision

modifies Rule 24(h) in that no written statement of reasons shall accompany the Award.

(c) If the Arbitrator has not been informed of the written proposals, the Arbitrator shall render the Award as if pursuant to Rule 24, except that the Award shall thereafter be corrected to conform to the closest of the last proposals, and the closest of the last proposals will become the Award.

(d) Other than as provided herein, the provisions of Rule 24 shall be applicable.

## Rule 34. Optional Arbitration Appeal Procedure

At any time before the Award becomes final pursuant to Rule 24, the Parties may agree to the JAMS Optional Arbitration Appeal Procedure. All Parties must agree in writing for such procedure to be effective. Once a Party has agreed to the Optional Arbitration Appeal Procedure, it cannot unilaterally withdraw from it, unless it withdraws, pursuant to Rule 13, from the Arbitration.

**EXHIBIT E**

# NIELSEN, MERKSAMER,
## PARRINELLO, MUELLER & NAYLOR, LLP
ATTORNEYS AT LAW

2350 KERNER BOULEVARD, SUITE 250

SAN RAFAEL, CALIFORNIA 94901

TELEPHONE (415) 389-6800   FAX (415) 388-6874

# FACSIMILE TRANSMISSION

| | | | |
|---|---|---|---|
| **TO:** | Ellen Schuster/JAMS | **FAX NO.:** | 415-982-5287 |
| **CC:** | Whitney Davis, Esq. | | 916-448-9009 |
| **FROM:** | **James R. Parrinello** | **DATE/TIME:** | 6/18/08 |

## MESSAGE

Re:  Renwood v. W.J. Deutsch & Sons

Dear Ms. Schuster,

Pursuant to your request, we are faxing the attached letter to you.  If you would like us to email it to you as well, please let us know.

**Operator:**  pas     **Number of Pages (incl. this cover page):**  26

**Client No.:**  2059.01

_____ ORIGINAL WILL FOLLOW VIA:  ___ First Class Mail _____ Hand Delivery

  _X_  ORIGINAL WILL <u>NOT</u> FOLLOW.

### **WARNING TO RECIPIENT**

THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS CONFIDENTIAL INFORMATION AND ATTORNEY/CLIENT PRIVILEGED.  IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE.  IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED.  IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE.

**IF YOU DO NOT RECEIVE ALL PAGES, PLEASE CALL (415) 389-6800**

SACRAMENTO OFFICE · 1415 L STREET, SUITE 1200 · SACRAMENTO · CALIFORNIA · 95814 · (916) 446-6752
WWW.NMGOVLAW.COM

# NIELSEN, MERKSAMER,
## PARRINELLO, MUELLER & NAYLOR, LLP
### ATTORNEYS AT LAW
#### 2350 KERNER BOULEVARD, SUITE 250, SAN RAFAEL, CALIFORNIA 94901
#### TELEPHONE (415) 389-6800  FAX (415) 388-0874

WWW.NMGOVLAW.COM

June 18, 2008

**VIA FACSIMILE**

Ellen Ruth Schuster
Senior Case Manager
JAMS
Two Embarcadero Center, Suite 1500
San Francisco, CA 94111

      Re:     *Renwood Winery, Inc. vs. W. J. Deutsch & Sons, Ltd.*
             Demand for Arbitration filed on or about June 6-9, 2008

Dear Ms. Schuster:

      In accord with our discussion late yesterday afternoon, I have prepared this letter to state the position of my client, W. J. Deutsch & Sons, Ltd. ("Deutsch"), regarding the proper handling of the new Demand for Arbitration ("Demand") that I received on June 7 by email from Whitney Davis, attorney for Renwood Winery, Inc. ("Renwood"). A copy of the Demand is attached hereto.[1] I will also respond briefly to the email sent today by Mr. Davis to Julie McCool regarding Renwood's claim for ex parte equitable relief.

     1.      The Arbitrator Appointment Procedures Under the JAMS Rules and the Parties' Agreement Apply to this New Case

      Renwood's Demand concerns a new case and must be treated as such. Renwood acknowledges as much by its filing of a new Demand with a new caption. Accordingly, JAMS case commencement procedures apply. (JAMS Rule 5.) Insofar as appointment of an arbitrator is concerned, JAMS arbitrator appointment procedures (JAMS Rule 15) apply, except to the extent the parties' agreement to arbitrate differs. In that regard, Paragraph XII E of the parties' agreement states that the parties will submit

---

     [1]   I received an email (also attached) from Mr. Davis on June 7 attaching an unsigned copy of the Demand which I assume is identical to the demand actually filed by Renwood at or about the same time. We reserve our right to challenge the efficacy of service under JAMS Comprehensive Arbitration Rules and Procedures, Rule 8(a).

Ellen Ruth Schuster
JAMS
June 18, 2008
Page 2

disputes to binding arbitration "by a mutually agreeable arbitrator, or in the event
agreement cannot be reached, then to an arbitrator appointed by the Superior Court in and
for the City and County of Sacramento." Thus, we must begin the process set forth in
Rule 15, which may or may not require the involvement of the Superior Court.

     As you know, Deutsch on October 18, 2006, filed a prior arbitration
demand against Renwood on limited issues and without making any monetary demand,
and Renwood counter-claimed. The parties agreed then that Mr. Ken Gack would serve
as arbitrator for that limited and very specific dispute.

     At the first conference in the prior arbitration, before any substantive
adversary proceedings occurred, the parties agreed to mediation before Judge Scott
Snowden. In a recent court filing, Renwood's Chairman and CEO, Robert Smerling,
acknowledged in his declaration that the prior arbitration was "cancelled" after the parties
entered into mediation. (Mr. Smerling's declaration is too lengthy to attach, but a copy of
the page containing this statement is attached and highlighted.) Judge Snowden met with
the parties in mid-May 2007 and the parties reached an agreement that was summarized
by Judge Snowden in a handwritten memo sent to the parties shortly afterwards.
Renwood however rejected the summary saying that it had a different recollection of the
terms. More discussions followed with Judge Snowden and an interim agreement was
reached during the summer of 2007.

     On November 21, 2007, JAMS wrote to the parties stating "JAMS has
closed our file in the above matter"; the parties were advised that all documents such as
briefs, exhibits evidence and transcripts previously submitted would be destroyed within
30 days. The case has been closed ever since: there have been no communications
whatsoever to or from JAMS since the November 21, 2007 letter; indeed, but for the
JAMS closing letter, there had not been any JAMS involvement with this prior
proceeding since the summer of 2007.

     Recently a new dispute erupted between the parties. Renwood late last
month unilaterally and unlawfully suspended the Services Agreement between the
parties; later, it wrongfully terminated that Agreement. Then – anticipating Deutsch's
claim for wrongful termination – Renwood raced to the state courthouse in Napa County
to commence its lawsuit for a writ of possession and provisional relief. At the same time
as it started that action Renwood filed its new Demand with JAMS. The Napa County

Ellen Ruth Schuster
JAMS
June 18, 2008
Page 3

case has since been removed to federal court, where Deutsch has moved to dismiss the lawsuit.

Given the circumstances, it is hardly surprising that the arbitration just initiated by Renwood will raise new and different claims and issues that were not part of the previously closed arbitration. Beyond the fact that unlike the prior proceeding, Renwood is the Petitioner now and Deutsch is the Respondent, Renwood seeks damages for at least $77 million (whereas unspecified monetary relief was sought in the prior proceeding). Deutsch, for its part, will have substantial claims arising from, among other things, Renwood's unlawful termination of the Agreement. This is a different case, emerging from new facts and implicating different issues. As stated above, JAMS case-opening and arbitrator appointment and vetting procedures must be utilized (except as otherwise provided in the parties' Agreement).

We have the utmost respect for Mr. Gack, but Renwood's new Demand cannot be automatically assigned to him. While we view Renwood's claims to be without merit, we believe the adjudication of this complicated matter may be best undertaken by an arbitrator with substantial prior judicial experience in handling such matters, of which JAMS has many. Additionally, circumstances have changed in the past 18 months since the prior arbitration was commenced that could affect the selection of the arbitrator and/or create conflicts or concerns where none existed previously. For example, we understand Mr. Gack has practiced for many years in Sonoma County and has a long-standing and significant presence there. Just last week, Deutsch acquired a substantial interest in three long-time Sonoma County wineries—Buena Vista, Geyser Peak and Gary Farrell. These new facts are just some of the circumstances which must be closely reviewed before an Arbitrator can be appointed for this case.[2]

Further, there is no emergency here. Deutsch advised Renwood of its position in this matter in February. It was only after several months lapsed that Renwood threatened to seek a TRO. And, despite that threat – issued on June 5th – Renwood has not done so. Indeed, while confronted with Renwood's duplicative litigation and threat, my client has filed a motion to dismiss Renwood's complaint in U.S. District Court which

---

[2]    Indeed, even if this somehow was deemed to be a "continuation" of a prior closed case, under JAMS Rule 10, once an arbitrator is appointed, no new or different claim may be submitted except with the Arbitrator's approval. Presumably, this Rule is intended to avoid the conflicts which may arise from a late-filed claim, among other purposes.

Ellen Ruth Schuster
JAMS
June 18, 2008
Page 4

is set for hearing on July 23. There is no reason to cause JAMS to alter its standard case-opening procedures.

Finally, we note that JAMS should not entertain any claim by Renwood for temporary relief or otherwise, while Renwood has a virtually identical claim pending in the U.S. District Court. We have asked Renwood to voluntarily dismiss that case but it refuses to do so. Such duplicative process raises issues of waiver and estoppel that may be addressed in due course.

2.     **Renwood Must Abide By the Dispute Resolution Procedures Set Forth in the Parties' Agreement and the JAMS Rules**

Initially, Renwood unquestionably agreed to arbitrate all claims related to the Services Agreement – such as the claims asserted here. Renwood likewise unquestionably agreed to submit such disputes for adjudication under the JAMS rules (except as otherwise specified in the Services Agreement). Renwood's present stance – a flagrant effort to avoid both its obligation to arbitrate and to do so under JAMS rules – constitutes a clear contravention of the Services Agreement.

Moreover, by its consistent conduct (including its participation in the prior arbitration and its new Demand), Renwood has conceded that it is bound to arbitrate its dispute with Deutsch, pursuant to the JAMS rules. These JAMS rules provide for the Arbitrator to consider whether a party is entitled to interim injunctive relief. There is no provision or rule allowing Renwood to seek an injunction without a hearing and from some individual or body that has not been appointed pursuant to the JAMS rules and the parties' Agreement. Even if there was such a rule (and there is not), Renwood has waived its right to seek ex parte relief from some unidentified body that has not been duly constituted.

Nor is there any reason – equitable or otherwise – to rewrite the JAMS rules or the Services Agreement – as Renwood seeks to do so blithely. As already noted, Renwood has known of Deutsch's position since February. It appears from Mr. Davis's email of today's date that he approached JAMS sometime in May about Renwood's effort to obtain an injunction. Had Renwood then filed its Demand and requested prompt commencement of the required case-opening process, there would have been no "urgency". Instead, Renwood raced to court. Now, only after receiving Deutsch's motion to dismiss Renwood's complaint (on the basis that the dispute is subject to arbitration) and the communications from Deutsch's counsel establishing that the court cannot interfere with the Arbitrator's authority here, Renwood has circled back to JAMS.

Ellen Ruth Schuster
JAMS
June 18, 2008
Page 5


       Nor should Renwood's dramatic claims about the "end of Renwood" justify a departure from the process to which the parties have agreed.  At bottom, this is only a claim about money.  Moreover, Renwood's claim that Deutsch owes millions of dollars in arrears is utterly misleading - - these claims are based on Renwood's incorrect views of sales standards and the theory that Deutsch should have purchased more wine than it did (not that Deutsch has failed to pay for wine delivered by Renwood).  Indeed, even if Renwood's sales standards theory was correct, its contractual remedy was for Deutsch to purchase *more* wine (wine that Renwood would not deliver to its wrongfully terminated distributor), not give back what it has bought and paid for.  Deutsch owns the wine Renwood seeks to seize and Renwood has no security interest covering this wine.  And, Renwood's unsupported and hyperbolic reference to the "threat of dumping" can hardly justify any seizure.

       In short, Renwood has agreed to a process by which to resolve this dispute and cannot circumvent this process by improper resort to the courts, at the same time as it requests that JAMS depart from its rules.  Once Renwood dismisses the claim in court and this case is properly commenced, its claim for interim relief can be heard by the duly-appointed arbitrator.  Respectfully, Deutsch will object to any other process.


       Sincerely,

       James R. Parrinello


JRP/pas
Enclosures

cc:   Whitney Davis, Esq.
      (via facsimile)

## Jim Parrinello

| | |
|---|---|
| **From:** | Whitney Davis [wdavislaw@comcast.net] |
| **Sent:** | Saturday, June 07, 2008 3:05 PM |
| **To:** | jparrinello@nmgovlaw.com |
| **Subject:** | Demand for Arbitration |

Attachments: DEMAND FOR ARBITRATION.doc

1   Whitney A. Davis, SBN 149523
    CHARTER DAVIS, LLP
2   1730 I Street, Suite 240
    Sacramento, California  95814
3   Telephone: 916.448.9000

4   Attorneys for Petitioner Renwood
    Winery, Inc.
5

6

7

8                   JUDICIAL ARBITRATION

9              AND MEDIATION SERVICE

10

11  RENWOOD WINERY, INC               Case No. 1130003656

12          Petitioner,               DEMAND FOR ARBITRATION

13      v.

14  W.J. DEUTSCH & SONS, LTD.,

15          Respondent.

16

17

18

19                              I.

20                GENERAL ALLEGATIONS

21      1.    Renwood Winery, Inc., (hereinafter "Renwood") owns and

22  operates a winery located in Amador County, California. Renwood has

23  produced several varieties of award-winning premium wines for more

24  than a decade. In 2005, Renwood's in-house sales and marketing staff

25  sold approximately 100,000 cases of wine domestically.  Although,

26  Renwood is a small winery by industry standards, it controls many of

27  the old vine Zinfandel grapes in California, and dominates the Premium
28

Zinfandel wine categories. The hand-crafted wines are produced in small lots, which distinguishes the brand from other producers. For this reason, Renwood received overtures from wine marketing and sales firms wishing to represent the winery and thereby add a premium producer to their product line.

2.     In like fashion, in the Spring of 2006, industry-leading wine marketeer W.J. Deutsch & Sons, Ltd. ("Deutsch"), approached Renwood and proposed that Deutsch obtain the exclusive right to sell Renwood products domestically, thereby obviating the need for Renwood to employ its own sales force. Deutsch cited its great success with other major brands, as achieved through its 120 person sales force, and promised to provide Renwood with greatly increased sales and positive exposure for this premium brand. Deutsch wanted to take this already-successful brand to unprecedented on-premise and off-premise sales levels through Deutsch's distribution channels. [1]

3.     Deutsch reported to Renwood that it had taken an obscure winery in Australia (Yellow Tail) from 200,000 cases per year in sales to almost 8 million cases per year in 5 years. According to Deutsch, this achievement was unprecedented in the wine industry, and provided Deutsch with the credibility and marketing leverage to place Renwood's premium products on more wine lists and selling establishments than ever before. Renwood selected Deutsch in light of its success with Yellow Tail, its industry expertise, its reportedly formidable marketing

---

[1] "On-Premise" sales are those made predominantly to restaurants, where the wine is consumed on the premises. Increases in these sales are primarily achieved through placement of products into restaurants to be sold "by the glass," and by convincing the establishment to place more of the product line on their wine list. "Off-Premise" sales are those made to liquor stores, grocery stores, etc., where the customer purchases the bottles of wine and consumes them elsewhere, or "off-premise."

1  and sales staff, its extensive and well-established distributor network,
2  and its proven ability to leverage its market strength and contacts to
3  place Renwood wine in diverse distribution channels throughout the
4  country.

5       4.    Renwood's pre-contract distributor network took more than
6  a decade to build.  Renwood's coveted "by-the-glass" marketing efforts
7  likewise took years to become effective.  Because of this, Renwood was
8  concerned about the risks posed by transferring sales, marketing and
9  distribution duties to salesmen and distributors unfamiliar with the
10 brand.  Renwood made this concern explicit in the Services Agreement
11 with Deutsch: *"Renwood abandoned its distributor network on the*
12 *representation by Deutsch that Deutsch will exert its portfolio brand*
13 *control to ensure priority distributor effort to meet or exceed Renwood*
14 *Tier Sales Standards."  See* Agreement at V.B(i).

15      5.    In addition to Deutsch's "priority distributor effort" promise,
16 the parties agreed in writing that Deutsch would perform very defined
17 marketing tasks and use its best efforts to promote, market, and
18 distribute Renwood's wines "in a manner in keeping with Renwood's
19 reputation in the marketplace." *Id.* at VIII.A.  This provision, along with
20 the tier-specific performance goals set by the parties, reflected the
21 requirement that Deutsch "enhance" the distinctive and high-quality
22 Renwood brand. *Id.* at X.A.

23      6.    Renwood reposed trust and confidence in Deutsch by
24 granting to Deutsch the exclusive right to perform the business-critical
25 tasks of protecting, promoting, and enhancing the Renwood brand.

26      7.    The parties expressly eliminated Renwood's risk of loss by
27 including a sales guarantee in the Services Agreement. *Id.* at VIII.D.  A
28 monthly performance standard was established for the four "tiers" of

JUN-18-08  15:07  From:NWPWN MARIN 2            4156346977            T-869  P.11/26  Job-229

1  wine that Renwood produced. *Id.* at Schedule C. Deutsch guaranteed
2  15% year-over-year growth in monthly sales for a period of five years.
3  If Deutsch's sales did not meet the standard, it promised to "cure" by
4  purchasing the deficit from Renwood, by tier. *Id.*

5      8.    The parties executed the Services Agreement in March,
6  2006. Deutsch took over the marketing, selling, and distribution of
7  Renwood's wines in April of 2006, and took credit for a 1,100 case sale
8  booked in March. Since that time, with only one exception, Deutsch
9  failed to achieve the required tier sales performance in any of the
10  subsequent months. In fact, Deutsch's sales have fallen short by many
11  thousands of cases. Months after the transition to Deutsch, some
12  distributors had not even received introductory sales meeting from
13  Deutsch, forcing Renwood to conduct these meetings at its own
14  expense.

15      9.    Due to these lost sales, Renwood suffered a loss in
16  shareholder value; a loss in its ratings and a loss of brand awareness and
17  recognition in the marketplace. Deutsch's failure to meet the
18  performance standards is the consequence of Deutsch ignoring many of
19  the marketing obligations it agreed to perform. Making matters worse,
20  some of the marketing efforts that Deutsch managed to exert served to
21  actually harm Renwood's reputation. In this regard, Renwood's
22  damages greatly exceed the monetary amount of the untimely cure
23  payments Deutsch made to Renwood.

24      10.   Prior to the execution of the Services Agreement, Deutsch
25  requested and was provided Renwood's financial statements. Deutsch
26  hired a financial analyst to scrutinize the cash flow, operating debt, and
27  other detailed financial information. This information clearly illustrated
28  this small winery's monthly dependence on cash flow from wine sales.

11.  Deutsch drafted the first iteration of the Services Agreement, employed a wine and spirits expert attorney to revise the later drafts, and was the party most experienced in the drafting and performance of marketing and distribution agreements for wine.

12.  The resulting Services Agreement clearly states that Renwood's transmittal of a Notice of Breach of the tier sales standards starts a 15-day period in which Deutsch must cure the breach.  There is no provision in the Services Agreement that in any manner limits Renwood's breach notice to only an annual basis.

13.  Due to Deutsch's dismal sales performance, the time for Deutsch to cure came quickly.  The first cure demand was met with arguments about the base-year sales upon which the guarantee was based.  Then, the cure payments were delayed beyond the 15-day period because Deutsch contended that a 35-day period applied after presentment of the cure invoice.  In a particularly malicious act, Deutsch then cured a disastrous month's sales performance by purchasing wine not by tier, but by buying only one or two products. They did so because Deutsch receives a significant marketing contribution from Renwood for the sales of some wines, and no contribution from others.  Deutsch cured by buying wines with the greatest marketing contribution, while the other products (affording no contribution) were left to remain in Renwood's inventory.  The result of this tactic was to throw Renwood's vintage of the over-bought product gravely out of balance, portending the exhaustion of the supply before the new vintage becomes available.  To add insult to injury, Deutsch was not using the marketing contributions at the distributor level to support the case price.  Instead, and in contravention of the terms of the Services Agreement, Deutsch banked the marketing contributions until

1  they decided to spend inordinately large sums of money on
2  unauthorized and ill-conceived promotions and use some of Renwood's
3  marketing money to offset expenses for the Yellow Tail advertising
4  agency.    While Deutsch earned interest on the banked marketing
5  contributions, sales support evaporated at the distributor level and sales
6  plummeted.    Deutsch's continuing breach of the cure provisions,
7  mishandling of the marketing contributions and degradation of the
8  brand constituted a malicious attempt to undermine Renwood's business
9  and make Renwood vulnerable to a distress sale.

10       All of the foregoing and following facts and allegations are
11  incorporated in each of the cross-claims asserted herein.

## II.
## CROSS-CLAIMS

### FIRST CAUSE OF ACTION
### Breach of Contract

17       14.   In reliance on Deutsch's representations, oral and written
18  promises, and its expertise and stature in the industry, Renwood reposed
19  special trust and confidence in Deutsch.  By agreeing to serve, and by
20  serving, as Renwood's exclusive marketer and distributor of Renwood's
21  wines, Deutsch accepted the burden of those critical responsibilities and
22  accepted control over the future sales of Renwood's wines.

23       15.   When accepting that control, Deutsch knew that Renwood
24  would abandon its distributor network in favor of Deutsch's network.
25  Deutsch also knew that re-aggregating Renwood's distributor network
26  once disbanded was, if not impossible due to marketplace realities,
27  prohibitively costly for Renwood.

28       16.   Deutsch also knew that its marketing of the Renwood brand

would be the sole means to maintain and enhance Renwood's brand identity and awareness among consumers and that, as Renwood's exclusive marketer, its marketing services were critical to the success of Renwood's business.

17.    Since April of 2006, Deutsch has been, and has held itself out as, Renwood's exclusive agent with regard to marketing, selling, and distributing Renwood's wine in communications and relations with beverage distributors, retailers, and the beverage industry as a whole.

18.    Deutsch breached its contractual obligations to Renwood by its acts as described herein, including, but not limited to, the subjects of the Notices of Breach attached hereto and incorporated by this reference, as well as: (1) WJD's false statement to beverage distributors that Deutsch purchased Renwood, (2) WJD's failure to use its best efforts to market Renwood's wine, (3) WJD's failure to seek Renwood's input into the manner of marketing its various wines, (4) WJD's failure to timely and accurately make its cure payments, (5) WJD submitting fraudulent marketing contribution claims, (6) WJD lying about the source of wine depletions to improper charge marketing allowances, (7) WJD selling its own cure inventory before it has met the Sales Performance Standards, and (8) WJD failing to meet the Sales Performance standards.

19.    Deutsch's promise "to ensure priority distributor effort to meet or exceed Renwood Tier Sales Standards," requires Deutsch to perform numerous, specific tasks. Deutsch has failed to perform many of those tasks and failed to perform others as they are described in the Agreement or to use its best efforts to perform those tasks. Renwood has fully performed all of the obligations it is required to under the Agreement.

1    20.    Deutsch breached the Agreement by failing to use its best
2  efforts to promote, enhance, and sell Renwood's wines. Deutsch further
3  breached the Services Agreement by failing to properly and timely cure
4  the sales guarantee deficits.

5    21.    Deutsch further breached the Agreement by failing, at least;
6  (9) to assign a competent brand manager to oversee the marketing and
7  distribution of Renwood's wines, (10) to seek and gain Renwood's
8  prior-approval of that brand manager, (11) to timely replace that brand
9  manager, (12) to inform and educate Deutsch's distributors and retail
10 purchasers about Renwood's wines, (13) to coordinate sales meetings
11 and ride-alongs with Deutsch's distributors, (14) to consult with
12 Renwood regarding the appropriate marketing of Renwood's various
13 types of wines, (15) to use Renwood's marketing contribution solely to
14 promote, enhance, and sell Renwood's wines, (16) to market
15 Renwood's wines in States where Renwood had established consumer
16 recognition, (17) by mismanaging Renwood's promotions, (18) by
17 disrupting Renwood's high quality, premium wine business with
18 Costco, (19) by deploying the "Find the Wren" marketing campaign
19 without prior approval from Renwood, and (20) by failing to ensure that
20 depletions of Renwood's wines did not fall below 80% of the tier-
21 specific performance standards.

22    22.    Deutsch further breached the Agreement by failing to, at
23 least: (21) provide Renwood with marketing reports, specifically, with
24 "contact reports, order reports, marketing contribution usage reports and
25 shipment summary reports" within 30 days of the end of each month,
26 and (22) to provide Renwood with sales reports, specifically, with
27 "sales, depletion, inventory and accounts sold reports" by the 20th day
28 following the month for which the categories were measured.

23. Deutsch further breached the Agreement by failing to, at least: (23) distinguish for accounting purposes between its sales of wine from the inventory purchased from Renwood to cure the failure to meet the performance standards from the wine Deutsch was obligated to sell to meet those performance standards; and (24) to timely order from Renwood, and to timely pay Renwood, for the amount of wine Deutsch was obligated to purchase to cure its failure to meet the performance standards.

24. As a direct result of these of the Agreement by Deutsch, Renwood has suffered damage to its business and to its Renwood brand in a monetary amount significantly greater than the amount Deutsch has paid to Renwood in cure payments.

## SECOND CAUSE OF ACTION
### Breach of the Covenant of Good Faith and Fair Dealing

25. By its conduct as described herein, Deutsch has breached the covenant of good faith and fair dealing inherent in the parties' Agreement.

26. As result of this breach, Renwood has been denied the benefits it bargained for in the Agreement. Renwood has suffered damage to its business and to its Renwood brand in a monetary amount significantly greater than the amount Deutsch has paid to Renwood in cure payments.

## THIRD CAUSE OF ACTION
### Promissory Fraud

27. Deutsch represented to Renwood: (1) that it possessed the requisite expertise to market Renwood's premium wines in an manner that would protect, promote, and enhance the Renwood brand and its

1  awareness among consumers, (2) that it intended to use that expertise,
2  on a best efforts basis, to ensure a "priority distributor effort to meet or
3  exceed Renwood Tier Sales Standards;" (3) that Deutsch would timely
4  cure deficits resulting from its sales guarantee; and (4) that Deutsch
5  would in good faith discharge the obligations it owed under the Services
6  Agreement.  The fact that Deutsch possessed the ability and intention to
7  perform these critically important functions is the touchstone and
8  essence of the parties' Agreement.

9      28.  These representations by Deutsch, however, were and are
10  false.  Deutsch does not possess the described requisite expertise.
11  Assuming that Deutsch possesses the requisite expertise, it entered the
12  Agreement with no intention of performing its obligations under the
13  Agreement—as is evidenced by its conduct described herein.  Deutsch,
14  in fact, has not performed those obligations.

15      29.  Deutsch knew at the time it negotiated the Agreement that
16  these representations were false.  Deutsch, nonetheless, intentionally
17  made the misrepresentations to induce Renwood to enter into the
18  Agreement.

19      30.  At the very least, Deutsch made its misrepresentations
20  negligently.

21      31.  Renwood was unaware that Deutsch's representations were
22  false. Due to  Deutsch's industry expertise, its considerable marketing
23  staff, its extensive and well-established distributor network, and its
24  proven ability to place wine in many retail outlets throughout the
25  country, Renwood reasonably relied upon Deutsch's misrepresentations
26  to enter into the Agreement.

27      32.  Deutsch's misrepresentations constitute deceit, specifically,
28  but not exclusively, promissory fraud, intentional misrepresentation,

1   and negligent misrepresentation.

2       33.   As a result of Deutsch's deceit, Renwood has suffered

3   damage to its business and to its Renwood brand in a monetary amount

4   significantly greater than the amount Deutsch has paid to Renwood in

5   cure payments.

6                          **FOURTH CAUSE OF ACTION**

7                           **Defamation- False Light**

8       34.   Deutsch informed various beverage distributors that it

9   purchased Renwood Winery.   Deutsch's assertion was made in a letter

10  to those distributors and, on information and belief, orally as well.  The

11  assertion is false.

12      35.   Deutsch knowingly published this falsehood at a time that

13  Renwood was exerting efforts to: 1) become a publicly-traded company;

14  2) incur debt to purchase other wineries; and 3) consolidate winery

15  operations into a package that afforded increased shareholder value

16  through a stock purchase.  The publication was timed perfectly to inflict

17  injury on Renwood.   The publication took place on the heels of

18  Renwood's insistence that Deutsch comply with the cure provisions of

19  the sales guarantee.  The publication injured Renwood's reputation by,

20  among other reasons, conveying the falsehood that Renwood is no

21  longer an independent, on-going concern, and the inference that

22  Renwood management was no longer in control of the company.

23  Deutsch, moreover, had reason to know that the distributors it notified

24  would republish the falsehood and that those republications would

25  damage Renwood's reputation further, in the eyes of wine industry

26  leaders, vendors, distributors, potential equity investors, shareholders,

27  lenders and promoters of the public offering.

28      36.   Deutsch's   publication   of   the   falsehood   constitutes

1  defamation per se.  The falsehood is directed specifically at Renwood's
2  ability to conduct its business with wine distributors and retailers, now
3  and in the future, and is only consistent with an effort to devalue
4  Renwood and to undermine its business.

5      37.    In addition to the reputational damage suffered, Renwood's
6  ability to re-aggregate a distributor network after termination of the
7  Agreement has been damaged in light of the false impression that
8  Renwood is no longer an independent, on-going concern.

9

10                        **FIFTH CAUSE OF ACTION**
11            **Interference with Prospective Economic Relations**

12      38.    The Agreement provides that it will terminate either by
13  mutual agreement or upon the occurrence of certain events.  In either
14  case, the Agreement contemplates that at some point Deutsch will no
15  longer serve as Renwood's exclusive marketer and distributor.

16      39.    Deutsch is acutely aware that the relationships formed
17  between a winery and its distributors is valuable and critical to the well-
18  being of the winery's business.  Deutsch knows of the relationships
19  Renwood had with its distributors, currently has with other distributors
20  via the Deutsch network, and could have with still others when the
21  Agreement terminates.

22      40.    By its conduct as described herein, Deutsch intentionally, or
23  at least negligently, has interfered with Renwood's ability to re-
24  aggregate a distributor network for its wines.  Renwood's relations with
25  its previous and potentially future wine distributors has been
26  significantly damaged by Deutsch publishing the false statement that it
27  purchased Renwood, by its failure to inform and educate distributors
28  about the Renwood brand, by its failure to maintain Renwood's brand

1  presence in the States where it previously had consumer recognition, by
2  its threats and heavy-handed communications to distributors dissuading
3  them from ordering direct from Renwood, and by its failure to use its
4  best efforts to maintain sales of Renwood's wines throughout the
5  country.    Further, the degraded sales performance combined with the
6  defamatory statements has effectively derailed any public offering.

7      41.    As a direct result of Deutsch's interference with Renwood's
8  prospective economic relations, Renwood has suffered damage to its
9  business and to its Renwood brand in a monetary amount significantly
10 greater than the amount Deutsch has paid to Renwood in cure payments.

11

12                        **SIXTH CAUSE OF ACTION**
13                          **Unfair Business Practices**

14     42.    By its conduct as described herein, Deutsch engaged in
15 common law unfair competition and has violated Business &
16 Professions Code section 17200 et seq.

17     43.    As a direct result of Deutsch's acts of unfair competition,
18 Renwood suffered actual and certain monetary losses and loss of
19 shareholder value.

20                       **SEVENTH CAUSE OF ACTION**
21                       **Fraud – Marketing Contributions**

22     44.    As of March 31, 2008, distributor Southern Wine & Spirits
23 reported to BDN the depletion of 50 cases of Red Label wines and
24 1,386 cases of Private Label wines to BevMo.

25     45.    Deutsch pulled that depletion data from the BDN database
26 using its DIVER computer software package.

27     46.    Deutsch manipulated its DIVER report to combine the Red
28

1  Label and Private Label case depletion volume under only the Red
2  Label sku's.

3      47.   On April 25, 2008, WJD sent its Quarterly Marketing
4  Contribution invoice to Renwood including the manipulated DIVER
5  data, demanding marketing allowances for Private Label wines for
6  which they knew they could receive no marketing contribution.

7      48.   On May 1, 2008, WJD employee Francois Magnant
8  (Renwood's Brand Manager) was not truthful when providing his e-
9  mail response to Robert Smerling of Renwood about the facts behind
10  the spike in Red Label sales to BevMo;

11      49.   Later on May 1, 2008, WJD employee Francois again sent
12  the manipulated DIVER data to Renwood to explain the Red Label sales
13  spike;

14      50.   On May 2, 2008, Robert Smerling sent correspondence to
15  Peter and William Deutsch concerning the manipulated data and
16  demanded an explanation.

17      51.   On May 5, 2008, Peter Deutsch sent correspondence to
18  Robert Smerling tacitly admitting that WJD unilaterally decided to
19  count the Private Label cases for performance purposes, but was silent
20  on the issue of counting those cases for purposes of charging Renwood
21  a marketing contribution.

22      52.   The difference between the marketing contribution
23  demanded by WJD, and that which would be due had WJD not
24  manipulated DIVER is $22,000.

25      53.   By counting those cases for depletion credit against the 80%
26  depletion standard in the Services Agreement, WJD took depletion
27  credits from Renwood of in excess of $140,000.

28      54.   By counting those cases for sales credit against the Sales

Performance Standard, WJD took sales credit from Renwood of in excess of $140,000.

55.  WJD did manipulated the data in the same manner to defraud Renwood for the fourth calendar quarter of 2007. WJD's fraud cost Renwood not less than $2,000 in fraudulent marketing contributions that WJD collected, and sales/depletion credits according to proof. This caused a serious problem with Renwood largest customer Southern Wine & Spirits because of Peter's accusation that it was done on SWS behest and that Deutsch was innocent, when the data show that SWS is innocent and that Deutsch altered the data.

## EIGHTH CAUSE OF ACTION

### Declaratory Relief

56.  A controversy exists between the parties regarding the cure interval (i.e. monthly, quarterly, annually) and the amount by which Tiers 2 & 3 must be cured (i.e. 85% versus 100% with 15% of the cure coming from any tier).

57.  A controversy also exists regarding whether Deutsch must buy-out the remaining years of the sales guarantee due to their breach and non-performance of the Services Agreement.

58.  Renwood has performed all of its obligations under the Services Agreement, and Deutsch has not done so. They owe Renwood over $3,000,000 which is severely past due.

**59.** Renwood therefore seeks a declaration of the rights and liabilities of the parties as follows:

a. That Deutsch has breached the contract and has failed to perform same by using its best efforts to sell and market Renwood wines;

b. That Deutsch has engaged in Unfair Business Practices as defined by California Business & Professionals Code section 17200 et. seq. by engaging in predatory business practices through manipulating sales data, using the cure procedure to delay payment; and by selling from its cure inventory before satisfying its sales performance guarantee under the Services Agreement.

c.  That the Services Agreement is terminated due to the Breach of same by Deutsch;

d.  That Deutsch is responsible to buy-out the remaining years of the sales guarantee, according to proof, at a future value of not less than $37 million;

e.  That Deutsch is responsible to satisfy all cures on a monthly basis to the date of termination;

f.  That Deutsch is responsible to cure Tiers 2 & 3 at 100%, with 85% of the cure coming from purchases within those Tiers, from the date the contract was entered, to the date of termination;

g.  That Deutsch is responsible to provide restitution to Renwood for the fraudulent marketing contributions at three times the amount taken in unearned marketing

1     contributions.

2

3     **THEREFORE**, Renwood prays for the following relief;

4     1.     That Renwood be awarded all damages recoverable at law or

5 in equity in an amount according to proof;

6     2.     That Renwood be awarded its attorneys' fees and costs;

7     3.     That Renwood be provided declaratory relief as set forth

8 above;

9     4.     That Renwood be awarded treble damages for each

10 fraudulent act it in which it engaged;

11     5.     That WJD be ordered to pay all cures owed to Renwood.

12     6.     That WJD be ordered to pay the reasonable value of all

13 future guarantee payments, of no less than $37 million.

14     7.     That WJD be ordered to compensate Renwood for a loss of

15 good will in Renwood Winery, Inc. at a valuation of not less than $40

16 million.

17     8.     That WJD be ordered to reimburse Renwood for all

18 Marketing Contributions paid by Renwood that were improperly spent

19 or held by WJD, an amount not less than $1 million.

20     9. For all other relief that is proper and just.

21

22 DATED: June 18, 2008          CHARTER DAVIS, LLP

23

24

25 _____

26                 WHITNEY A. DAVIS
                SBN #149523

27

28

*Affidavit of Robert Swerling, filed Napa Superior Court June 9, 2008*

*Page 5*

**Arbitration, Shipment and Payment Changes:**

19.    In the year before hiring WJD, Renwood shipped about 96,000 cases of wine and collected the proceeds directly from the distributors. By the end of WJD's first year of service, in June of 2007, WJD had only sold about $3 million of the $8.217 million performance standard.

20.    As the first year progressed, WJD fell further and further behind the sales performance standards. In the Fall of 2006, after just 6 months of sales WJD demanded that Renwood accept annual cure payments. After I declined on Renwood's behalf, WJD started to disrupt shipment and payment procedures dramatically.

21.    Then, WJD filed for arbitration regarding the cure and sales guarantee in November, 2006, only 7 months into the agreement. <u>The arbitration was eventually cancelled after the parties entered into mediation.</u> An interim operating agreement resulted from the mediation that gave WJD a reduced sales goal. (See *Interim Agreement*, **Exhibit B** to the *Evidentiary Exhibits*)  Renwood later allowed that interim agreement to expire after Renwood realized that WJD could not even achieve the agreement's modified sales goals.

22.    Before WJD filed for arbitration, they paid Renwood regular invoices within 35 days generally. Cure invoices were paid late.

23.    *After* filing for arbitration, however, WJD unilaterally declared that they could cure by merely "acknowledging" the cure amount in 15 days, and not pay for it. WJD would place an order for the cure goods 10 to 15 days thereafter, and then pay Renwood 35 days after their order is *shipped*. WJD also manipulated the shipping date by refusing to accept goods within the 15 day cure period. This departure from the prior contractual arrangement moved Renwood's cash flow back between 50-60 days.     This action by WJD actually removed two months of income out of Renwood's annual sales, placing Renwood in jeopardy with lender covenants.

-5-

U.S. District Court, Northern District of California, Case No. C 08-02848 PJH

## PROOF OF SERVICE

1

2  I, the undersigned, declare under penalty of perjury that:

3  I am a citizen of the United States employed in the County of Marin. I am over the age of 18 and not a party to the within cause of action. My business address is 2350 Kerner Blvd., Suite 250,
4  San Rafael, California 94901. I am readily familiar with my employer's practices for collection and processing of correspondence for mailing with the United States Postal Service and for pickup by
5  Federal Express.

6  On June 18, 2008, I served a true copy of the foregoing LETTER TO ELLEN SCHUSTER AT JAMS DATED JUNE 18, 2008, on the following parties in said action, by serving:
7

8  | Whitney A. Davis | |
   | Charter Davis LLP | |
9  | 1730 I Street, Suite 240 | |
   | Sacramento, CA 95811 | |
10 | Fax: (916) 448-9009 | |
   | Attorneys for Renwood Winery, Inc. | |

11

12  ___ **BY U.S. MAIL:** By following ordinary business practices and placing for collection and mailing at 2350 Kerner Blvd., Suite 250, San Rafael, CA a true copy of the above-referenced
13  document(s), enclosed in a sealed envelope; in the ordinary course of business, the above documents would have been deposited for first-class delivery with the United States Postal
14  Service the same day they were placed for deposit, with postage thereon fully prepaid.

15  _X_ **BY FACSIMILE:** By transmitting by facsimile machine to the above party(ies) at the above facsimile number(s).

16  **BY OVERNIGHT DELIVERY:**
    ___ **FEDERAL EXPRESS:** By following ordinary business practices and placing for pickup by
17  FEDERAL EXPRESS at 2350 Kerner Blvd., Suite 250, San Rafael, CA copies of the above documents in an envelope or package designated by FEDERAL EXPRESS with delivery fees
18  paid or provided for.

19  Executed in San Rafael, California, on June 18, 2008.

20  I declare under penalty of perjury, that the foregoing is true and correct.

21

22                                    _Paula Scott_
                                      Paula Scott
23

24

25

26

# EXHIBIT F

## Whitney A. Davis

**From:** Whitney Davis [wdavislaw@comcast.net]
**Sent:** Monday, June 30, 2008 8:09 AM
**To:** Whitney A. Davis
**Subject:** FW: arbitration

**From:** Robert Smerling [mailto:ris@renwood.com]
**Sent:** Tuesday, June 10, 2008 7:30 AM
**To:** whitney davis
**Subject:** FW: arbitration

**From:** Peter Deutsch [mailto:peterd@wjdeutsch.com]
**Sent:** Tuesday, June 10, 2008 6:54 AM
**To:** Robert Smerling; billd@wjeutsch.com
**Subject:** RE: arbitration

Robert,
I heard you had a great productive day in Napa Court yesterday.

*Peter Deutsch*
*CEO*
**W. J. Deutsch & Sons, Ltd.**
Tel: (914) 251-9463
Fax: (914) 251-0283
email: peterd@wjdeutsch.com



**From:** Robert Smerling [mailto:ris@renwood.com]
**Sent:** Saturday, June 07, 2008 9:07 PM
**To:** Peter Deutsch; billd@wjeutsch.com
**Subject:** arbitration

Peter,
Let me bring to your attention are formal filing for arbitration.

Robert I. Smerling
Chairman & CEO
Renwood Winery
10461 Old Placerville Rd.
Suite 150
Sacramento, Ca. 95827
Tel: 916 381-9460

6/30/2008