1  NIELSEN, MERKSAMER, PARRINELLO,
   MUELLER & NAYLOR, LLP
2  JAMES R. PARRINELLO, SBN #63415
   SEAN P. WELCH, SBN #227101
3  2350 KERNER BLVD., SUITE 250
   SAN RAFAEL, CA 94901
4  TELEPHONE (415) 389-6800
   FAX       (415) 388-6874
5  e-mail: jparrinello@nmgovlaw.com

6  *Attorneys for Defendant*
   W.J. Deutsch & Sons, Ltd.
7

8
                    UNITED STATES DISTRICT COURT
9
              FOR THE NORTHERN DISTRICT OF CALIFORNIA
10
                      SAN FRANCISCO DIVISION
11

12  RENWOOD WINERY, INC.,                )   Case No.  C 08-02848 PJH
                                         )
13         *Plaintiff,*                   )   **DECLARATION OF EVIS
                                         )   SAVVIDES OPPOSING TRO
14  v.                                   )   AND RELATED REQUESTS**
                                         )
15  W.J. DEUTSCH & SONS, LTD., a New York )
16  Corporation, and DOES 1-50, inclusive, )
                                         )
17         *Defendants.*                  )
                                         )
18                                       )
                                         )
19                                       )
                                         )
20  _____)

21        I, Evis Savvides, declare as follows:

22        1.  I am the Chief Operating Officer of W.J. Deutsch & Sons, Ltd., a New York

23  corporation with its principal place of business in the state of New York (WJD).

24        2.  WJD is a family owned business and is one of the largest and most successful

25  wine marketing companies in the USA.

26        3.  WJD entered into a wine marketing agreement (the Services Agreement,

27  Exhibit A hereto) with Renwood Winery in the spring of 2006.  Disputes concerning the

28
                                        1

application and interpretation of the Services Agreement began almost immediately. Two issues were disputed: whether the agreement required WJD to purchase 85%, or 100%, of the "tier sales standard" for two "tiers" (categories) of wine products; and whether WJD's performance under the "tier sales standards" was to be measured (and if applicable, "cured") on an annual or monthly basis. Attempts were made to mediate (see, e.g., paragraph XII.E of the Services Agreement) with the assistance of former Napa County Presiding Judge and now JAMS mediator, Scott Snowden. Ultimately these efforts resulted in the parties signing an Interim Agreement which was to be a precursor to a written amendment to the Services Agreement. Renwood, however, declined to go forward with the contemplated amendment in late January 2008. As a result WJD notified Renwood in writing on <u>February 21, 2008</u> (Exhibit B hereto), that it would thereafter make any applicable "cure" purchases annually (at the end of each contract fiscal year) at 85% for the two tiers of wine in dispute, in accordance with WJD's understanding of the Services Agreement.

4. **Renwood has sat on its hands for more than 4 months.** Renwood has known for 4 months of WJD's position. It has done nothing during that time but now illogically claims there is an "emergency." Based on that delay alone, there is no justification for a TRO.

5. **This application contravenes Renwood's obligation to arbitrate.** In addition to requiring mediation, Paragraph XII.E of the Services Agreement provides for arbitration. This application constitutes a bold effort to circumvent Renwood's obligation to arbitrate disputes. I am also advised there is case law to the effect that the application for injunctive relief is not legally permitted by the Federal Arbitration Act ("FAA"). *See Comedy Club, Inc. v. Improv West Associates*, 514 F.3d 833, 843 (9th Cir. 2007). In that regard, I note that there is no question that the Service Contract – providing for nationwide distribution of Renwood's products – effects interstate commerce (<u>i.e.</u>, I am advised under such circumstances the FAA governs the parties' rights). *See Citizens*

2

*Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003).

6. **WJD has paid Renwood in full for all wine in the inventory at issue and WJD owns that wine.** It is important for the Court to understand that WJD has already paid Renwood in full for all of the wine in the inventory that Renwood now seeks to attach. This is WJD's wine and Renwood has no right to it.

7. **Renwood has no security interest in the wine in the inventory at issue.** Section VII of the Services Agreement sets forth the terms of pricing and payment for wines delivered to WJD. It provides that WJD has 35 days to pay for wines <u>after the shipping date</u> (VII.B(i)); that invoices not paid within the 35 day period will bear interest at 18% (VII.B(i)(a); and that a condition of breach is triggered if invoices are more than 60 days past due (VII.B.(i)(b). It then provides Renwood with a security interest in such wine which has been delivered to WJD but not been paid for. (VII.B(i)(c).) But here, WJD has paid for all the wine in the inventory, and Renwood is asserting a security interest over products where it has no security interest under the Services Agreement.

Additionally, it is important to understand that Renwood's claim for money is <u>not</u> for wine that has been delivered but not paid for; instead it is based on the theory that WJD should have bought more wine than it did and that WJD must pay for wine that it has never received. WJD disputes this strenuously and the agreement is to the contrary.

8. **Renwood itself is in breach of its contractual obligation to pay WJD $224,216 in marketing fees for the first quarter of 2008 and owes additional fees for April and May 2008.** Section VI of the Services Agreement requires Renwood to pay WJD quarterly for marketing support of the Renwood brand. Payment is due within 30 days of invoice. Renwood is past due on its obligation to make the marketing support payment of $224,216 for the first quarter of 2008. WJD delivered a Notice of Breach to Renwood for this amount on May 28, 2008 (Exhibit C hereto), which apparently triggered Renwood's action in this court.

9. **Renwood already holds $1,000,000 of WJD money.** At the same time the

parties signed the Services Agreement, WJD invested $1 million in Renwood in exchange for a small percentage of stock, pursuant to a securities purchase agreement (pertinent portions attached as Exhibit D hereto). The stock is not publicly traded and, in view of Renwood's unilateral termination of the Services Agreement, is to be re-purchased by Renwood over a 2 ½ year period. Thus Renwood already holds $1 million of WJD's money which is tantamount to "security."

10. As explained above, WJD owns and has paid Renwood in full for that inventory. It consists of approximately 16,540 cases of wine for which we paid Renwood approximately $1,212,410. WJD will be seriously harmed if the relief requested by Renwood is granted. Renwood has unilaterally—and in our view, wrongfully--terminated the Services Agreement, making it much more difficult for us to sell this wine. If we are prevented from selling it for any length of time, WJD likely will be forced to sell at a material loss. Existing vintages will fall behind current vintages released by the winery and customers will be much less likely to purchase old vintages when current vintages are available. Additionally, in some cases the wine quality will diminish over time, making it more difficult to sell.

11. I understand Renwood may be claiming that WJD plans to "dump" at below market prices the wine inventory which it owns. That is completely false.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and of my own personal knowledge except for those matters stated on information and belief and, as to those matters, I believe them to be true. If called as a witness, I could competently testify thereto.

Executed on July 1, 2008, at White Plains, New York.

Evis Savvides

4

Execution Copy

# SERVICES AGREEMENT

## I.
## THE PARTIES

A.  Renwood Winery, Inc., ("Renwood"), a California corporation, maintains its principal place of business at 8795 Folsom Boulevard, Sacramento, California, 95826.

B.  W.J. Deutsch & Sons, Ltd ("Deutsch"), a New York corporation, maintains its principal place of business at 108 Corporate Park Drive, White Plains, New York, 10604.

## II.
## RECITAL

A.  Renwood produces distinctive brands of premium wines which it sells in the United States of America, Canada, the Caribbean Islands, Europe, and various locations worldwide through a broker and distributor network. These products bear the "Renwood®" name. Renwood possesses the required federal, state and local licenses to do so.

B.  Deutsch purchases, markets and sells premium wines at wholesale on behalf of wine producers through its own international and domestic distributor network, and possesses the required federal, state and local licenses to do so.

C.  By this agreement, Renwood hires Deutsch as its exclusive service provider to purchase, market, promote, sell and deplete Renwood® products on the terms and conditions set forth below. Except as set forth below, Deutsch accepts Renwood® as its exclusive Zinfandel brand and exclusive wine supplier from the regions designated below.

## III.
## DEFINITIONS

A.  **Anniversary Date**: July 1, 2007, and each succeeding first of July during the term of this agreement.

B.  **Authorized Execution**: the execution of this contract pursuant to resolution by the governing body of each Party.

C.  **Condition of Breach**: a defined event that vests in the aggrieved Party a right to terminate performance on this agreement.

D.  **Contracted Products**: the Renwood® brand wine products that Deutsch acquires the exclusive right to market and sell, subject to the terms and limitations set forth below.

E.  **Deplete**: shall mean the sale of wine by a distributor to merchants that sell the wine to the final consumer.

EXHIBIT A

Execution Copy

F.   **Effective Date**: April 1, 2006, so long as Authorized Execution of this agreement by all signatories, in counterpart or otherwise, facsimile or original, takes place by that date.

G.   **Renwood Distribution Facilities**: the facilities, of Renwood's choosing, at which title of Contracted Products transfers to Deutsch.

H.   **Renwood Retail Facilities**: Any merchant operation from which Renwood or its affiliates sell wine products directly to the final consumer.

I.   **Renwood Tasting Room(s):** Any merchant operation that offers tasting services and/or sells Renwood® products directly to the final consumer.

J.   **Retail**: a sale to a merchant that re-sells the product to the final consumer.

K.   **Territory:** the geographic area in which Deutsch shall enjoy the exclusive right to sell Contracted Products to licensed wholesalers, which area included the United States of America, its territories and possessions, the District of Columbia, Puerto Rico, the Virgin Islands and the Caribbean Islands, subject to those rights that Renwood retains as set forth below.

L.   **Transition Period:** The time period between the Effective Date and July 1, 2006.

M.   **Wholesale**: all sales by Deutsch other than **Retail** sales.

N.   **Deutsch Portfolio**: the group of wine brands Deutsch successfully developed, the brand control of which Deutsch will use as leverage with distributors to sell Renwood® wines.

## IV.
## TERM OF AGREEMENT

The agreement term is ten years from July 1, 2006. Absent termination, this agreement will automatically renew for up to two successive five year periods.

## V.
## CONTRACTED PRODUCTS AND SERVICES

A.   Products:

   i.   The Renwood products included in this agreement ("**Contracted Products**") fall into the following Tiers:

      a.   **Tier 1**: Proprietary brands:

         Grandpere®
         Grandmere®.

      b.   **Tier 2**: Amador County:

         Old Vine Zinfandel
         Amador Barbera

Execution Copy

                Fiddletown Zinfandel
                Jack Rabbit Flat Zinfandel
                Amador Syrah

   c. **Tier 3**: Sierra Series/Select Series/Red Label:

                Pinot Grigio
                Viognier
                Dry Rose
                Syrah
                Zinfandel
                Barbera

   d. **Tier 4**: Dessert:

                Port
                Orange Muscat
                Amador Ice Zinfandel

ii.  Renwood will sell Contracted Products available within the Territory to Deutsch. Products may be added to this provision, transferred to other Tiers, or deleted from this provision only by written consent of all Parties.

iii.  Products outside the scope of this agreement include:

    a.  All Renwood products that are not wine;
    b.  All Renwood products that are not Contracted Products;
    c.  All Renwood products sold from a Renwood Tasting Room, Renwood Retail Facility or via electronic, telephonic or internet means to the final consumers;
    d.  Incidental auction sales and/or donated wine;
    e.  Bulk wine products;
    f.  All Renwood products sold via any means to any person or entity outside of the Territory;
    g.  All Renwood products, wherever delivered, that are sold for resale on any common carrier, airline, or cruise ship;
    h.  All Santino brands, except, by agreement of the parties, Deutsch may assist Renwood in certain circumstances;
    i.  All Renwood wine products that do not exist on the Effective Date.

3

Execution Copy

B.      Services:

i.  Renwood abandoned its distributor network on the representation by Deutsch that Deutsch will exert its portfolio brand control to ensure priority distributor effort to meet or exceed Renwood Tier Sales Standards. Accordingly, Deutsch will provide wine marketing, sales, promotion and reporting services including, but not limited to:

  a.  With the prior advice and consent of Renwood, the retention of a talented and well-experienced brand manager;

  b.  The promotion of Renwood products at wine industry meetings, conventions, trade shows and press events;

  c.  With the prior advice and consent of Renwood, the composition of materials promoting Renwood products;

  d.  The sale of Renwood products in compliance with Tier Sales Standards;

  e.  Commercially reasonable cooperation and coordination with Renwood's lenders and vendors to the extent required by Renwood;

  f.  Upon commercially reasonable request by Renwood, Deutsch will arrange sales meetings, ride-alongs and inspections of selected distributors.

  g.  Arranging for the transportation and storage of Contracted Products, pursuant to industry standards applicable to premium wines, and similar to those employed for other Deutsch premium wine brands;

  h.  Deutsch will provide contact reports, order reports, marketing contribution usage reports and shipment summary reports to Renwood within 30 days of the end of the target month.

  i.  Deutsch will deliver sales, depletion, inventory and accounts sold reports to Renwood by the

Execution Copy

20th day following the month for which the categories were measured;

    j.  Deliver to Renwood final, adjusted annual versions of all reports by the 30th day after July 1, 2007 and every year on that date thereafter;

    k.  Within 90 days of July 1 of every year during the term of this agreement, Deutsch will deliver to Renwood [Deutsch's] audited Balance Sheets and Profit/Loss Statements;

    l.  Deutsch will ensure that depletions of Contracted Products do not fall below 80% of the Tier Sales Standards.

  ii.  The failure of Deutsch to perform the services above constitutes a Condition of Breach.

  iii.  Transition Period:

    1.  During this period, the Parties will begin to transition the distribution network, make announcements regarding the Deutsch/Renwood relationship, and commence performance of the obligations under this agreement.

    2.  During this period, the Parties will be bound by the terms of this agreement.

    3.  Further, all Tier Sales Standards and cure obligations/ guarantees will apply during the transition period, except that:

        a.  Deutsch will guarantee, through cure procedure, 100% of the prior year's sales for the months of April, May and June, 2005 as set forth in <u>Schedule A</u>.

        b.  Deutsch shall not be responsible for collecting accounts receivable from Renwood's distributor network that existed prior to the Effective Date.

VERSION RW1-5                                     5

Execution Copy

    c.  In states where Deutsch is unable to post prices and register the brand by April 1, 2006, Renwood shall invoice the distributor. Within 30 days of collection by Renwood of the invoice amount from the distributor, Renwood shall forward Deutsch a copy of the invoice, payment to Deutsch of its services fee of 15%, and payment to Deutsch of the sample allowance of 1.5%.

## VI.
## MARKETING CONTRIBUTION

A.  Renwood will remit to Deutsch a marketing contribution as set forth in **Schedule B** for verified sales of Contracted Products. The marketing contribution shall be the sole payment to Deutsch to defray the costs of all Special Price Allowances, Distribution Allowances, sales person incentives, printing (neck-hangars, shelf-talkers, case cards, coupons and redemption thereof, and other point-of-sale material), promotional expenses, and trade-show/wine show expenses.

B.  Costs or allowances borne by Renwood due to special circumstances will be deducted from the next marketing contribution payment from Renwood to Deutsch. However, Renwood shall be responsible for the expenses its representatives incur to attend trade-shows or other industry functions. Deutsch will mail its marketing contribution claim and supporting documentation on the 15th day following each quarter to Renwood, on 30 day terms. Marketing contributions not exhausted by the end of the contract year shall be credited against Renwood's marketing contribution obligation for following year. Marketing contribution levels are subject to review at the end of the fifth year of this Service Agreement.

In addition, as a monthly sample allowance, from July 1, 2006 to July 1, 2007, Deutsch may take an additional 1.5% deduction from each sales invoice issued by Renwood. The Parties may extend or modify this provision after July 1, 2007.

As a sample allowance, Deutsch will also be entitled to a payment from Renwood equaling 1.5% of existing distributor inventory taken by Deutsch as of March 31, 2006. Deutsch assumes responsibility for all distributor samples used thereafter. For purposes of offset, Renwood will forward to Deutsch those sample allowance invoices applicable to samples used after April 1, 2006, but received by Renwood after that date.

VERSION RWI-5                                         6

Execution Copy

## VII.
## PRICING AND PAYMENT

A. Pricing

i.  On 90 days notice to Deutsch, Renwood will set the price of the Contracted Products, FOB Renwood Winery or Renwood Distribution Facility, at the option of Renwood. Renwood covenants not to change the price of Sierra/Select Series/Red Label , Old Vine Zinfandel, Amador Syrah, Jack Rabbit Flat Zinfandel, Fiddletown Zinfandel for a period of two years from the Effective Date.

ii.  Sales invoices from Renwood to Deutsch will reflect only the FOB list price, with instructions to Deutsch to deduct 15% therefrom.

iii.  Deutsch will confer with Renwood to coordinate pricing of Contracted Products and use of corresponding marketing contributions. Pricing disputes shall be handled pursuant to the terms of the Dispute Resolution Procedure, set forth below, subject to the following agreed limitations:

> a.  Price changes programmed prior to March 1, 2006 are not subject to dispute by Deutsch;

> b.  Unless otherwise agreed to by the parties, prices shall never fall below those of the prior year;

> c.  Deutsch cannot dispute price increases below 5% in any given year for any single product;

> d.  Deutsch cannot contest the pricing of any new or different Renwood® product for a period of two years from its inclusion by modification to this agreement.

B. Payment:

Payment to Renwood by Deutsch will be made in U.S. dollars and will be wired or electronically transferred to Renwood's account as follows:

Wells Fargo Bank
5700 Folsom Blvd
Sacramento, CA 95829

ABA Routing Number:    121 042 882
For Account:           Renwood Winery
Acct Number:           008 766 2904

VERSION RWI-5                    7

Execution Copy

i.  Payment by Deutsch shall be made within 35 days of the date of invoice, which invoice date will not be earlier than the shipping date.

    a.  Balances not paid by the 35-day deadline are deemed late, and will be charged interest at the rate of 18% per annum. Renwood™ will not pay service fees or marketing contributions while the account is past due, unless all of the past due balance is attributed to a bona fide dispute between the parties, and the parties have submitted the dispute for resolution as set forth below.

    b.  A Condition of Breach is triggered upon a 60 day past due balance, at which time all receivables for Contracted Products revert to Renwood, and at which time Deutsch consents to the filing and satisfaction of stipulated Writs of Attachment and/or Execution against all Contracted Product inventory owned by Deutsch.

    c.  This agreement shall serve as a security agreement for all Renwood products delivered to, or for the benefit of, Deutsch. The Parties agree that Renwood is a secured creditor of Deutsch. Deutsch will prepare, execute and deliver to Renwood, for the benefit of Renwood or its lenders/designees, appropriate UCC documents necessary to perfect a security interest in all Contracted Products in Deutsch's possession. Deutsch also agrees to provide all commercially reasonable and necessary financial documentation as requested by Renwood, its lenders or their respective designees.

## VIII.
## PERFORMANCE STANDARDS

A.  On a best efforts basis, Deutsch will promote, market, distribute, sell and deplete Contracted Products in the Territory in a manner in keeping with Renwood's reputation in the marketplace.

MAR-24-2006 FRI 02:08 PM CHARTER DAVIS, LLP          FAX NO. 916 448 9009          P. 10/25

Execution Copy

B.  Deutsch and its distributors will annually schedule reasonable sales and marketing time, including visits to accounts for Renwood personnel, and will arrange for general, regional and team manager sales meetings and annual tastings of Renwood Contracted Products with Renwood personnel in attendance.

C.  Deutsch shall be responsible for all distributors they utilize as of April 1, 2006. Deutsch shall have the discretion to use channels of distribution of its choice, subject to:

    i.  existing contractual obligations Renwood owes to certain disclosed distributors, and subject to state and federal franchise laws;

    ii.  Deutsch may not enter into any new agreements regarding Contracted Products until after April 1, 2006.

    iii.  Renwood's determination that Deutsch's selection of distribution channels is traditional and appropriate for Renwood products;

    iv.  After the end of the Transition Period, Renwood shall be notified 60 days before the effective date of any proposed change in Deutsch's distributor network. Deutsch shall indemnify and hold Renwood completely harmless from any liability, fines or loss of any kind due to any change in Deutsch's distributor network.

D.  Tier Sales Standards:

    i.  Deutsch will sell Renwood products on a nine (9) liter case equivalent, by Tier, pursuant to the five-year performance guarantees set forth on **Schedule C**.

    ii.  Failure of Deutsch to meet each Tier Sales Standard is a Condition of Breach.

    iii.  Within 15 days of notice by Renwood of a Condition of Breach of Tier Sales Standards, Deutsch must cure the Condition of Breach by purchasing sufficient Renwood products at the scheduled price on its own account, by tier. To cure sales deficits for Tier 1 Contracted Products (Proprietary), and Tier 4 (Dessert) Deutsch must purchase up to a level of 100% of the standard then applicable. To cure sales deficits for all other Tiers of Contracted Products, Deutsch must purchase up to a level of 85% of the standard then applicable. Deutsch shall be

VERSION RWI-5                              9

Execution Copy

responsible for all storage costs incurred by Renwood so long as the products Deutsch purchased for purposes of cure remain at the Renwood Distribution Facility.

IX.
AGREEMENT TERMINATION

A. Termination by Mutual Agreement:

1. No provision of this agreement prevents the Parties from terminating this agreement by mutual agreement at any time on terms to be determined at the time of such agreement.

2. The Parties agree that no stranger to this agreement has any interest in this agreement as a third party beneficiary, and warrants that no such rights or interests in the continued operation of this agreement have been, or will be transferred.

3. In the event any third party claims any interest in this agreement, the Parties' mutually agree that their obligations of performance on this agreement are mutually terminated, absent the execution of a separate, mutual written agreement to the contrary.

4. Upon the mutual termination of this agreement:

   a. Unless otherwise agreed, Deutsch will immediately discontinue the use of Renwood trade names, trade labels, copyrights and other advertising media and shall remove all signs and displays relating thereto;

   b. At Renwood's discretion, Renwood will repurchase from Deutsch those of its products that are in saleable condition on terms agreed to by the Parties, and offset by any amounts due and owing from Deutsch to Renwood;

   c. Deutsch will cooperate in a commercially reasonable manner with Renwood to ensure an orderly transition of all contracted service functions to Renwood or its designee;

   d. Deutsch will continue to deliver Renwood products to customers during all transition periods, and will take no detrimental action whatsoever to interfere with Renwood's

VERSION RW1-5

10

Execution Copy

establishment of a substitute distributor network.

    c.  Deutsch agrees that under any termination scenario (i.e. mutual, unilateral without breach, or unilateral with breach) Deutsch shall not increase its distributors' inventories beyond that required to meet the current Tier Sales Standard.

    f.  Deutsch will satisfy all balances due, and will take no detrimental action whatsoever to interfere with Renwood's reputation, solvency, or cash flow, and will make all payments promptly required pursuant to this agreement, which payment covenants shall survive the mutual termination of this agreement

B.  Unilateral Termination without Breach by the Other Party:

    1.  The Parties acknowledge that this agreement will fundamentally change the distribution network that Renwood has developed over many years. Further, the Parties acknowledge that, in the event Deutsch terminates this agreement, Renwood will suffer damage to its distribution network and cash flow that is not reasonably subject to calculation.

    2.  The Parties acknowledge that unilateral termination will disrupt Renwood and Deutsch business operations to an extent not reasonably subject to calculation.

    3.  Therefore, the Parties agree as follows:

        a.  In the event Deutsch unilaterally terminates this agreement in the absence of a Condition of Breach by Renwood, Deutsch shall pay to Renwood Liquidated Damages in the amount of $4 million if termination takes place before July 1, 2007, and that amount will increase by 20% annually on a compounded basis for the term of this agreement, except that the Liquidated Damages amount cannot exceed Renwood's gross sales for the prior 12 month period. All such damages amounts shall be offset by amounts Renwood owes to Deutsch under this agreement. Renwood has no obligation, in that event, to repurchase Renwood products in the

VERSION RWI-5                                11

Execution Copy

inventory of Deutsch or its distributors. Payment shall be made no more than 60 days from the date of mailing written notice of termination.

b. In the event Renwood unilaterally terminates this agreement in the absence of a Condition of Breach, Renwood shall pay to Deutsch Liquidated Damages in the amount equivalent to twelve (12) months of service fee as measured by the prior 12 months sales history, less any amounts Deutsch owes to Renwood. Renwood shall also have the obligation to re-purchase Renwood products in Deutsch's inventory at Deutsch's laid-in cost. Payment shall be made no more than 60 days from the date of mailing written notice of termination.

C. Unilateral Termination with Breach by the Other Party:

1. Either party may terminate this Agreement by written notice for the following reasons, in the absence of cure, with such termination to be effective sixty (60) days after receipt of notice of breach (unless provided otherwise below):

a) The filing of a voluntary or involuntary petition in bankruptcy, reorganization or a similar proceeding concerning either party if not dismissed or vacated within ninety (90) days from the date of filing;

b) The appointment of a receiver or trustee for all or a substantial part of the other party's property, provided such appointment is not vacated within ninety (90) days from the date of such appointment;

c) The execution by the other party of an assignment for the benefit of creditors;

d) The suspension of business, liquidation, dissolution, or termination of existence of the other party; the condemnation, attachment or appropriation of all or a material portion of the property of the other party;

e) The failure of the other party to maintain, at all times, all federal licenses, permits, approvals, and consents necessary to perform its obligations hereunder, irrespective of the

Execution Copy

cause or reason for such failure, except that suspension of federal licenses or permits for period of less than ninety (90) days shall not be construed as a Condition of Breach;

f)    Misrepresentation of a material fact, or commission of a misdemeanor or felony in manufacturing, wine-making, selling, or related activities;

g)    The failure to fulfill any of the obligations in this Agreement;

h)    All Conditions of Breach otherwise provided for in the agreement;

i)    The failure to meet the Tier Sales Standards or cure through purchase within 15 days of notice;

j)    A substantial change in ownership and/or control of Deutsch;

2.    During the period in which the breaching party may cure the breach, if it can be cured, the *status quo ante* shall be preserved by the Parties, except for commercially reasonable measures taken to cure the breach. If the breaching party fails to timely cure the breach, then the other party may immediately terminate this agreement without consequence, and may recover damages for the breach in addition to reasonable costs of suit, attorney fees and/or mediator/arbitrator fees. If the defaulting party cures the breach within the cure period, then the agreement remains in force.

## X.
## ADDITIONAL TERMS, WARRANTIES AND COVENANTS

A.    Deutsch agrees to sell, promote, merchandise, and advertise Contracted Products to enhance the Renwood® brand and expand the markets for Contracted Products in the Territory in accordance with the Tier Sales Standards. Deutsch shall prominently display the Contracted Products at the major annual trade and wine shows in a manner consistent with Renwood's past practices.

B.    Within 30 days after the end of each month, Deutsch will supply to Renwood a report setting forth by product, vintage, Tier, state and distributor, on-premises, off-premises: 1) the accounts sold; 2) the quantities sold; 3) products depleted during the prior month; and 4) the prior month's ending inventories for each distributor and for Deutsch. In addition, the report shall contain the name of each retail account, as well as the total number of retail

Execution Copy

accounts, in which the products were sold during the prior month against the number of retail accounts that the products were sold in for monthly, quarterly and annual periods on a running three (3) year basis. All such reports shall be in a mutually agreeable computerized form such that the data may be utilized for market analysis purposes.

C.  Deutsch will not distribute or sell Contracted Products outside of the Territory or within the Territory for resale outside of the Territory, and shall take commercially reasonable measures to prevent extra-Territorial distribution or sale of Contracted Products by its distributors.

D.  Deutsch will defend, hold Renwood harmless from, and indemnify Renwood from any liability in connection with:

1.  Any claim, loss or expense (including reasonable attorneys fees and costs) arising from a Third Party claim alleging willful or negligent conduct, breach of an agreement, or breach of obligations arising from this agreement; and

2.  Any and all fines, levies, damages, and costs (including reasonable attorney fees) of judgments that Renwood suffers as a result of Deutsch's failure to comply with applicable laws in the Territory including, but not limited to, the payment of any sales taxes, license taxes and fees. Deutsch will pay all levies, excise taxes (except federal excise taxes imposed directly on Renwood), occupational taxes, and bonds, and shall maintain all appropriate licenses and permits in connection with shipments of Contracted Products to all portions of the Territory. Deutsch will not be responsible for judgments resulting from Renwood's failure to comply with applicable laws or pay applicable taxes with regard to Renwood Tasting Facilities or Retail Facilities.

E.  Under no circumstances will Deutsch ship or store Contracted Products, or allow its direct delivery customers to ship the products, in a manner likely to deteriorate product quality.

F.  Renwood may at any time (upon reasonable notice) inspect the products as sold and stored by Deutsch and distributors. Further, Renwood may contact any distributor, visit any retail account and will enjoy unfettered access to any Renwood product data furnished by distributors or retail accounts to Deutsch.

VERSION RWI-5                         14

MAR-24-2006 FRI 02:09 PM CHARTER DAVIS, LLP      FAX NO. 916 448 9009          P. 16/25

Execution Copy

G. Renwood warrants that all Contracted Products it makes available to Deutsch under this agreement will be of good quality, are suitable for beverage consumption, and are properly packaged by Renwood in conformity with applicable laws, regulations, and requirements in force in the Territory. Renwood will hold Deutsch harmless from any and all fines, levies, damages, and costs of judgments that Deutsch may suffer as a result of Renwood's failure to comply with the provisions of this section.

H. Deutsch will inform Renwood within seven days of notice of quality complaints and fully and completely cooperate with Renwood and the customer in complaint resolution.

I. Renwood shall enjoy reasonable access to the Deutsch sales force, which is expected to taste the Contracted Products;

J. Deutsch will present to Renwood on or before January 30th of each year the marketing plan and promotional schedule by which Deutsch plans to sell each Contracted Product, vintage and Tier for the next fiscal year commencing July 1.

K. Deutsch currently sells Zinfandel wines made by three other suppliers (Kunde, Artesa, and Esser). Deutsch warrants that it will not sell the Zinfandel wines of those three other suppliers, beyond 10% of 2006 levels. With the above exception, Deutsch will not represent any other Zinfandel wine products, or any wines produced by wineries located in Amador, Alameda, Sacramento and the Delta Region, Stanislaus, San Joaquin, El Dorado, Tuolumne or Calaveras County.

L. Deutsch will appoint a brand manager responsible for administering the Renwood wine program, subject to the approval of Renwood.

M. Deutsch shall require the distributors it engages to do the following at all times:

    1. Maintain an inventory level of the Renwood products sufficient to satisfy projected sales within the particular distributor's territory for a minimum 60-day period based upon Deutsch's forecast for the following quarter; and

    2. Deutsch will notify Renwood within a reasonable period of any event within the distributor's territory that could result in projections for that territory varying more than 25% during any calendar quarter.

Execution Copy

N.  Renwood will not ship or sell Contracted Products in the Territory, except as otherwise provided in this agreement.

O.  Renwood will refer to Deutsch any and all orders and inquiries for Contracted Products that it may receive for shipment from distributors, retailers or other persons in the business of buying wine for resale in the normal course of trade for sale within the Territory.  Deutsch and its distributors must respond to all inquiries in a prompt manner and will report the results to Renwood.

P.  Unless the transfer of right will cause the breach of existing contracts or obligations, Renwood grants to Deutsch the first right of refusal (which right shall expire within 90 days of written notice) to accept and merge into this agreement wine products acquired or developed by Renwood Winery after the Effective Date that will bear the Renwood® brand and be depicted within the Territory;

Q.  That during the term of this agreement, Renwood shall maintain product liability coverage concerning the sale of Contracted Products in the Territory in an amount of not less than five million ($5,000,000) dollars per occurrence naming Deutsch as an additional named insured.

R.  All un-merchantable products suffering from quality deficiencies, packaging problems or errors found to be the fault of Renwood may be returned to Renwood for full credit (less marketing contributions and service fees) provided that notice of such deficiency, problem or error has been given to Renwood within 10 days of discovery of the deficiency.

S.  Renwood owes no obligation to provide any credit for products rendered un-merchantable while in the possession and/or control of Deutsch or its customers.  Deutsch is not entitled to claim any marketing contribution from Renwood for such products. Notice of the discovery of an un-merchantable product condition will be provided immediately to all parties.  In addition to other conditions, a product shall be deemed un-merchantable in the event the containers or labels become unsightly or of less than first class condition. Deutsch will not sell un-merchantable products or otherwise dispose of such products or permit them to become the property of any insurer, carrier or salvage company in the absence of prior written consent of Renwood. Renwood reserves the right to have such un-merchantable products destroyed on site at Deutsch or the applicable storage facility, and obtain destruction records from Deutsch.

T.  Within 30 days following the end of each contact year, Deutsch will provide Renwood with a "Final Contract Year Performance Statistics" report.

U.  The Parties will meet and confer on the anticipated quantity and quality of that year's harvest and meaningfully discuss and consider the portion of that year's

Execution Copy

harvest, by variety, which should be made into wines produced and marketed under the Renwood® brand name. The parties will also mutually agree at that time on the methods and allocation of costs of promotion and selling by Deutsch.

V.  Deutsch will obtain Renwood's permission before committing acts that could adversely affect Renwood with respect to existing contracts or the import, licensing or territorial registration requirements of any state, territory or political subdivision in the Territory. In the event that Deutsch takes action without obtaining Renwood prior written approval in any of these areas, Deutsch shall be responsible for all financial and other liability incurred by Renwood, including all recoverable damages (including attorney's fees and costs or the payments of fines to regulatory agencies or judgments in favor of distributors) in connection with the consequences of such action.

## XI.
## INTELLECTUAL PROPERTY

A.      Renwood grants to Deutsch for the term of this Agreement a right to use the Renwood® trademarks solely within the Territory in connection with and for the purpose of promoting, advertising and selling the products pursuant to the terms of this Agreement. The use of Renwood® trademarks or other intellectual property shall be consistent with and supportive of the current brand image. This provision does not constitute an assignment of Renwood® trademarks or intellectual property.

B.      Deutsch further agrees:

1.  To use the Renwood® Brand Identity Package as described in the attached CD-rom;
2.  Not to remove the trademarks from the Products;
3.  Not to alter the trademarks in any manner;
4.  Not to use any trademark, trade name, or designation of origin other than the Renwood® trademarks and Deutsch's trade name in connection with the promotion, advertising, or sale of Contracted Products; and
5.  Not to use the Trademarks in connection with any products, goods, business or services other than Renwood® products.

C.      Renwood warrants that, to the best of its knowledge, it is the sole and exclusive owner of the Renwood® trademarks and intellectual property and has not assigned or licensed in the Territory any right or interest therein that would interfere or conflict with Deutsch's use thereof.

D.      Renwood also warrants that there are no known claims or demands in the Territory pertaining to such trademarks and intellectual property, and that

Execution Copy

no proceeding is pending or threatened against Renwood challenging Renwood's rights in respect thereof.

E.    In the event Deutsch becomes aware of any infringement of the trademarks, or any claim that the trademarks infringe the proprietary rights of a third party, Deutsch will immediately notify Renwood thereof in writing.

## XII.
## MISCELLANEOUS TERMS

### A.  FORCE MAJEURE

The Parties will not be liable in any way for any Condition of Breach caused by events beyond their commercially reasonable control including, but not limited to, fire, flood, pests, riots, wars, terrorism, sabotage, strikes, lockouts, anomalous and unfavorable climate course, or any other unavoidable events or contingencies, including a national financial crisis of catastrophic proportions.

### B.  NOTICE

All notices or other written communications required or referred to in this agreement shall be in writing an sent to the address of the recipient as it appears in the introductory paragraph to this Agreement (or such other address as such party shall have notified to the sender) by (in order of descending preferences (i) e-mail or facsimile transmission, (ii) DHL, Federal Express, or other reputable commercial carrier, or (iii) registered mail, return receipt requested, with all costs of delivery or transmission prepaid and shall be deemed given when actually received. Copies of all such notices shall be sent by email to the email addresses listed in the introductory paragraphs.

### C.  SEVERABILITY

In the event any term or provision hereof is in violation of, or prohibited by the law of the State of California, such term or provision shall be deemed to be amended or deleted to conform to such law or regulation without invalidating or amending or deleting any other term of this agreement.

### D.  WAIVER

The failure or omission by either party to insist upon or enforce any of the terms of this agreement shall not be deemed a waiver of such term unless the waiver is in writing by the party against whom the waiver is sought to be enforced. Waiver of one term will not be deemed a waiver of any other term. Waiver of a term on one occasion shall not be deemed a waiver of the same term at any other time.

### E.  GOVERNING LAW AND DISPUTE RESOLUTION

VERSION RWI-5                              18

Execution Copy

This agreement shall at all times be interpreted pursuant to California law.

Any dispute regarding the terms and operation of this agreement, and any controversy or claim arising from of this agreement, shall first be submitted to mediation in the City and County of Sacramento by a mutually agreeable mediator. All settlements are deemed to have taken place pursuant to California Code of Civil Procedure section 664.6. The prevailing party in any action to enforce any such settlement shall be entitled to reasonable attorney fees and costs of enforcement.

In the event mediation does not resolve the claim or controversy, the parties will submit the matter to binding arbitration in the City and County of Sacramento, by a mutually-agreeable arbitrator, or in the event agreement cannot be reached, then to an arbitrator appointed by the Superior Court in and for the County of Sacramento. Attendant to such a proceeding, the parties shall enjoy rights of discovery per the California Code of Civil Procedure.

The arbitration proceedings shall take place pursuant to Comprehensive Rules and Procedures of JAMS or its successor then in effect, and judgment upon the award rendered by the arbitrator may be entered in any court of competent jurisdiction. The decision of the arbitrator shall be final and binding on the parties. The arbitrators are not empowered to award damages in excess of compensatory damages, but shall include in the final award an allocation of attorneys' fees, costs and expenses incurred in the arbitration to the prevailing party, whether or not such fees, costs and expenses would otherwise be recoverable under applicable statutes and rules of court.

The arbitrator shall render the award in writing, explaining the factual and legal basis for decision as to each of the principal controverted issues. The parties and each of them expressly agree that any petition to confirm, modify or enforce the arbitral award, shall be resolved in the Sacramento County Superior Court to which jurisdiction the parties hereby submit.

## F. CONFIDENTIALITY/PROTECTION OF INFORMATION EXCHANGED

Renwood and Deutsch agree that each needs accurate and timely information from the other on a regular basis to satisfy their obligations under this agreement. Each will protect and safeguard received from the other will not share it with any person or entity outside of Renwood's or Deutsch's organization unless prior written consent of all parties is obtained, disclosure is compelled by authorities or disclosure is necessary to enforce the terms of this Agreement. Both parties acknowledge that information received from the other would be useful to competitors, and if furnished to such competitors, would cause irreparable harm to the Parties in the marketplace.

## G. NATURE OF AGREEMENT

The Parties acknowledge that they are dealing as independent contractors only. Neither party is granted any right or authority to act or hold itself out as the legal agent of

Execution Copy

the other, or to assume or create any obligations or responsibilities, express or implied, on behalf of or in the name of the other or any person or entity affiliated with the other or to bind the other in any manner whatsoever except as may otherwise be expressly agreed upon by the parties in writing for purposes of compliance with applicable state or federal laws or requirements.

H.  ENTIRE AGREEMENT

This Agreement shall constitute the entire understanding by and between the parties as to the subject matter hereof, replacing and superseding all previous agreements and understandings between the parties hereto or their predecessors concerning such subject matter. No modification of this Agreement shall be effective unless set forth in writing and signed by both parties. All notices required by this Agreement shall be in writing and shall be deemed given on the date of delivery.

I.  BINDING AGREEMENT AND EXECUTION IN COUNTERPARTS

This Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and assigns, provided that it may not be assigned by either party without the prior written consent of the other. This Agreement may be executed in counterparts, and if so executed, shall be fully effective and enforceable in accordance with its terms.

Date: March 17, 06

Robert L. Smerling
Chairman and Chief Executive
Officer
Renwood Group, Inc

Date: _____

William Deutsch
Chairman
W.J. Deutsch & Sons, Ltd.

Date: _____

Peter Deutsch
President
W.J. Deutsch & Sons, Ltd.

VERSION RWI-5                    20

Execution Copy

## SCHEDULE A

### TRANSITION PERIOD SALES STANDARDS

(Attached)

### SCHEDULE B
MARKETING CONTRIBUTION
(Applies to Sales through June 30, 2011)

<u>SIERRA SERIES/RED LABEL ZINFANDEL AND SYRAH</u> –

$11 PER CASE DISTRIBUTOR ALLOWANCE

<u>SIERRA SERIES/SELECT SERIES/RED LABEL (other)</u>:

$5 PER CASE DISTRIBUTOR ALLOWANCE

<u>OLD VINE ZINFANDEL</u>:

$20 PER CASE DISTRIBUTOR ALLOWANCE

<u>FIDDLETOWN ZINFANDEL</u>:

$20 PER CASE DISTRIBUTOR ALLOWANCE

## SCHEDULE C

FIVE-YEAR TIER SALES STANDARDS
(Attached, to reflect 15% increase over prior year's sales, compounded)

MAR-24-2006 FRI 02:11 PM CHARTER DAVIS, LLP     FAX NO. 916 448 9009     P. 23/25

Schedule A

## Sales & Cases April / May / June 2005 by Product and Family (9L Equivalent)

| Product | June 2005 Cases | June 2005 Sales | May 2005 Cases | May 2005 Sales | April 2005 Cases | April 2005 Sales |
|---|---|---|---|---|---|---|
| 1 Grandmere | 30.0 | $4,500 | 67.5 | $10,125 | 48.5 | $7,275 |
| 2 Grandpere | 92.5 | $17,760 | 111.0 | $21,312 | 62.0 | $11,904 |
| **Total Proprietary** | 122.5 | $22,260 | 178.5 | $31,437 | 110.5 | $19,179 |
| 3 Select Pinot Grigio | - | ($163) | | $0 | | $0 |
| 4 Select Syrah Rose | 413.0 | $25,508 | 404.0 | $22,624 | 72.0 | $4,032 |
| 5 Select Viognier | 352.0 | $25,344 | 697.0 | $50,184 | 246.0 | $17,712 |
| 6 Sierra Barbera | 600.0 | $43,240 | 739.0 | $63,216 | 394.0 | $28,368 |
| 7 Sierra Syrah | 656.0 | $43,496 | 496.0 | $35,712 | 318.0 | $22,896 |
| 8 Sierra Zinfandel | 2,584.0 | $186,048 | 2,728.0 | $196,416 | 2,019.0 | $145,368 |
| **Total Sierra / Select** | 4,605.0 | $323,474 | 5,064.0 | $358,152 | 3,049.0 | $218,376 |
| 9 Amador Barbera | 60.0 | $7,200 | 112.0 | $13,440 | 52.0 | $6,240 |
| 10 Amador Barbera 375 | 11.5 | $1,388 | 1.5 | $180 | 2.0 | $240 |
| 11 Amador Sangiovese | 3.0 | $360 | 5.0 | $600 | - | $0 |
| 12 Amador Syrah | 19.5 | $2,925 | 12.5 | $1,875 | 22.0 | $3,300 |
| 13 Amador Viognier | 21.0 | $3,150 | 18.0 | $2,700 | - | $0 |
| 14 D'Agostini Bros. | - | $0 | 17.0 | $3,060 | - | $0 |
| 15 Fiddletown | 438.0 | $65,700 | 1,340.0 * | $201,000 | 49.0 | $7,350 |
| 16 Fiddletown 375 | 40.5 | $6,075 | 2.5 | $375 | - | $0 |
| 17 Jack Rabbit Flat | 80.0 | $14,400 | 51.0 | $9,180 | 23.0 | $4,140 |
| 18 Old Vine | 2,583.7 | $314,160 | 1,931.3 | $235,020 | 1,154.0 | $140,172 |
| 19 Old Vine 375 | 27.5 | $3,300 | 63.5 | $7,620 | 39.0 | $4,680 |
| **Total Amador County** | 3,284.7 | $418,658 | 3,554.3 * | $475,050 | 1,341.0 | $166,122 |
| 20 Ice Wine | 105.5 | $37,980 | - | $0 | 18.0 | $3,456 |
| 21 Muscat | 27.0 | $5,256 | 57.5 | $11,040 | 17.0 | $1,530 |
| 22 Port | 3.0 | $270 | 23.0 | $2,070 | - | $0 |
| **Total Dessert** | 135.5 | $43,506 | 80.5 | $13,110 | 35.0 | $4,986 |
| **Grand Total** | 8,147.7 | $807,898 | 8,877.3 * | $877,749 | 4,535.5 | $408,663 |

* Includes BevMo sale of 1,100 cases. WJDeutsch will receive a credit of 1,100 Fiddletown Zinfandel cases against Transition Period Standards if it does not receive a comparable order from BevMo

Page 1 of 1

SalesAprMayJun2005Final.xls --SalesByProductLabel

3/17/2006 3:26 PM

MAR-24-2006 FRI 02:11 PM CHARTER DAVIS, LLP          FAX NO. 916 448 9009          P. 24/25

## Sales & Cases Jul 2005 to June 2006 by Product and Tier (9L Equivalent)   —   Schedule C

| Product | Jul-05 Cases | Jul-05 Dollars | Aug-05 Cases | Aug-05 Dollars | Sep-05 Cases | Sep-05 Dollars | Oct-05 Cases | Oct-05 Dollars | Nov-05 Cases | Nov-05 Dollars | Dec-05 Cases | Dec-05 Dollars |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Grandpere | 350.0 | $5,250 | 33.5 | $5,025 | 54.5 | $8,175 | 35.5 | $5,325 | 32.0 | $4,800 | 55.5 | $8,325 |
| 2 Grandpere | 31.5 | $6,048 | 45.0 | $8,640 | 34.8 | $6,734 | 112.5 | $21,600 | 40.0 | $7,680 | 63.5 | $12,000 |
| Total Proprietary | 66.5 | $11,298 | 78.5 | $13,665 | 89.3 | $14,909 | 148.0 | $26,925 | 72.0 | $12,480 | 119.0 | $20,325 |
| 3 Select Pinot Grigio | 653.0 | $67,016 | 335.0 | $23,986 | 216.0 | $15,433 | 452.0 | $32,544 | 177.0 | $12,744 | 93.0 | $6,840 |
| 4 Select Syrah Rose | 242.0 | $17,424 | 128.0 | $8,592 | 108.0 | $7,776 | -47.0 | $3,384 | 74.0 | $5,328 | 36.0 | $2,520 |
| 5 Select Viognier | 232.0 | $16,704 | 365.0 | $26,280 | 398.0 | $28,512 | 513.0 | $36,936 | 250.0 | $18,000 | 307.0 | $21,888 |
| 6 Sierra Barbera | 232.0 | $18,144 | 185.0 | $13,297 | 477.0 | $31,593 | 687.0 | $49,464 | 478.0 | $34,416 | 321.0 | $23,112 |
| 7 Sierra Syrah | 186.0 | $13,392 | 188.0 | $13,392 | 436.0 | $31,392 | 808.0 | $36,576 | 611.0 | $43,992 | 519.0 | $37,296 |
| 8 Sierra Zinfandel | 1,126.0 | $81,072 | 885.0 | $63,674 | 1,986.0 | $142,992 | 3,170.0 | $228,240 | 2,989.0 | $215,208 | 1,973.0 | $142,004 |
| Total Sierra / Select | 2,691.0 | $193,752 | 2,086.0 | $153,478 | 3,619.0 | $260,698 | 5,377.0 | $387,144 | 4,579.0 | $329,688 | 3,250.0 | $233,660 |
| 9 Amador Barbera | 42.0 | $5,040 | 106.0 | $12,720 | 46.0 | $5,184 | 155.0 | $18,600 | 75.0 | $9,000 | 54.0 | $6,360 |
| 10 Amador Barbera 375 | - | $0 | 5.5 | $660 | 1.0 | $120 | - | $0 | - | $0 | 2.0 | $240 |
| 11 Amador Sangiovese | - | $0 | - | $0 | - | $0 | - | $0 | 2.5 | $375 | 2.5 | $375 |
| 12 Amador Syrah | 4.0 | $600 | 8.5 | $1,275 | 2.5 | $375 | 33.5 | $5,025 | - | $0 | 9.0 | $1,350 |
| 13 Amador Viognier | 13.0 | $1,990 | - | $0 | 7.0 | $1,050 | 1.0 | $180 | - | $0 | - | $0 |
| 14 D'Agostini Bros. | - | $0 | 13.0 | $2,340 | - | $0 | 112.0 | $20,160 | 42.0 | $6,327 | 58.0 | $8,700 |
| 15 Fiddletown | 17.0 | $2,050 | 1,090.0 | $163,500 | 287.0 | $43,050 | 1,717.0 | $183,600 | 32.0 | $5,888 | 33.0 | $6,072 |
| 16 Fiddletown 375 | 4.5 | $675 | 3.5 | $525 | 6.0 | $900 | 29.0 | $4,350 | - | $0 | - | $0 |
| 17 Jack Rabbit Flat | 7.5 | $1,364 | 58.5 | $10,724 | 61.0 | $11,224 | 65.5 | $12,062 | - | $0 | - | $0 |
| 18 Old Vine | 540.3 | $41,920 | 1,045.7 | $125,512 | 1,139.7 | $139,660 | 2,070.7 | $251,340 | 2,418.7 | $292,260 | 1,425.0 | $173,700 |
| 19 Old Vine 375 | 13.0 | $1,560 | 35.5 | $4,260 | 15.0 | $1,800 | 60.0 | $9,000 | 32.5 | $3,900 | 19.0 | $2,280 |
| Total Amador County | 641.3 | $61,659 | 2,366.2 | $321,516 | 1,565.2 | $203,263 | 4,263.7 | $504,877 | 2,602.7 | $317,750 | 1,602.5 | $199,077 |
| 20 Ice Wine | 23.5 | $8,460 | 87.5 | $31,500 | 47.5 | $17,100 | 97.5 | $35,000 | 64.0 | $23,040 | 17.5 | $5,939 |
| 21 Muscat | 41.3 | $7,920 | 34.5 | $6,624 | 5.0 | $490 | - | $0 | 2.5 | $480 | 5.0 | $960 |
| 22 Port | 17.0 | $1,530 | 11.0 | $1,002 | - | $0 | 14.0 | $1,260 | 43.0 | $3,870 | 24.0 | $2,160 |
| Total Dessert | 81.8 | $17,910 | 133.0 | $39,126 | 52.5 | $17,550 | 111.5 | $36,360 | 109.5 | $27,390 | 46.5 | $9,059 |
| Totals | 3,480.6 | $305,419 | 4,663.7 | $527,785 | 5,326.0 | $496,420 | 9,900.2 | $955,306 | 7,363.2 | $687,308 | 5,019.0 | $462,121 |

Note: Standards are calculated at 15% increase year over year. For simplicity sake only monthly totals are shown on the schedule, but it is implicit that the Standards are applied product by product and tier by tier.

### Sales Growth — Standards By Year

| Standards By Year | Cases | Dollars | Cases | Dollars | Cases | Dollars | Cases | Dollars | Cases | Dollars | Cases | Dollars |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year Ended June 2007 | 4,003.0 | $350,312 | 5,363.0 | $606,953 | 6,125.0 | $570,883 | 11,385.0 | $1,098,602 | 8,468.0 | $790,404 | 5,772.0 | $531,439 |
| Year Ended June 2008 | 4,603.0 | $402,859 | 6,167.0 | $697,996 | 7,044.0 | $656,515 | 13,093.0 | $1,263,392 | 9,738.0 | $908,965 | 6,638.0 | $611,155 |
| Year Ended June 2009 | 5,293.0 | $463,288 | 7,092.0 | $802,695 | 8,101.0 | $754,992 | 15,057.0 | $1,452,901 | 11,199.0 | $1,045,310 | 7,634.0 | $702,828 |
| Year Ended June 2010 | 6,087.0 | $532,781 | 8,156.0 | $923,099 | 9,316.0 | $868,241 | 17,316.0 | $1,670,836 | 12,879.0 | $1,202,107 | 8,779.0 | $808,252 |
| Year Ended June 2011 | 7,000.0 | $612,698 | 9,379.0 | $1,061,564 | 10,713.0 | $998,477 | 19,913.0 | $1,921,461 | 14,811.0 | $1,382,423 | 10,096.0 | $929,490 |

3/17/2006 1:23 AM

SalesJul05Jun06Final.xls – SalesByProductLabel

MAR-24-2006 FRI 02:11 PM CHARTER DAVIS, LLP          FAX NO. 916 448 9009          P. 25/25

**Schedule C**

## Sales & Cases Jul 2005 to June 2006 by Product and Tier (9L Equivalent)

*** Note that March to June numbers are for 2005 ***

The following table reproduces the values that could be read reliably. The **Jan-06** and **Total** columns (and the sub-total rows) have been cross-checked; cells in the Feb-06 through Jun-05 columns that could not be read with confidence on the faxed image are left blank.

| # | Product | Jan-06 Cases | Jan-06 Dollars | Feb-06 Cases | Feb-06 Dollars | Mar-05 Cases | Mar-05 Dollars | Apr-05 Cases | Apr-05 Dollars | May-05 Cases | May-05 Dollars | Jun-05 Cases | Jun-05 Dollars | Total Cases | Total Dollars |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Grandoers | 50.5 | $8,214 | 30.5 | $5,124 | 19.0 | $2,850 | 43.5 | $7,275 | 67.5 | $10,125 | 30.0 | $4,500 | 492.0 | $74,988 |
| 2 | Grandpere | 71.5 | $14,528 | 23.5 | $6,344 | 196.0 | $37,632 | 62.0 | $11,904 | 110.0 | $21,312 | 92.5 | $17,760 | 883.8 | $172,182 |
| | **Total Proprietary** | **122.0** | **$22,742** | **54.0** | **$11,468** | **215.0** | **$40,482** | **105.5** | **$19,179** | **177.5** | **$31,437** | **122.5** | **$22,260** | **1,375.8** | **$247,170** |
| 3 | Select Pinot Grigio | 387.0 | $27,864 | 138.0 | $11,952 | 116.0 | $6,496 | (72.0) | ($4,032) | 404.0 | $22,624 | 413.0 | $25,503 | 2,453.0 | $178,217 |
| 4 | Select Syrah Rose | 21.0 | $1,512 | 38.0 | $2,736 | | | | | | | | | 1,699.0 | $107,612 |
| 5 | Select Viognier | 165.0 | $11,880 | 318.0 | $22,608 | 685.0 | $49,320 | (246.0) | ($17,712) | 697.0 | $50,184 | 730.0 | $53,216 | 4,351.0 | $311,544 |
| 6 | Sierra Barbera | 336.0 | $24,192 | 303.0 | $21,024 | | | 394.0 | $28,568 | | | 496.0 | $35,712 | 5,457.0 | $393,970 |
| 7 | Sierra Syrah | 374.0 | $26,928 | 501.0 | $37,080 | | | 318.0 | $22,896 | | | 702.0 | $50,544 | 5,495.0 | $396,553 |
| 8 | Sierra Zinfandel | 1,996.0 | $143,712 | 2,060.0 | $145,296 | 1,964.0 | $141,408 | 2,019.0 | $145,398 | | | | | 29,480.0 | $1,831,438 |
| | **Total Sierra / Select** | **3,279.0** | **$236,088** | **3,353.0** | **$239,976** | **3,982.0** | **$284,848** | **3,049.0** | **$218,376** | **5,954.0** | **$358,152** | **4,605.0** | **$323,474** | **44,935.0** | **$3,219,334** |
| 9 | Amador Barbera | 96.0 | $11,520 | 44.0 | $5,280 | 85.0 | $10,200 | 52.0 | $6,240 | 112.0 | $13,440 | 60.0 | $7,200 | 927.0 | $110,784 |
| 10 | Amador Barbera 375 | 6.0 | $720 | 5.0 | $600 | 7.0 | $840 | 1.5 | $180 | 1.5 | $180 | 3.0 | $360 | 34.5 | $4,148 |
| 11 | Amador Sangiovese | - | $0 | - | $0 | - | $0 | - | $0 | - | $0 | - | $0 | 15.0 | $1,800 |
| 12 | Amador Syrah | 14.0 | $2,100 | 1.5 | $225 | 20.0 | $3,000 | 22.0 | $3,300 | 12.5 | $1,875 | 19.5 | $2,925 | 143.0 | $21,450 |
| 13 | Amador Viognier | 14.0 | $2,100 | 32.0 | $600 | 4.0 | $600 | - | $0 | 18.0 | $2,700 | 21.0 | $3,150 | 119.0 | $13,450 |
| 14 | D'Agostini Bros. | - | $0 | - | $0 | - | $0 | - | $0 | 17.0 | $3,060 | - | $0 | 142.0 | $25,560 |
| 15 | Fiddletown | 331.0 | $49,650 | 108.0 | $17,250 | 319.0 | $47,850 | 49.0 | $7,350 | 1,340.0 | $201,000 | 438.0 | $65,700 | 5,796.0 | $794,527 |
| 16 | Fiddletown 375 | 3.0 | $450 | 2.0 | $300 | 10.5 | $1,575 | - | $0 | 2.5 | $375 | 40.5 | $6,075 | 101.5 | $15,225 |
| 17 | Jack Rabbit Flat | 36.5 | $6,716 | 22.5 | $5,244 | 87.0 | $15,660 | 23.0 | $4,140 | 51.0 | $9,180 | 80.0 | $14,400 | 557.5 | $102,664 |
| 18 | Old Vine | 1,817.0 | $218,980 | 1,399.7 | $168,040 | 1,622.0 | $194,640 | 1,154.0 | $140,172 | 1,931.3 | $235,020 | 2,583.7 | $314,160 | 19,147.0 | $2,322,104 |
| 19 | Old Vine 375 | 29.0 | $3,480 | 16.0 | $1,440 | 40.0 | $4,800 | 39.0 | $4,680 | 63.5 | $7,620 | 27.5 | $3,300 | 435.0 | $58,260 |
| | **Total Dessert** | **2,346.5** | **$295,716** | **1,055.7** | **$203,319** | **2,194.5** | **$284,848** | **1,341.0** | **$166,122** | **3,594.3** | **$475,050** | **3,264.7** | **$418,698** | **27,418.3** | **$3,466,172** |
| 20 | Ice Wine | 10.5 | $3,780 | 16.0 | $1,080 | 16.0 | $8,760 | 18.0 | $3,436 | 57.5 | $11,040 | 10.5 | $37,980 | 472.5 | $169,739 |
| 21 | Muscat | 29.0 | $5,560 | 28.5 | $6,336 | 45.5 | $8,736 | 17.0 | $1,530 | 23.0 | $2,070 | 27.0 | $5,256 | 288.8 | $56,376 |
| 22 | Port | 23.0 | $2,070 | 16.0 | $1,440 | 40.5 | $3,672 | 3.0 | $4,986 | 8.5 | $13,110 | 3.0 | $270 | 997.3 | $247,439 |
| | **Total Dessert1** | **62.5** | **$11,410** | **47.5** | **$8,856** | **102.0** | **$18,168** | **38.0** | | **10.5** | | **13.5** | **$43,506** | **1,758.6** | **$473,554** |
| | **Totals** | **5,810.0** | **$565,956** | **5,110.2** | **$463,619** | **5,493.5** | **$622,663** | **4,535.5** | **$608,463** | **8,877.3** | **$877,749** | **8,147.7** | **$807,898** | **74,726.9** | **$7,180,115** |

**Notes:** Standards are calculated at 15% increase year over year. For simplicity sake only monthly totals are shown on the schedule, but it is implicit that the Standards are applied product and tier by tier shown on the schedule.

### Sales Growth Standards By Year

| | Jan-06 Cases | Jan-06 Dollars | Feb-06 Cases | Feb-06 Dollars | Mar-05 Cases | Mar-05 Dollars | Apr-05 Cases | Apr-05 Dollars | May-05 Cases | May-05 Dollars | Jun-05 Cases | Jun-05 Dollars | Total Cases | Total Dollars |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Amador County | 2,346.5 | $295,716 | 1,055.7 | $203,319 | 2,194.5 | $627,619 | 1,341.0 | $166,122 | 3,594.3 | $475,050 | 3,264.7 | $418,698 | 85,938.0 | $8,257,131 |
| Year Ended June 2007 | 6,682.0 | $650,859 | 5,877.0 | $533,162 | 7,468.0 | $716,062 | 5,216.0 | $469,962 | 10,209.0 | $1,009,411 | 9,370.0 | $929,082 | 98,828.0 | $9,495,700 |
| Year Ended June 2008 | 7,684.0 | $748,488 | 6,759.0 | $613,136 | 8,588.0 | $823,471 | 5,998.0 | $540,456 | 11,740.0 | $1,160,823 | 10,776.0 | $1,048,444 | 113,653.0 | $10,920,054 |
| Year Ended June 2009 | 8,837.0 | $860,761 | 7,773.0 | $705,106 | 9,876.0 | $946,992 | 6,898.0 | $621,524 | 13,501.0 | $1,334,946 | 12,392.0 | $1,220,711 | 130,702.0 | $12,558,063 |
| Year Ended June 2010 | 10,163.0 | $989,875 | 8,939.0 | $810,872 | 11,357.0 | $1,089,041 | 7,933.0 | $714,753 | 15,526.0 | $1,535,188 | 14,251.0 | $1,413,018 | 150,307.0 | $14,441,772 |
| Year Ended June 2011 | 11,687.0 | $1,138,356 | 10,280.0 | $932,503 | 13,061.0 | $1,252,397 | 9,123.0 | $821,966 | 17,855.0 | $1,765,466 | 16,389.0 | $1,624,971 | | |

3/17/2006 10:23 AM

Page 2 of 2

Sales1\0051m05Final.xls—SalesByProductLabel

**From:** William Deutsch
**Sent:** Thursday, February 21, 2008 11:25 AM
**To:** ris@renwood.com; (r.smerling@mycingular.blackberry.net)
**Cc:** Peter Deutsch; Jim Mello; Evis Savvides
**Subject:** WJD / Renwood

Dear Robert,

We write to confirm our position regarding the Services Agreement. It has been our position since inception, and continues to be our position, that the Services Agreement provides for "cure" annually, not monthly, at the level of 100% for Tiers 1 and 4 and 85% for Tiers 2 and 3. You have expressed a contrary view.

We have tried repeatedly to resolve this disagreement. We participated in a lengthy mediation in Sacramento with Judge Snowden and reaching what we thought was a resolution, only to have you attempt to modify an important term a few days later. Then, with Judge Snowden's assistance, we negotiated and entered into an Interim Agreement which provided the parties would prepare and sign an amendment to the Services Agreement by October 31, 2007. We prepared and tendered the amendment to Renwood but never heard a single comment back. We agreed to extend the Interim Agreement three times for one month each, the final extension thru January 31, 2008.

Although we received no comment from Renwood as to the proposed amendment to the Services Agreement called for by the Interim Agreement, we did receive an entirely new proposal from Renwood in late December 2007. In keeping with our attempts to resolve matters, we responded with a counter proposal accepting most of your terms, and asking for a response before January 31, the expiration of the Interim Agreement. To date, we have had no response whatsoever.

While we would still prefer resolving matters, and since the Interim Agreement has expired, this is to confirm our position as of now that any "cure" will be annual and based upon 100% of Tiers 1 and 4 and 85% of Tiers 2 and 3. We will however remain open to evaluating you response to our counter proposal and are willing to agree on a new agreement going forward.

We worked so long and so hard on this to try to bring resolution. We are so disappointed that there has been no response.

It is unfortunate that both sides have to waste money on legal bills when these additional funds could be better spent building the brand.

We really believed that you had turned the corner when you visited in November, all pumped up, and when you were so enthusiastic at the meeting with our team in La Quinta.

Regards,

*Bill Deutsch*
Chairman



EXHIBIT B

# NOTICE OF BREACH
## OF
## SERVICES AGREEMENT
## DATED MARCH 17, 2006

This is to advise that Renwood Winery, Inc., is in breach of ¶ VI.B of the Services Agreement, for failing and refusing to pay on or before May 25, 2008, the 1st Quarter Marketing Support payment of $224,216.24 to W.J. Deutsch & Sons, Ltd.

CURE DEADLINE:                Payment in full of $224,216.24 must be
                              received by W.J. Deutsch & Sons, Ltd. at its
                              office at 108 Corporate Park Drive, White
                              Plains, NY, 10604, no later than 12:00 noon,
                              New York time, on Monday, June 2, 2008.

Date:  May 28, 2008

PETER J. DEUTSCH
W.J. DEUTSCH & SONS, LTD.

EXHIBIT C

**Jim Parrinello**

| | |
|---|---|
| **From:** | Peter Deutsch [peterd@wjdeutsch.com] |
| **Sent:** | Thursday, May 29, 2008 6:09 AM |
| **To:** | RIS |
| **Cc:** | William Deutsch |
| **Subject:** | Breach |
| **Attachments:** | Notice_Of_Breach_03_17_2006.pdf |

Dear Robert,

Please see attached.

*Peter Deutsch*
*CEO*
W. J. Deutsch & Sons, Ltd.
Tel: (914) 251-9463
Fax: (914) 251-0283
email: peterd@wjdeutsch.com

## SECURITIES PURCHASE AGREEMENT
### (Signature Page)

Renwood Group, Inc.
8795 Folsom Blvd., #203
Sacramento, CA 95826

Ladies & Gentlemen:

The undersigned (the "Investor"), hereby confirms its agreement with you as follows:

1.      This Securities Purchase Agreement, including the Terms and Conditions set forth in Annex I (the "Terms and Conditions"), and the Risk Factors set forth in Annex II (the "Risk Factors"), which are all attached hereto and incorporated herein by reference as if fully set forth herein (the "Agreement"), is made as of the date set forth below between Renwood Group, Inc., a Delaware corporation (the "Company"), and the Investor.

2.      The Company has authorized the sale and issuance of 1,428,571 shares of common stock of the Company, par value $0.001 per share of the Company (the "Common Stock") to the Investor in a private placement (the "Offering").

3.      The Company and the Investor agree that the Investor will purchase from the Company and the Company will issue and sell to the Investor 285,715 shares of Common Stock (the "Shares"), for a purchase price of $3.50 per share, for an aggregate purchase price of $1,000,002.50, pursuant to the Terms and Conditions, and two options to purchase up to an additional 571,420 shares of common stock, in increments of 57,142 share lots (the "Option Shares") for an aggregate purchase price of $1,999,970, pursuant to the Terms and Conditions. Unless otherwise requested by the Investor, certificates representing the Shares purchased by the Investor will be registered in the Investor's name and address as set forth below.

4.      The Investor represents that, except as set forth below, (a) it has had no position, office or other material relationship within the past three years with the Company or persons known to it to be affiliates of the Company, (b) neither it, nor any group of which it is a member or to which it is related, beneficially owns (including the right to acquire or vote) any securities of the Company and (c) it has no direct or indirect affiliation or association with any NASD member as of the date hereof. Exceptions:

_____

(If no exceptions, write "none." If left blank, response will be deemed to be "none.")

Please confirm that the foregoing correctly sets forth the agreement between us by signing in the space provided below for that purpose.

Date: March 24, 2006

Investor: W. J. Deutsch & Sons, Ltd.
By: _____
Print Name: Peter Deutsch
Title: President
Address: 108 Corporate Park Dr
         White Plains NY 10604
Tax ID No.: 13-3539989
Contact name: Scott Cooper
Telephone: 914-251-3203

AGREED AND ACCEPTED:
RENWOOD GROUP, INC.

By: _____
     Robert I. Smerling, Chairman & CE

1

EXHIBIT D

## RENWOOD GROUP, INC.
## BUY-SELL AGREEMENT

This Buy-Sell Agreement (the "Agreement") is made this 24th day of March, 2006, by and between Renwood Group, Inc., a Delaware corporation (the "Company"), and W.J. Deutsch & Sons, Ltd., and its assignee, upon formation, BP Wine Investing Co., LLC, a Delaware limited liability company (the "Investor"). This Agreement shall apply to all shares owned by the Investor pursuant to the Securities Purchase Agreement of even date herewith.

### RECITALS

WHEREAS, the Company and the Investor have entered into that certain Service Agreement, dated as of even date herewith (the "Service Agreement"), providing, upon the terms and conditions set forth therein, for the engagement of the Investor's services by the Company.

WHEREAS, the Company and the Investor have entered into that certain Securities Purchase Agreement dated as of even date hereof (the "Securities Purchase Agreement"), providing, upon the terms and conditions set forth therein, for the purchase of the Shares (as defined in the Securities Purchase Agreement) by the Investor.

WHEREAS, the Company and the Investor desire to enter into this Agreement for the purpose of protecting the Company and its stockholders in the event of a proposed transfer of the Shares owned by the Investor or other events affecting Share ownership as provided for in this Agreement.

NOW, THEREFORE, based on the premises and mutual covenants set forth herein, the parties hereby agree that the Shares may not be transferred except as follows:

1.    **DEFINITIONS**

"Bankruptcy" of the Investor shall mean any of the following:

(i)    Obtains or becomes subject to an order for relief under the Bankruptcy Code;

(ii)    Obtains or becomes subject to an order or decree of insolvency under state law;

(iii)    Makes an assignment for the benefit of creditors;

(iv)    Consents to or suffers the appointment of a receiver or trustee to any substantial part of its assets, which appointment is not vacated within thirty (30) days; or

(v)    Consents to or suffers a charging order against its interest in the Company that is not released or satisfied within thirty (30) days.

"Change of Control" shall mean (A) the "Bankruptcy" (as defined herein), liquidation, dissolution or winding up of the Investor; (B) the acquisition of the Investor by another entity by means of any transaction or series of related transactions (including, without limitation, any reorganization, merger or consolidation, but excluding any merger or conversion effected exclusively for the purpose of changing the domicile of the Investor); (C) a sale of all or substantially all of the assets of the Investor, unless the Investor's shareholders of record as constituted immediately prior to such acquisition or sale will, immediately after such acquisition or sale (by virtue of securities issued as consideration for the Investor's acquisition or sale or otherwise) hold at least 50% of the voting power of the surviving or acquiring entity; (D) change in the executive management team of the Investor such that neither William Deutsch or Peter Deutsch are a principal executive officer of the Investor; or (E) the lease or transfer of all or substantially all of the assets of the Investor to a third party.

"Fair Value" shall mean the aggregate price for Renwood Group, Inc. as determined by the following:

(a)  Insured value of all fixed assets and inventory, less debt, plus
(b)  Inventory calculated at FOB price with all wines converted to 9 liter cases, plus
(c)  Current Assets less current liabilities; plus
(d)  All land valued at appraised value, less debt.

"Public Market" shall mean either the Nasdaq National Market, the Nasdaq Capital Market, the Pacific Stock Exchange, the New York Stock Exchange, the American Stock Exchange, the London Stock Exchange (including AIM), or the Nasdaq Over the Counter Bulletin Board, or successors to any of the foregoing as they may develop during the term of this Agreement, or other markets where securities are listed and traded.

"Shares" shall mean all of the shares of common stock acquired by Investor pursuant to the Securities Purchase Agreement.

2.    **BUY-SELL FOR TERMINATION OF SERVICE AGREEMENT; CHANGE OF CONTROL.**

a.    **Company 's Option.** In the event of a Change of Control of the Investor or the termination of the Service Agreement for any reason whatsoever and the Company's securities are not traded on a Public Market, the Company ("Trigger Event"), its assignees, successors or designees shall purchase all of the Shares, as follows: In the event the Company acquires the Shares at Fair Value pursuant to the method described herein, the purchase price will be paid by the Company in equal installments over two and one-half (2 ½) years, with the first payment being on a date six months (180-days) following the date of the Trigger Event ("Payment Date"), and subsequent equal payments (without interest) on the anniversary of the Payment Date for the next two years until all Shares have been purchased. The Company agrees that it shall use its best efforts not to take any actions that might impair its ability to repurchase the shares during the repurchase period, subject to the Company's board of directors' determination, consistent with their fiduciary obligations to the shareholders, to take such actions. The Company, its assignees, successors or designees' ability to purchase the Shares pursuant to this Section is subject to federal and state securities laws, other regulatory authorities and applicable Delaware corporate laws then currently in effect. Nothing in the foregoing shall prohibit the Company from purchasing the Shares earlier.

b.    **Investor's Option.** In the event the Service Agreement is terminated for any reason whatsoever and the Company's securities are traded on a Public Market, the Investor may elect to sell all or a portion of the Shares on such Public Market; provided, however, Investor may only sell up to five percent (5%) of the Shares on a quarterly basis from the date of termination. Investors' ability to sell the Shares pursuant to this Section is subject to federal and state securities laws then currently in effect, or any agreement with the Company, any agreement with a financial institution or underwriter for the Company.

c.    **Board Seat.** In the event of a "Change of Control" of the Investor or the Service Agreement is terminated for any reason whatsoever, Investor's representative on the Board of Directors of the Company, if any, will immediately tender his resignation from the Board.

2.    **RESTRICTIVE LEGEND; STOP TRANSFER INSTRUCTIONS.**

a.    **Legend.** In addition to any legend required by state or federal securities laws, each stock certificate representing shares presently owned, or hereafter issued, shall, on execution of this Agreement, have visibly endorsed on its face, the following legend:

"Any sale, transfer, or hypothecation of the shares represented by this certificate is restricted by the provisions of a Buy-Sell Agreement between the Holder and the Company dated March 24, 2006, a copy of which may be inspected at the principal office of the Company, and all the provisions of which are incorporated by reference in this certificate."

b.    **Stop Transfer Instructions.** The Investor agrees that the Company may instruct its transfer agent to impose transfer restrictions on the shares represented by certificates bearing the legend referred to in Section 2(a) above

to enforce the provisions of this Agreement and the Company agrees promptly to do so. The legend shall be removed upon termination of this Agreement.

## 3.    MARKET STAND-OFF.

The Investor hereby agrees that, if so requested by the Company and/or underwriters (if any) in connection with the Company's initial public offering of its securities on the Public Markets, the Investor will not sell, make any short sale of, loan, grant any option for the purchase of, or otherwise transfer or dispose of any Shares or other securities of the Company without the prior written consent of the Company and/or underwriters (if any) for 365 days following the effective date of a registration statement of the Company filed pursuant to such offering.

## 4.    CONFIDENTIALITY.

The Investor agrees to use, and to use its best efforts to insure that its authorized representatives use, the same degree of care as the Investor uses to protect its own confidential information (but in no event less than reasonable care) to keep confidential financial statements, forecasts, business plans, marketing plans, customer lists and any other information furnished to it which the Company identifies as being confidential or proprietary (so long as such information is not in the public domain), except that the Investor may disclose such proprietary or confidential information to any shareholder, subsidiary or parent of such Investor for the purpose of evaluating its investment in the Company as long as such shareholder, subsidiary or parent agrees to be bound by the confidentiality provisions of this Section 4.

## 5.    NO DISPARAGEMENT.

For a period of one (1) year after the date upon which a transfer, sale or purchase of the Shares is effected, the parties agree to treat each other respectfully and professionally and not disparage the other party, and the other party's officers, directors, employees, shareholders and agents, in any manner likely to be harmful to them or their business, business reputation or personal reputation; provided that both the Company and the Investor will respond accurately and fully to any question, inquiry or request for information when required by the legal process.

## 6.    TERMINATION OF AGREEMENT.

This Agreement shall terminate upon the occurrence of any of the following events:

a.    The execution of a written instrument by all the parties hereto agreeing to the termination of this Agreement.

b.    The bankruptcy, insolvency, receivership or dissolution of the Company, or an assignment by the Company for the benefit of creditors.

## 7.    ENTIRE AGREEMENT.

This Agreement supersedes all agreements previously made between the parties herein relating to its subject matter. There are no other understandings or agreements between the parties. Any amendments or addendums to this Agreement must be signed by the parties in writing.

## 8.    BINDING EFFECT OF AGREEMENT.

This Agreement shall be binding upon, and shall inure to the benefit of, the parties to it and their respective heirs, executors, administrators, legal representatives, successors, assigns.

## 9.    MISCELLANEOUS MATTERS.

Each party to this Agreement agrees to perform any further acts and execute and deliver all documents that may be reasonably necessary to carry out the provisions of this Agreement.

4209540_7

3

10.    NOTICES.

Any notices to be given hereunder by either party to the other shall be given in accordance with the terms under the Securities Purchase Agreement.

11.    NON-WAIVER.

No delay or failure by either party to exercise any right under this Agreement and no partial or single exercise of that right shall constitute a waiver of that or any other right, unless otherwise expressly provided herein.

12.    CAPTIONS.

The headings in this Agreement are inserted for convenience only and identification only and are in no way intended to describe, define or limit the scope, intent or interpretation of this Agreement or any provision hereof.

13.    GOVERNING LAW.

This Agreement, and the application or interpretation thereof, shall be governed by, and construed in accordance with, the laws of the State of California, without regard to conflicts of laws principles.

14.    JURISDICTION AND VENUE.

If any action at law or in equity, including an action for declaratory relief, is brought to enforce or interpret any provision or provisions of this Agreement or to enforce any right and/or legal remedy the other party might have against the other, such action must be brought in a State or federal court in the State of California with a venue in the County of Sacramento.

15.    SEVERABILITY.

If any provision in this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions will, nevertheless, continue in full force without being impaired or invalidated in any way.

16.    JOINT CONSTRUCTION.

The parties mutually acknowledge that they had assistance of counsel in the preparation of this Agreement and that al terms and conditions shall be construed and interpreted as though jointly drafted.

17.    COUNTERPARTS.

This Agreement may be signed in one or more counterparts, including facsimile signatures, all of which shall be treated as originals and together shall be treated as one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date set forth hereinabove.

RENWOOD GROUP, INC.

By: _____
    Robert I. Smerling,
    Chairman and CEO

**W.J. Deutsch & Sons, Ltd.**

By: _____
    William J. Deutsch
    Chairman

By: _____
    Peter E. Deutsch
    President

By: _____
    William J. Deutsch, on Behalf of
    BP Wine Investing Co, LLC, a to
    Be formed Delaware limited liability company

By: _____
    Peter E. Deutsch, on Behalf of
    BP Wine Investing Co, LLC, a to
    Be formed Delaware limited liability company

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date set forth hereinabove.

RENWOOD GROUP, INC.

By: _____
    Robert I. Smerling,
    Chairman and CEO

W.J. Deutsch & Sons, Ltd.

By: _____
    William J. Deutsch
    Chairman

By: _____
    Peter E. Deutsch
    President

By: _____
    William J. Deutsch, on Behalf of
    BP Wine Investing Co, LLC, a to
    Be formed Delaware limited liability company

By: _____
    Peter E. Deutsch, on Behalf of
    BP Wine Investing Co, LLC, a to
    Be formed Delaware limited liability company