1 NIELSEN, MERKSAMER, PARRINELLO,
    MUELLER & NAYLOR, LLP
2 JAMES R. PARRINELLO, SBN #63415
SEAN P. WELCH, SBN #227101
3 2350 KERNER BLVD., SUITE 250
SAN RAFAEL, CA 94901
4 TELEPHONE (415) 389-6800
FAX         (415) 388-6874
5 e-mail: jparrinello@nmgovlaw.com

6 *Attorneys for Defendant*
*W.J. Deutsch & Sons, Ltd.*
7

8                    UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                     SAN FRANCISCO DIVISION

11

12 RENWOOD WINERY, INC.,                )
                                        )   Case No.  C 08-02848 PJH
13      *Plaintiff,*                     )
                                        )   **DECLARATION OF JAMES R.**
14 v.                                    )   **PARRINELLO IN OPPOSITION**
                                        )   **TO EX PARTE APPLICATION**
15 W.J. DEUTSCH & SONS, LTD., a New York )   **FOR WRIT OF POSSESSION**
Corporation, and DOES 1-50, inclusive,  )   **AND/OR TEMPORARY**
16                                        )   **RESTRAINING ORDER**
      *Defendants.*                       )
17                                        )
                                        )   DATE:  July 2, 2008
18                                        )   TIME:   9:00 a.m.
                                        )   Hon. Phyllis J. Hamilton
19                                        )
                                        )
20 _____)

21

22 I, JAMES R. PARRINELLO, hereby declare under penalty of perjury as follows:

23      1.    I am one of the attorneys for Defendant W.J. DEUTSCH & SONS, LTD.

24 ("WJD"), in the action filed by Plaintiff RENWOOD WINERY, INC. ("Renwood") and am

25 familiar with the file, the documents, and the history related to the action.  I have personal

26 knowledge of the facts stated in this declaration and, if called as a witness, could and would

27 competently testify to the facts set forth below.

28

                                  1

2.     Renwood's papers claim that WJD has improperly obstructed Renwood's efforts to obtain ex parte relief from JAMS. Renwood's accusations are false, and Renwood has only itself to blame for any delays. The true facts are set forth below.

3.     On Thursday, June 5, 2008, I received a fax from Renwood's counsel, Whitney Davis, advising that he would seek a writ of possession or TRO on the morning of June 6, 2008 in Napa County Superior Court. (Based on his June 18, 2008 e-mail to JAMS, Exhibit A hereto, Mr. Davis was in touch with JAMS in late May about obtaining injunctive relief.) After close of business on June 5, I received another fax from Mr. Davis' office advising he was postponing the ex parte hearing until Monday, June 9.

4.     Exercising its right under federal law, WJD on June 9, 2008, removed the lawsuit from Napa County to this Court.

5.     The case was assigned to Magistrate Spero. WJD promptly filed a motion to dismiss Renwood's complaint and to compel arbitration (at that time it was unclear whether Renwood had actually commenced the arbitration, and our calls to JAMS to ascertain the status of Renwood's new demand for arbitration were inconclusive; my secretary, for example, was told Renwood had not yet paid the requisite fee for a new case filing and JAMS was in the process of contacting Renwood's counsel to clarify his intentions.)

6.     In an attempt to obviate any further requests for provisional relief, on June 10 I faxed a letter to Renwood's counsel offering on behalf of WJD to (a) post an undertaking in the amount of the cure inventory or (b) offering Renwood the opportunity to repurchase the cure inventory at WJD's laid-in cost. (Exhibit B hereto.) Renwood rejected both proposals.

7.     On June 11, WJD filed its motion to dismiss. On June 12 Renwood objected to the assignment of Magistrate Spero to preside over the case, causing the case to be reassigned to this Court and a short postponement of the hearing date on the motion to dismiss.

8.     Renwood's counsel wrote to JAMS on June 16, requesting that a telephone conference call be immediately convened before Kenneth Gack regarding Renwood's just-submitted demand for arbitration. (Exhibit C hereto.) In doing so, Renwood was plainly attempting to end run JAMS rules governing the commencement of cases and appointment of

2

arbitrators.  In contravention of those rules, Renwood sought to have JAMS unilaterally appoint arbitrator Ken Gack to preside over the new case.  That would have been clearly improper, and I advised JAMS in my letter of June 18 that JAMS case commencement and arbitrator appointment rules should be followed.  (Exhibit D hereto.)  JAMS agreed with me as confirmed by its correspondence of June 20.  (Exhibit E hereto.)  In that same correspondence JAMS advised Renwood that "Once an arbitrator is appointed, any party may petition him or her for injunctive relief."  (*Id*.)  Renwood's attempt to have Mr. Gack designated the arbitrator for this new case was misplaced, as JAMS itself concluded.  (Mr. Gack was for a very short time the appointed arbitrator in the prior arbitration between the parties, but his only involvement was more than 15 months ago when he presided over the first telephone conference in the case where the parties agreed to mediate before Judge Snowden.  That first case was terminated in late 2007 and all JAMS files were destroyed.  Renwood's clever tactic to attempt to revive the prior case and have Mr. Gack automatically appointed as the arbitrator for Renwood's newly-filed arbitration demand clearly violated JAMS rules.)  JAMS' June 20 correspondence establishes that WJD had no obligation to accept Mr. Gack as the arbitrator and did not act improperly by refusing to do so.

9.    JAMS is in fact processing Renwood's newly-filed arbitration demand in accord with the rules agreed to by the parties.  WJD paid its half of the case management fee last week and JAMS is communicating with the parties regarding possible arbitrators.  In fact this morning at 10:43 a.m. I received an email from JAMS providing the parties with a list of possible arbitrators.  (Exhibit F hereto.)

10.    Attached as Exhibit G hereto is a true and correct copy of Renwood's Demand for Arbitration filed with JAMS in June 2008.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on July 1, 2008, at San Rafael, California.

_____
James R. Parrinello

3

# EXHIBIT A

**Jim Parrinello**

| | |
|---|---|
| **From:** | Whitney A. Davis [WAD@Charter-Davis.com] |
| **Sent:** | Wednesday, June 18, 2008 10:50 AM |
| **To:** | jmccool@jamsadr.com |
| **Cc:** | ris@renwood.com; wdavislaw@comcast.net; Jim Parrinello |
| **Subject:** | Renwood v. Deutsch |

Dear Ms. McCool:

I want to thank you for your patience concerning the jurisdictional issue that seems to have arisen.  I am in receipt of Jim Parinello's letter regarding the subject, and wish to provide JAMS with Renwood's position.

**Background**:

In late May, Renwood counsel Whitney A. Davis contacted you, Assistant to Ken Gack, Esq., to determine how or if JAMS handled equitable remedies.  Renwood counsel did so because the JAMS rules were silent on the procedure for such relief, yet the agreement containing the arbitration provision could be read broadly to include equitable relief.  Confounding this disparity is the fact that California stautory law on the subject of arbitration allows a party bound by an arbitration provision to seek immediate court relief if that party could not obtain that same relief from the arbitrator.

Renwood counsel described the relief as an injunction and a claim & delivery.

Julie McCool consulted several people at JAMS on whether or not JAMS provided a means to obtain ex parte equitable relief.  The answer, apparently provided to Ms. McCool by the JAMS General Manager who is a lawyer, was that they were unsure, but suspected that enforceable ex parte relief could not be obtained from JAMS, and that Renwood would need to go to court for immediate relief.

In reliance on this, Renwood counsel made application to the Napa County Superior Court to enter a TRO preventing W.J. Deutsch and Sons from selling approximately 17,000 cases of wine that remained in W.J. Deutsch's inventory.  Renwood Winery filed UCC statements on that inventory, and the Services Agreement acted as a security agreement in favor of Renwood on that W.J. Deutsch inventory.  Although W.J. Deutsch owned that inventory, it also served as collateral for any amounts due and owing to Renwood from W.J. Deutsch.  By May of 2008, W.J. Deutsch was in arrears to Renwood in an amount of between $2-3 million.

In addition to the problem caused by the depletion of the Renwood's collateral, the W.J. Deutsch inventory sales essentially cut-off most sales from Renwood's own inventory.  Since approximately February of 2008, W.J. Deutsch began filling customer orders from its own inventory instead of ordering the wine from Renwood's inventory.  So, in addition to W.J. Deutsch ignoring the millions it owed Renwood in sales over those months, W.J. Deutsch was also cutting off revenue to Renwood from new sales.  As Renwood prepares for harvest, most of its revenue has been either held by W.J. Deutsch in the form of past due invoices, or diverted by W.J. Deutsch through sales of its own inventory.  The bottling and harvest cannot take place, resulting in the loss of an entire vintage, and the end of Renwood.

Renwood terminated the W.J. Deutsch contract in late May, and terminated W.J. Deutsch authority to sell Renwood wine in all states.  However, W.J. Deutsch has instructed all distributors to only buy Renwood wine from W.J. Deutsch.  This places W.J. Deutsch in the position to dump its cure inventory at below-market prices, which would devastate the market.  This also stymies sales by Renwood.

Due to cash flow threat to the 2008 harvest, the threat of dumping, and the continuing depletion of Renwood's collateral, Renwood sought ex parte relief in the Napa County Superior Court for a TRO to preclude shipment of W.J. Deutsch's inventory until the past due invoice issues were dealt with on the merits.  Renwood also sought equitable relief in the form a claim & delivery, to execute on that inventory to prevent dumping and satisfy the amounts due and owing.

Renwood asserted different claims in a demand for arbitration, filed with JAMS last week.

W.J. Deutsch removed the Renwood application to the U.S. District Court for the Northern District of California.  W.J. Deutsch then filed a motion to dismiss and to compel arbitration.

**The Answer Renwood Seeks**:

In light of W.J. Deutsch's removal of the ex parte claims, the motion to dismiss and compel arbitration, and the subsequent

re-assignment of the federal judge, Renwood has been attempting to obtain an answer from our arbitrator, Ken Gack, as to whether or not JAMS has jurisdiction it is willing to exercise effectively over Renwood's ex parte claims. If JAMS now believes it has the jurisdiction and can entertain Renwood's motions for ex parte relief, the parties and the federal court need to know this before W.J. Deutsch is able to further deplete the collateral or otherwise ruin Renwood's harvest and destroy the company. If JAMS believes it does not have the jurisdiction or ability to entertain the ex parte motions, then Renwood will continue to seek its remedy in court.

Further confounding the issue is the fact that the JAMS rules make no provision for ex parte relief to take place in a timely fashion. W.J. Deutsch is making its best effort to delay the consideration of Renwood's relief. W.J. Deutsch has not responded to request for a telephonic administrative discussion today from Ken Gack's office. They infer that they wish to appoint a different arbitrator, a process that will take weeks. They do not nominate a proposed arbitrator to meet the exigency of the circumstances. W.J. Deutsch will not agree to stop selling from its inventory in the meantime to mitigate the potential damage to Renwood. In other words, JAMS seems not to be configured to consider ex parte requests, and W.J. Deutsch is using that reality as a litigation and business tactic.

By designating JAMS as the arbitration organization, Renwood did not waive its right to ex parte equitable relief. If JAMS cannot entertain an application for that relief in a meaningful and timely manner, we need to know this immediately.

If JAMS can entertain an application for such relief, we ask that JAMS please find a reasonable way to perform meaningfully.

I may be reached at wad@charter-davis.com, or at 916-719-6827. My fax number is 916-448-9009.

Sincerely,

Whitney A. Davis
**CHARTER DAVIS, LLP**
1730 I Street, Suite 240
Sacramento, CA 95814
Telephone (916) 448-9000
Facsimile (916) 448-9009
Email wad@charter-davis.com

# EXHIBIT B

**NIELSEN, MERKSAMER,**
**PARRINELLO, MUELLER & NAYLOR, LLP**

ATTORNEYS AT LAW

2350 KERNER BOULEVARD, SUITE 250, SAN RAFAEL, CALIFORNIA 94901

TELEPHONE (415) 389-6800  FAX (415) 388-6874

—————

WWW.NMGOVLAW.COM

June 10, 2008

Whitney A. Davis, Esq.                                   *Via Facsimile & U.S. Mail*
Charter Davis LLP
1730 I Street, Suite 240
Sacramento, CA 95811

      Re:    Renwood Winery, Inc. v. W.J. Deutsch & Sons, Ltd.

Dear Mr. Davis:

      We write to advise you that the claims embodied in the Complaint filed in Napa County Superior Court – now removed to Federal Court - constitute a flagrant violation of Renwood's obligation to arbitrate disputes related to the Services Agreement.  We urge you to discontinue the case, saving us all the burden of an unnecessary dismissal motion.

      More significantly, the ex parte application accompanying that complaint violates the governing rule (emerging from recent case law) that the Federal Arbitration Act "does not give a court the authority to issue equitable remedies" (*Comedy Club, Inc. v. Improv West Associates*, 514 F.3d 833, 843 (9th Cir. 2007)).  While we believe any effort to pursue injunctive relief under such circumstances would be sanctionable (and expressly reserve all rights associated with such an application), we also note your several communications concerning a possible resolution of your client's immediate grievance; *i.e.*, relative to the so-called "cure inventory."  We suggest the following resolution: (i) our client will provide an undertaking in an amount approximating the cost of the cure inventory; (ii) your client will be afforded the opportunity to repurchase such inventory within 15 days at Deutsch's laid-in cost; (iii) until your client does so (or if it does not do so) Deutsch reserves the right to sell its inventory.

      We believe that the above constitutes a <u>very</u> generous offer; particularly, since your client's submissions suggest it will <u>not</u> be in a position to provide the appropriate undertaking to support its application – even if the application was not devoid of merit.

      If your client wishes to proceed on the basis described above, please advise no later than 12:00 noon on Friday, June 13, 2008.

      Very truly yours,

      James R. Parrinello

JRP/pas

Confirmation Report — Memory Send

```
                                    Page      : 001
                                    Date & Time: Jun-10-08  04:42pm
                                    Line 1    : 4156346978
                                    Line 2    : 4156346978
                                    Machine ID : NMPWN MARIN 3
```

| | | |
|---|---|---|
| Job number | : | 269 |
| Date | : | Jun-10 04:40pm |
| To | : ☎ | 919164489009 |
| Number of pages | : | 002 |
| Start time | : | Jun-10 04:40pm |
| End time | : | Jun-10 04:42pm |
| Pages sent | : | 002 |
| Status | : | OK |

Job number    : 269              *** SEND SUCCESSFUL ***

### NIELSEN, MERKSAMER,
### PARRINELLO, MUELLER & NAYLOR, LLP
ATTORNEYS AT LAW
2350 KERNER BOULEVARD, SUITE 250, SAN RAFAEL, CALIFORNIA 94901
TELEPHONE (415) 389-6800 FAX (415) 388-6874

WWW.NMGOVLAW.COM

## FACSIMILE TRANSMISSION

| TO: | Whitney A. Davis | FAX NO.: | (916) 448-9009 |
|---|---|---|---|
| | Charter Davis LLP | | |
| FROM: | James R. Parrinello | DATE/TIME: | 6/10/08   4:30 pm |

### MESSAGE

Re:   Renwood Winery, Inc. v. W.J. Deutsch & Sons, Ltd.

Attached: Letter dated June 10, 2008      Signed version

| | | |
|---|---|---|
| Operator: | pas | Number of Pages (incl. this cover page):    2 |
| Client No.: | 2059.01 | |

____X____ ORIGINAL WILL FOLLOW VIA: ___X___ First Class Mail _____ Email

_____ ORIGINAL WILL NOT FOLLOW.

**WARNING TO RECIPIENT**

THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS CONFIDENTIAL INFORMATION AND ATTORNEY/CLIENT PRIVILEGED. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE.

IF YOU DO NOT RECEIVE ALL PAGES, PLEASE CALL (415) 389-6800

SACRAMENTO OFFICE · 1415 L STREET, SUITE 1200 · SACRAMENTO · CALIFORNIA · 95814 · (916) 446-6752

Confirmation Report — Memory Send

```
                                    Page      : 001
                                    Date & Time: Jun-10-08  04:32pm
                                    Line 1    : 4156346978
                                    Line 2    : 4156346978
                                    Machine ID : NMPMN MARIN 3
```

| | | |
|---|---|---|
| Job number | : | 268 |
| Date | : | Jun-10 04:32pm |
| To | : | ☎919164489009 |
| Number of pages | : | 002 |
| Start time | : | Jun-10 04:32pm |
| End time | : | Jun-10 04:32pm |
| Pages sent | : | 002 |
| Status | : | OK |

Job number    : 268              *** SEND SUCCESSFUL ***

NIELSEN, MERKSAMER,
PARRINELLO, MUELLER & NAYLOR, LLP
ATTORNEYS AT LAW
2350 KERNER BOULEVARD, SUITE 250, SAN RAFAEL, CALIFORNIA 94901
TELEPHONE (415) 389-6800  FAX (415) 388-6874

WWW.NMGOVLAW.COM

## FACSIMILE TRANSMISSION

| | | | |
|---|---|---|---|
| TO: | Whitney A. Davis | FAX NO.: | (916) 448-9009 |
| | Charter Davis LLP | | |
| FROM: | James R. Parrinello | DATE/TIME: | 6/10/08  4:30 pm |

### MESSAGE

Re:   Renwood Winery, Inc. v. W.J. Deutsch & Sons, Ltd.

Attached: Letter dated June 10, 2008

Operator:    pas        Number of Pages (incl. this cover page):        2

Client No.:    2059.01

___X___ ORIGINAL WILL FOLLOW VIA:    __X__ First Class Mail  _____ Email

_____ ORIGINAL WILL NOT FOLLOW.

**WARNING TO RECIPIENT**

THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS CONFIDENTIAL INFORMATION AND ATTORNEY/CLIENT PRIVILEGED. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE.

IF YOU DO NOT RECEIVE ALL PAGES, PLEASE CALL (415) 389-6800

SACRAMENTO OFFICE · 1415 L STREET, SUITE 1200 · SACRAMENTO · CALIFORNIA · 95814 · (916) 446-6752

# EXHIBIT C

## Jim Parrinello

| | |
|---|---|
| **From:** | Whitney Davis [wdavislaw@comcast.net] |
| **Sent:** | Monday, June 16, 2008 4:27 PM |
| **To:** | jmccool@jamsadr.com |
| **Cc:** | Jim Parrinello; 'Robert Smerling' |
| **Subject:** | Renwood/W.J. Deutsch |
| **Attachments:** | SERVICES AGR 052108 (WAD5062).pdf |

Ms. McCool:

You advised me today that the file from the previous arbitration between Renwood and W.J. Deutsch no longer contained the start-up documents, and that we would need to complete those. Thank you for faxing them to our offices on an expedited basis.

Please find attached the Services Agreement, which at pp. 18-19 recite the arbitrator's authority. Both parties had already stipulated to use Ken Gack as our neutral in 2007. Although Mr. Gack referred us out to Scott Snowden for mediation, I know of no reason why our previous agreement to Ken Gack for arbitration purposes would not remain intact.

As I inquired of you earlier this month, Renwood needed to apply for equitable relief in the form of an injunction and a "claim and delivery" regarding about 17,000 cases of wine. I was directed by the JAMs GM to seek that relief in superior court, and did so in Napa County Superior Court, where the wine was located. W.J. Deutsch removed that matter to the Federal District Court for the Northern District. W.J. Deutsch also filed a motion to dismiss and to compel arbitration.

So, in addition to Renwood's original demand for arbitration which we ask JAMS to administrate in due course, Renwood and W.J. Deutsch apparently have a jurisdictional question for Mr. Gack. The answer to that question will determine whether the equitable claims (injunction, claim/delivery) are to be heard by him, or by a federal or state court.

I will forward to you several pdf versions of the equitable claims that will be presented to Mr. Gack for a jurisdictional decision.

Therefore, due to the exigency of the circumstances, I would ask that Mr. Gack provide the parties with available times in the next two days to discuss the jurisdictional issue and the injunction issue. Mr. Parinello has been cooperative and I am sure his office will make every effort to schedule such a conference call.

By copy of this message to Mr. Parinello, I would suggest that he mail to you his client's motion to dismiss.

Sincerely,

Whitney A. Davis

7/1/2008

# EXHIBIT D

**NIELSEN, MERKSAMER,**
**PARRINELLO, MUELLER & NAYLOR, LLP**
ATTORNEYS AT LAW
2350 KERNER BOULEVARD, SUITE 250, SAN RAFAEL, CALIFORNIA 94901
TELEPHONE (415) 389-6800 FAX (415) 388-6874

WWW.NMGOVLAW.COM

June 18, 2008

**VIA FACSIMILE**

Ellen Ruth Schuster
Senior Case Manager
JAMS
Two Embarcadero Center, Suite 1500
San Francisco, CA 94111

> Re:  *Renwood Winery, Inc. vs. W. J. Deutsch & Sons, Ltd.*
>      Demand for Arbitration filed on or about June 6-9, 2008

Dear Ms. Schuster:

      In accord with our discussion late yesterday afternoon, I have prepared this letter to state the position of my client, W. J. Deutsch & Sons, Ltd. ("Deutsch"), regarding the proper handling of the new Demand for Arbitration ("Demand") that I received on June 7 by email from Whitney Davis, attorney for Renwood Winery, Inc. ("Renwood"). A copy of the Demand is attached hereto.[1]  I will also respond briefly to the email sent today by Mr. Davis to Julie McCool regarding Renwood's claim for ex parte equitable relief.

    1.    The Arbitrator Appointment Procedures Under the JAMS Rules and the Parties' Agreement Apply to this New Case

      Renwood's Demand concerns a new case and must be treated as such. Renwood acknowledges as much by its filing of a new Demand with a new caption. Accordingly, JAMS case commencement procedures apply. (JAMS Rule 5.) Insofar as appointment of an arbitrator is concerned, JAMS arbitrator appointment procedures (JAMS Rule 15) apply, except to the extent the parties' agreement to arbitrate differs. In that regard, Paragraph XII E of the parties' agreement states that the parties will submit

---

[1]  I received an email (also attached) from Mr. Davis on June 7 attaching an unsigned copy of the Demand which I assume is identical to the demand actually filed by Renwood at or about the same time. We reserve our right to challenge the efficacy of service under JAMS Comprehensive Arbitration Rules and Procedures, Rule 8(a).

Ellen Ruth Schuster
JAMS
June 18, 2008
Page 2

disputes to binding arbitration "by a mutually agreeable arbitrator, or in the event agreement cannot be reached, then to an arbitrator appointed by the Superior Court in and for the City and County of Sacramento." Thus, we must begin the process set forth in Rule 15, which may or may not require the involvement of the Superior Court.

As you know, Deutsch on October 18, 2006, filed a prior arbitration demand against Renwood on limited issues and without making any monetary demand, and Renwood counter-claimed. The parties agreed then that Mr. Ken Gack would serve as arbitrator for that limited and very specific dispute.

At the first conference in the prior arbitration, before any substantive adversary proceedings occurred, the parties agreed to mediation before Judge Scott Snowden. In a recent court filing, Renwood's Chairman and CEO, Robert Smerling, acknowledged in his declaration that the prior arbitration was "cancelled" after the parties entered into mediation. (Mr. Smerling's declaration is too lengthy to attach, but a copy of the page containing this statement is attached and highlighted.) Judge Snowden met with the parties in mid-May 2007 and the parties reached an agreement that was summarized by Judge Snowden in a handwritten memo sent to the parties shortly afterwards. Renwood however rejected the summary saying that it had a different recollection of the terms. More discussions followed with Judge Snowden and an interim agreement was reached during the summer of 2007.

On November 21, 2007, JAMS wrote to the parties stating "JAMS has closed our file in the above matter"; the parties were advised that all documents such as briefs, exhibits evidence and transcripts previously submitted would be destroyed within 30 days. The case has been closed ever since: there have been no communications whatsoever to or from JAMS since the November 21, 2007 letter; indeed, but for the JAMS closing letter, there had not been any JAMS involvement with this prior proceeding since the summer of 2007.

Recently a new dispute erupted between the parties. Renwood late last month unilaterally and unlawfully suspended the Services Agreement between the parties; later, it wrongfully terminated that Agreement. Then – anticipating Deutsch's claim for wrongful termination – Renwood raced to the state courthouse in Napa County to commence its lawsuit for a writ of possession and provisional relief. At the same time as it started that action Renwood filed its new Demand with JAMS. The Napa County

Ellen Ruth Schuster
JAMS
June 18, 2008
Page 3

case has since been removed to federal court, where Deutsch has moved to dismiss the lawsuit.

       Given the circumstances, it is hardly surprising that the arbitration just initiated by Renwood will raise new and different claims and issues that were not part of the previously closed arbitration. Beyond the fact that unlike the prior proceeding, Renwood is the Petitioner now and Deutsch is the Respondent, Renwood seeks damages for at least $77 million (whereas unspecified monetary relief was sought in the prior proceeding). Deutsch, for its part, will have substantial claims arising from, among other things, Renwood's unlawful termination of the Agreement. This is a different case, emerging from new facts and implicating different issues. As stated above, JAMS case-opening and arbitrator appointment and vetting procedures must be utilized (except as otherwise provided in the parties' Agreement).

       We have the utmost respect for Mr. Gack, but Renwood's new Demand cannot be automatically assigned to him. While we view Renwood's claims to be without merit, we believe the adjudication of this complicated matter may be best undertaken by an arbitrator with substantial prior judicial experience in handling such matters, of which JAMS has many. Additionally, circumstances have changed in the past 18 months since the prior arbitration was commenced that could affect the selection of the arbitrator and/or create conflicts or concerns where none existed previously. For example, we understand Mr. Gack has practiced for many years in Sonoma County and has a long-standing and significant presence there. Just last week, Deutsch acquired a substantial interest in three long-time Sonoma County wineries—Buena Vista, Geyser Peak and Gary Farrell. These new facts are just some of the circumstances which must be closely reviewed before an Arbitrator can be appointed for <u>this</u> case.[2]

       Further, there is no emergency here. Deutsch advised Renwood of its position in this matter in February. It was only after several months lapsed that Renwood threatened to seek a TRO. And, despite that threat – issued on June 5th – Renwood has <u>not</u> done so. Indeed, while confronted with Renwood's duplicative litigation and threat, my client has filed a motion to dismiss Renwood's complaint in U.S. District Court which

---

[2] Indeed, even <u>if</u> this somehow was deemed to be a "continuation" of a prior closed case, under JAMS Rule 10, once an arbitrator is appointed, no new or different claim may be submitted except with the Arbitrator's approval. Presumably, this Rule is intended to avoid the conflicts which may arise from a late-filed claim, among other purposes.

Ellen Ruth Schuster
JAMS
June 18, 2008
Page 4

is set for hearing on July 23. There is no reason to cause JAMS to alter its standard case-opening procedures.

Finally, we note that JAMS should not entertain any claim by Renwood for temporary relief or otherwise, while Renwood has a virtually identical claim pending in the U.S. District Court. We have asked Renwood to voluntarily dismiss that case but it refuses to do so. Such duplicative process raises issues of waiver and estoppel that may be addressed in due course.

2.  Renwood Must Abide By the Dispute Resolution Procedures Set Forth in the Parties' Agreement and the JAMS Rules

Initially, Renwood unquestionably agreed to arbitrate all claims related to the Services Agreement – such as the claims asserted here. Renwood likewise unquestionably agreed to submit such disputes for adjudication under the JAMS rules (except as otherwise specified in the Services Agreement). Renwood's present stance – a flagrant effort to avoid both its obligation to arbitrate and to do so under JAMS rules – constitutes a clear contravention of the Services Agreement.

Moreover, by its consistent conduct (including its participation in the prior arbitration and its new Demand), Renwood has conceded that it is bound to arbitrate its dispute with Deutsch, pursuant to the JAMS rules. These JAMS rules provide for the Arbitrator to consider whether a party is entitled to interim injunctive relief. There is no provision or rule allowing Renwood to seek an injunction without a hearing and from some individual or body that has not been appointed pursuant to the JAMS rules and the parties' Agreement. Even if there was such a rule (and there is not), Renwood has waived its right to seek ex parte relief from some unidentified body that has not been duly constituted.

Nor is there any reason – equitable or otherwise – to rewrite the JAMS rules or the Services Agreement – as Renwood seeks to do so blithely. As already noted, Renwood has known of Deutsch's position since February. It appears from Mr. Davis's email of today's date that he approached JAMS sometime in May about Renwood's effort to obtain an injunction. Had Renwood then filed its Demand and requested prompt commencement of the required case-opening process, there would have been no "urgency". Instead, Renwood raced to court. Now, only after receiving Deutsch's motion to dismiss Renwood's complaint (on the basis that the dispute is subject to arbitration) and the communications from Deutsch's counsel establishing that the court cannot interfere with the Arbitrator's authority here, Renwood has circled back to JAMS.

Ellen Ruth Schuster
JAMS
June 18, 2008
Page 5


Nor should Renwood's dramatic claims about the "end of Renwood" justify a departure from the process to which the parties have agreed. At bottom, this is only a claim about money. Moreover, Renwood's claim that Deutsch owes millions of dollars in arrears is utterly misleading - - these claims are based on Renwood's incorrect views of sales standards and the theory that Deutsch should have purchased more wine than it did (not that Deutsch has failed to pay for wine delivered by Renwood). Indeed, even if Renwood's sales standards theory was correct, its contractual remedy was for Deutsch to purchase *more* wine (wine that Renwood would not deliver to its wrongfully terminated distributor), not give back what it has bought and paid for. Deutsch owns the wine Renwood seeks to seize and Renwood has no security interest covering this wine. And, Renwood's unsupported and hyperbolic reference to the "threat of dumping" can hardly justify any seizure.

In short, Renwood has agreed to a process by which to resolve this dispute and cannot circumvent this process by improper resort to the courts, at the same time as it requests that JAMS depart from its rules. Once Renwood dismisses the claim in court and this case is properly commenced, its claim for interim relief can be heard by the duly-appointed arbitrator. Respectfully, Deutsch will object to any other process.


Sincerely,

James R. Parrinello

JRP/pas
Enclosures

cc:    Whitney Davis, Esq.
       (via facsimile)

# EXHIBIT E

## Jim Parrinello

| | |
|---|---|
| **From:** | Schuster Ellen [ESchuster@jamsadr.com] |
| **Sent:** | Friday, June 20, 2008 2:30 PM |
| **To:** | Whitney A. Davis |
| **Cc:** | Jim Parrinello |
| **Subject:** | RE: Renwood Winery, Inc. vs. W.J. Deutsch & Sons, Ltd. - REF# 1130004263 |

Thank you for your message.  I note that JAMS Comprehensive Rules are listed in the contract.  While this is enough to establish jurisdiction, we are still awaiting the additional $400 Case Management Fee from, or on behalf of, the respondent.  Once we have received that fee, we can commence the matter and either appoint a mutual-agreed upon arbitrator or determine the arbitrator using a strike list pursuant to the Comprehensive Rules.  Once an arbitrator is appointed any party may petition him or her for injunctive relief.  Prior to appointment, JAMS does not have any authority or jurisdiction to issue injunctive relief or a TRO.

Thank you,
Ellen

Ellen Schuster
ADR Specialist
415-774-2608

**From:** Whitney A. Davis [mailto:WAD@Charter-Davis.com]
**Sent:** Friday, June 20, 2008 1:47 PM
**To:** Schuster Ellen
**Cc:** Jim Parrinello
**Subject:** RE: Renwood Winery, Inc. vs. W.J. Deutsch & Sons, Ltd. - REF# 1130004263

Ms. Schuster:

Renwood has a demand for arbitration pending with JAMS.  So we know JAMS has jurisdiction over the Arb Demand.  Renwood sent JAMS the contract granting jurisdiction and the $400 fee.

However, Renwood has a separate proceeding pending in federal court asking for ex parte (immediate) injunctive and equitable relief, separate and apart from the relief that Renwood claims in the arb demand.

W.J. Deutsch has moved to dismiss the TRO in Federal Court, contending that only JAMS can issue a TRO in this case.

That is why Renwood asked JAMS earlier this week whether JAMS had the ability to issue ex parte injunctive/equitable relief in the form of a Temporary Restraining Order and/or Claim& Delivery.

Your e-mail does not answer that question.  Renwood asks that JAMS answer that question today.

Thank You.

Whitney A. Davis

-----Original Message-----
**From:** Schuster Ellen [mailto:ESchuster@jamsadr.com]
**Sent:** Friday, June 20, 2008 12:31 PM
**To:** Whitney A. Davis; JParrinello@NMGovLaw.com
**Subject:** Renwood Winery, Inc. vs. W.J. Deutsch & Sons, Ltd. - REF# 1130004263

Counsel:

Please note that JAMS does have jurisdiction in the above-referenced matter at this time.

We can proceed with the arbitration once we have received proof of jurisdiction and a $400 non-refundable Case Management Fee from each party.

Thank you,
Ellen



**Ellen R. Schuster**
ADR Specialist
Two Embarcadero Center, Suite 1500
San Francisco, CA 94111
Email: eschuster@jamsadr.com
415-774-2608 (Direct Dial)
415-982-5287 (Facsimile)

# EXHIBIT F

## Jim Parrinello

| | |
|---|---|
| **From:** | Demmon Nicole [ndemmon@jamsadr.com] |
| **Sent:** | Tuesday, July 01, 2008 10:42 AM |
| **To:** | wad@charter-davis.com; Jim Parrinello |
| **Subject:** | Renwood Winery, Inc. vs. W.J. Deutsch & Sons, Ltd. - REF# 1130004263 |
| **Attachments:** | _0701103613_001.pdf |

Dear Counsel:

The attached document contains the Northern California Panel of Arbitrators and an altered second copy. On the second document I have crossed out JAMS neutrals that definitely charge travel expenses for going to Sacramento. Please note though that depending on the hearing length some of the neutrals that are not crossed out may end up charging for expenses if they need to spend the night.

Please let me know if you have any questions.

Thank you,



**Nicole Demmon**
Case Manager
JAMS, *The Resolution Experts*
Two Embarcadero Center, Suite 1500
San Francisco, CA 94111
Email: ndemmon@jamsadr.com
415.774.2635 (Direct Dial)
415.982.5287 (Facsimile)
Need a commercial ADR clause? Click below:
http://www.jamsadr.com/rules/clauses.asp



THE RESOLUTION EXPERTS®

# Northern California
# Panel of Arbitrators

JAMS has assembled the finest exclusive panel of arbitrators who practice ADR full-time. Our arbitrators are dedicated to fairness and ultimate closure and make important decisions based on the facts and the law. They are trusted professionals who possess process expertise and proven track records.

## Attorney Panel
Richard Chernick, Esq.
Zela "Zee" G. Claiborne, Esq.
Gary S. Davis, Esq.
Linda DeBene, Esq.
Bruce A. Edwards, Esq.
Jay Folberg, Esq.
Kenneth D. Gack, Esq.
Lester J. Levy, Esq.
Michael J. Loeb, Esq.
Robert S. Luft, Esq.
James D. Mart, Esq.
John P. McGlynn, Esq.
Michael G. Ornstil, Esq.
Donald R. Person, Esq.
Martin Quinn, Esq.
Michael D. Ranahan, Esq.
Michael J. Timpane, Esq.
Catherine A. Yanni, Esq.

## Federal Panel
Judge David Warner Hagen (Ret.)
Judge Charles A. Legge (Ret.)
Judge Eugene F. Lynch (Ret.)
Judge Fern M. Smith (Ret.)

## California Court of Appeal Panel
Justice Nat A. Agliano (Ret.)
Justice Walter P. Capaccioli (Ret.)
Justice Zerne P. Haning, III (Ret.)
Justice Daniel "Mike" Hanlon (Ret.)
Justice Harry W. Low (Ret.)
Justice William A. Masterson (Ret.)
Justice Gary E. Strankman (Ret.)

## California Supreme Court Panel
Chief Justice Malcolm Lucas (Ret.)
Justice Edward A. Panelli (Ret.)

## State Trial Court Panel
Judge Demetrios P. Agretelis (Ret.)
Judge Read Ambler (Ret.)
Judge Robert A. Baines (Ret.)
Judge Michael E. Ballachey (Ret.)
Judge William L. Bettinelli (Ret.)
Judge Joseph F. Biafore, Jr. (Ret.)
Judge Cecily Bond (Ret.)
Judge William J. Cahill (Ret.)
Judge John A. Flaherty (Ret.)
Judge David A. Garcia (Ret.)
Judge Ellen Sickles James (Ret.)
Judge Ken M. Kawaichi (Ret.)
Judge John A. Marlo (Ret.)
Judge William F. Martin (Ret.)
Judge V. Gene McDonald (Ret.)
Judge Ronald M. Sabraw (Ret.)
Judge Laurence K. Sawyer (Ret.)
Judge Richard M. Silver (Ret.)
Judge W. Scott Snowden (Ret.)
Judge Norman Spellberg (Ret.)
Judge Edward Stern (Ret.)
Judge Peter G. Stone (Ret.)
Judge Mark E. Thomas, Jr. (Ret.)
Judge James L. Warren (Ret.)
Judge Rebecca Westerfield (Ret.)
Judge Robert B. Yonts (Ret.)

Please visit our website or call for a detailed profile of any panel member.

*RESOLUTION CENTERS NATIONWIDE • 1.800.352.JAMS • www.jamsadr.com • Revised 6.12.08*

SAN FRANCISCO ● SAN JOSE ● SANTA ROSA ● WALNUT CREEK ● SACRAMENTO



**THE RESOLUTION EXPERTS®**

# Northern
# California
# Panel of Arbitrators

JAMS has assembled the finest exclusive panel of arbitrators who practice ADR full-time. Our arbitrators are dedicated to fairness and ultimate closure and make important decisions based on the facts and the law. They are trusted professionals who possess process expertise and proven track records.

## Attorney Panel

Richard Chernick, Esq.
Zela "Zee" G. Claiborne, Esq.
Gary S. Davis, Esq.
Linda DeBene, Esq.
Bruce A. Edwards, Esq.
Jay Folberg, Esq.
Kenneth D. Gack, Esq.
Lester J. Levy, Esq.
Michael J. Loeb, Esq.
Robert S. Luft, Esq.
James D. Mart, Esq.
John P. McGlynn, Esq.    *(no charge if full day)*
Michael G. Ornstil, Esq.
Donald R. Person, Esq.
Martin Quinn, Esq.
Michael D. Ranahan, Esq.
Michael J. Timpane, Esq.
Catherine A. Yanni, Esq.

## Federal Panel

Judge David Warner Hagen (Ret.)
Judge Charles A. Legge (Ret.)
Judge Eugene F. Lynch (Ret.)
Judge Fern M. Smith (Ret.)

## California Court of Appeal Panel

Justice Nat A. Agliano (Ret.)    *(only if extended stay)*
Justice Walter P. Capaccioli (Ret.)    *(no cases in SAC)*
Justice Zerne P. Haning, III (Ret.)
Justice Daniel "Mike" Hanlon (Ret.)
Justice Harry W. Low (Ret.)
Justice William A. Masterson (Ret.)
Justice Gary E. Strankman (Ret.)

## California Supreme Court Panel

Chief Justice Malcolm Lucas (Ret.)
Justice Edward A. Panelli (Ret.)

## State Trial Court Panel

Judge Demetrios P. Agretelis (Ret.)
Judge Read Ambler (Ret.)
Judge Robert A. Baines (Ret.)
Judge Michael E. Ballachey (Ret.)
Judge William L. Bettinelli (Ret.)
Judge Joseph F. Biafore, Jr. (Ret.)
Judge Cecily Bond (Ret.)
Judge William J. Cahill (Ret.)
Judge John A. Flaherty (Ret.)
Judge David A. Garcia (Ret.)
Judge Ellen Sickles James (Ret.)
Judge Ken M. Kawaichi (Ret.)
Judge John A. Marlo (Ret.)
Judge William F. Martin (Ret.)
Judge V. Gene McDonald (Ret.)
Judge Ronald M. Sabraw (Ret.)
Judge Laurence K. Sawyer (Ret.)
Judge Richard M. Silver (Ret.)
Judge W. Scott Snowden (Ret.)
Judge Norman Spellberg (Ret.)
Judge Edward Stern (Ret.)
Judge Peter G. Stone (Ret.)
Judge Mark B. Thomas, Jr. (Ret.)
Judge James L. Warren (Ret.)
Judge Rebecca Westerfield (Ret.)
Judge Robert B. Yonts (Ret.)

Please visit our website or call for a detailed profile of any panel member.

# EXHIBIT G



1   Whitney A. Davis, SBN 149523
    CHARTER DAVIS, LLP
2   1730 I Street, Suite 240
    Sacramento, California 95814
3   Telephone: 916.448.9000

4   Attorneys for Petitioner Renwood Winery, Inc.

5

6                    JUDICIAL ARBITRATION

7                   AND MEDIATION SERVICE

8

9   RENWOOD WINERY, INC              Case No. 1130003656

10                Petitioner,        DEMAND FOR ARBITRATION

11          v.

12  W.J. DEUTSCH & SONS, LTD.,

13

14                Respondent.

15

16

17                          I.

18               GENERAL ALLEGATIONS

19          1.    Renwood Winery, Inc., (hereinafter "Renwood") owns and operates a winery

20  located in Amador County, California. Renwood has produced several varieties of award-

21  winning premium wines for more than a decade. In 2005, Renwood's in-house sales and

22  marketing staff sold approximately 100,000 cases of wine domestically. Although, Renwood is

23  a small winery by industry standards, it controls many of the old vine Zinfandel grapes in

24  California, and dominates the Premium Zinfandel wine categories. The hand-crafted wines are

25  produced in small lots, which distinguishes the brand from other producers. For this reason,

26  Renwood received overtures from wine marketing and sales firms wishing to represent the

27  winery and thereby add a premium producer to their product line.

28

                                   1
            ARBITRATION DEMAND OF RENWOOD WINERY, INC.

2.    In like fashion, in the Spring of 2006, industry-leading wine marketeer W.J. Deutsch & Sons, Ltd. ("Deutsch"), approached Renwood and proposed that Deutsch obtain the exclusive right to sell Renwood products domestically, thereby obviating the need for Renwood to employ its own sales force.  Deutsch cited its great success with other major brands, as achieved through its 120 person sales force, and promised to provide Renwood with greatly increased sales and positive exposure for this premium brand.  Deutsch wanted to take this already-successful brand to unprecedented on-premise and off-premise sales levels through Deutsch's distribution channels. [1]

3.    Deutsch reported to Renwood that it had taken an obscure winery in Australia (Yellow Tail) from 200,000 cases per year in sales to almost 8 million cases per year in 5 years. According to Deutsch, this achievement was unprecedented in the wine industry, and provided Deutsch with the credibility and marketing leverage to place Renwood's premium products on more wine lists and selling establishments than ever before.  Renwood selected Deutsch in light of its success with Yellow Tail, its industry expertise, its reportedly formidable marketing and sales staff, its extensive and well-established distributor network, and its proven ability to leverage its market strength and contacts to place Renwood wine in diverse distribution channels throughout the country.

4.    Renwood's pre-contract distributor network took more than a decade to build. Renwood's coveted "by-the-glass" marketing efforts likewise took years to become effective. Because of this, Renwood was concerned about the risks posed by transferring sales, marketing and distribution duties to salesmen and distributors unfamiliar with the brand.  Renwood made this concern explicit in the Services Agreement with Deutsch:  *"Renwood abandoned its distributor network on the representation by Deutsch that Deutsch will exert its portfolio brand*

---

[1] "On-Premise" sales are those made predominantly to restaurants, where the wine is consumed on the premises.  Increases in these sales are primarily achieved through placement of products into restaurants to be sold "by the glass," and by convincing the establishment to place more of the product line on their wine list.  "Off-Premise" sales are those made to liquor stores, grocery stores, etc., where the customer purchases the bottles of wine and consumes them elsewhere, or "off-premise."

*control to ensure priority distributor effort to meet or exceed Renwood Tier Sales Standards."*
*See* Agreement at V.B(i).

   5.    In addition to Deutsch's "priority distributor effort" promise, the parties agreed in writing that Deutsch would perform very defined marketing tasks and use its best efforts to promote, market, and distribute Renwood's wines "in a manner in keeping with Renwood's reputation in the marketplace." *Id.* at VIII.A.   This provision, along with the tier-specific performance goals set by the parties, reflected the requirement that Deutsch "enhance" the distinctive and high-quality Renwood brand. *Id.* at X.A.

   6.    Renwood reposed trust and confidence in Deutsch by granting to Deutsch the exclusive right to perform the business-critical tasks of protecting, promoting, and enhancing the Renwood brand.

   7.    The parties expressly eliminated Renwood's risk of loss by including a sales guarantee in the Services Agreement. *Id.* at VIII.D.   A monthly performance standard was established for the four "tiers" of wine that Renwood produced.  *Id.* at Schedule C.  Deutsch guaranteed 15% year-over-year growth in monthly sales for a period of five years. If Deutsch's sales did not meet the standard, it promised to "cure" by purchasing the deficit from Renwood, by tier. *Id.*

   8.    The parties executed the Services Agreement in March, 2006.  Deutsch took over the marketing, selling, and distribution of Renwood's wines in April of 2006, and took credit for a 1,100 case sale booked in March.  Since that time, with only one exception, Deutsch failed to achieve the required tier sales performance in any of the subsequent months.  In fact, Deutsch's sales have fallen short by many thousands of cases. Months after the transition to Deutsch, some distributors had not even received introductory sales meeting from Deutsch, forcing Renwood to conduct these meetings at its own expense.

   9.    Due to these lost sales, Renwood suffered a loss in shareholder value; a loss in its ratings and a loss of brand awareness and recognition in the marketplace. Deutsch's failure to meet the performance standards is the consequence of Deutsch ignoring many of the marketing obligations it agreed to perform. Making matters worse, some of the marketing efforts that

3
ARBITRATION DEMAND OF RENWOOD WINERY, INC.

1  Deutsch managed to exert served to actually harm Renwood's reputation. In this regard,
2  Renwood's damages greatly exceed the monetary amount of the untimely cure payments
3  Deutsch made to Renwood.

4       10.     Prior to the execution of the Services Agreement, Deutsch requested and was
5  provided Renwood's financial statements. Deutsch hired a financial analyst to scrutinize the
6  cash flow, operating debt, and other detailed financial information. This information clearly
7  illustrated this small winery's monthly dependence on cash flow from wine sales.

8       11.     Deutsch drafted the first iteration of the Services Agreement, employed a wine
9  and spirits expert attorney to revise the later drafts, and was the party most experienced in the
10  drafting and performance of marketing and distribution agreements for wine.

11       12.     The resulting Services Agreement clearly states that Renwood's transmittal of a
12  Notice of Breach of the tier sales standards starts a 15-day period in which Deutsch must cure
13  the breach. There is no provision in the Services Agreement that in any manner limits
14  Renwood's breach notice to only an annual basis.

15       13.     Due to Deutsch's dismal sales performance, the time for Deutsch to cure came
16  quickly. The first cure demand was met with arguments about the base-year sales upon which
17  the guarantee was based. Then, the cure payments were delayed beyond the 15-day period
18  because Deutsch contended that a 35-day period applied after presentment of the cure invoice.
19  In a particularly malicious act, Deutsch then cured a disastrous month's sales performance by
20  purchasing wine not by tier, but by buying only one or two products. They did so because
21  Deutsch receives a significant marketing contribution from Renwood for the sales of some
22  wines, and no contribution from others. Deutsch cured by buying wines with the greatest
23  marketing contribution, while the other products (affording no contribution) were left to remain
24  in Renwood's inventory. The result of this tactic was to throw Renwood's vintage of the over-
25  bought product gravely out of balance, portending the exhaustion of the supply before the new
26  vintage becomes available.    To add insult to injury, Deutsch was not using the marketing
27  contributions at the distributor level to support the case price. Instead, and in contravention of
28  the terms of the Services Agreement, Deutsch banked the marketing contributions until they

1  decided to spend inordinately large sums of money on unauthorized and ill-conceived

2  promotions and use some of Renwood's marketing money to offset expenses for the Yellow

3  Tail advertising agency.  While Deutsch earned interest on the banked marketing contributions,

4  sales support evaporated at the distributor level and sales plummeted.  Deutsch's continuing

5  breach of the cure provisions, mishandling of the marketing contributions and degradation of the

6  brand constituted a malicious attempt to undermine Renwood's business and make Renwood

7  vulnerable to a distress sale.

8       All of the foregoing and following facts and allegations are incorporated in each of the

9  cross-claims asserted herein.

10                                        **II.**

11                           **FIRST CAUSE OF ACTION**

12                              **Breach of Contract**

13       14.    In reliance on Deutsch's representations, oral and written promises, and its

14  expertise and stature in the industry, Renwood reposed special trust and confidence in Deutsch.

15  By agreeing to serve, and by serving, as Renwood's exclusive marketer and distributor of

16  Renwood's wines, Deutsch accepted the burden of those critical responsibilities and accepted

17  control over the future sales of Renwood's wines.

18       15.    When accepting that control, Deutsch knew that Renwood would abandon its

19  distributor network in favor of Deutsch's network.  Deutsch also knew that re-aggregating

20  Renwood's distributor network once disbanded was, if not impossible due to marketplace

21  realities, prohibitively costly for Renwood.

22       16.    Deutsch also knew that its marketing of the Renwood brand would be the sole

23  means to maintain and enhance Renwood's brand identity and awareness among consumers and

24  that, as Renwood's exclusive marketer, its marketing services were critical to the success of

25  Renwood's business.

26       17.    Since April of 2006, Deutsch has been, and has held itself out as, Renwood's

27  exclusive agent with regard to marketing, selling, and distributing Renwood's wine in

28  communications and relations with beverage distributors, retailers, and the beverage industry as

1  a whole.

2      18.    Deutsch breached its contractual obligations to Renwood by its acts as described

3  herein, including, but not limited to, the subjects of the Notices of Breach attached hereto and

4  incorporated by this reference, as well as: (1) WJD's false statement to beverage distributors

5  that Deutsch purchased Renwood, (2) WJD's failure to use its best efforts to market Renwood's

6  wine, (3) WJD's failure to seek Renwood's input into the manner of marketing its various

7  wines, (4) WJD's failure to timely and accurately make its cure payments, (5) WJD submitting

8  fraudulent marketing contribution claims, (6) WJD lying about the source of wine depletions to

9  improper charge marketing allowances, (7) WJD selling its own cure inventory before it has met

10  the Sales Performance Standards, and (8) WJD failing to meet the Sales Performance standards.

11

12      19.    Deutsch's promise "to ensure priority distributor effort to meet or exceed

13  Renwood Tier Sales Standards," requires Deutsch to perform numerous, specific tasks. Deutsch

14  has failed to perform many of those tasks and failed to perform others as they are described in

15  the Agreement or to use its best efforts to perform those tasks. Renwood has fully performed all

16  of the obligations it is required to under the Agreement.

17      20.    Deutsch breached the Agreement by failing to use its best efforts to promote,

18  enhance, and sell Renwood's wines. Deutsch further breached the Services Agreement by

19  failing to properly and timely cure the sales guarantee deficits.

20      21.    Deutsch further breached the Agreement by failing, at least; (9) to assign a

21  competent brand manager to oversee the marketing and distribution of Renwood's wines, (10)

22  to seek and gain Renwood's prior-approval of that brand manager, (11) to timely replace that

23  brand manager, (12) to inform and educate Deutsch's distributors and retail purchasers about

24  Renwood's wines, (13) to coordinate sales meetings and ride-alongs with Deutsch's distributors,

25  (14) to consult with Renwood regarding the appropriate marketing of Renwood's various types

26  of wines, (15) to use Renwood's marketing contribution solely to promote, enhance, and sell

27  Renwood's wines, (16) to market Renwood's wines in States where Renwood had established

28  consumer recognition, (17) by mismanaging Renwood's promotions, (18) by disrupting

1   Renwood's high quality, premium wine business with Costco, (19) by deploying the "Find the

2   Wren" marketing campaign without prior approval from Renwood, and (20) by failing to ensure

3   that depletions of Renwood's wines did not fall below 80% of the tier-specific performance

4   standards.

5       22.   Deutsch further breached the Agreement by failing to, at least: (21) provide

6   Renwood with marketing reports, specifically, with "contact reports, order reports, marketing

7   contribution usage reports and shipment summary reports" within 30 days of the end of each

8   month, and (22) to provide Renwood with sales reports, specifically, with "sales, depletion,

9   inventory and accounts sold reports" by the 20th day following the month for which the

10   categories were measured.

11       23.   Deutsch further breached the Agreement by failing to, at least: (23) distinguish

12   for accounting purposes between its sales of wine from the inventory purchased from Renwood

13   to cure the failure to meet the performance standards from the wine Deutsch was obligated to

14   sell to meet those performance standards; and (24) to timely order from Renwood, and to timely

15   pay Renwood, for the amount of wine Deutsch was obligated to purchase to cure its failure to

16   meet the performance standards.

17       24.   As a direct result of these of the Agreement by Deutsch, Renwood has suffered

18   damage to its business and to its Renwood brand in a monetary amount significantly greater

19   than the amount Deutsch has paid to Renwood in cure payments.

20

21                      **SECOND CAUSE OF ACTION**

22            **Breach of the Covenant of Good Faith and Fair Dealing**

23       25.   By its conduct as described herein, Deutsch has breached the covenant of good

24   faith and fair dealing inherent in the parties' Agreement.

25       26.   As result of this breach, Renwood has been denied the benefits it bargained for in

26   the Agreement.  Renwood has suffered damage to its business and to its Renwood brand in a

27   monetary amount significantly greater than the amount Deutsch has paid to Renwood in cure

28   payments.

**THIRD CAUSE OF ACTION**

**Promissory Fraud**

27.    Deutsch represented to Renwood: (1) that it possessed the requisite expertise to market Renwood's premium wines in an manner that would protect, promote, and enhance the Renwood brand and its awareness among consumers, (2) that it intended to use that expertise, on a best efforts basis, to ensure a "priority distributor effort to meet or exceed Renwood Tier Sales Standards;" (3) that Deutsch would timely cure deficits resulting from its sales guarantee; and (4) that Deutsch would in good faith discharge the obligations it owed under the Services Agreement. The fact that Deutsch possessed the ability and intention to perform these critically important functions is the touchstone and essence of the parties' Agreement.

28.    These representations by Deutsch, however, were and are false. Deutsch does not possess the described requisite expertise. Assuming that Deutsch possesses the requisite expertise, it entered the Agreement with no intention of performing its obligations under the Agreement—as is evidenced by its conduct described herein. Deutsch, in fact, has not performed those obligations.

29.    Deutsch knew at the time it negotiated the Agreement that these representations were false. Deutsch, nonetheless, intentionally made the misrepresentations to induce Renwood to enter into the Agreement.

30.    At the very least, Deutsch made its misrepresentations negligently.

31.    Renwood was unaware that Deutsch's representations were false. Due to Deutsch's industry expertise, its considerable marketing staff, its extensive and well-established distributor network, and its proven ability to place wine in many retail outlets throughout the country, Renwood reasonably relied upon Deutsch's misrepresentations to enter into the Agreement.

32.    Deutsch's misrepresentations constitute deceit, specifically, but not exclusively, promissory fraud, intentional misrepresentation, and negligent misrepresentation.

33.    As a result of Deutsch's deceit, Renwood has suffered damage to its business and to its Renwood brand in a monetary amount significantly greater than the amount Deutsch has

8

1   paid to Renwood in cure payments.

2   **FOURTH CAUSE OF ACTION**

3   **Defamation- False Light**

4     34. Deutsch informed various beverage distributors that it purchased Renwood

5   Winery.  Deutsch's assertion was made in a letter to those distributors and, on information and

6   belief, orally as well.  The assertion is false.

7     35. Deutsch knowingly published this falsehood at a time that Renwood was exerting

8   efforts to: 1) become a publicly-traded company; 2) incur debt to purchase other wineries; and

9   3) consolidate winery operations into a package that afforded increased shareholder value

10  through a stock purchase.  The publication was timed perfectly to inflict injury on Renwood.

11  The publication took place on the heels of Renwood's insistence that Deutsch comply with the

12  cure provisions of the sales guarantee.  The publication injured Renwood's reputation by,

13  among other reasons, conveying the falsehood that Renwood is no longer an independent, on-

14  going concern, and the inference that Renwood management was no longer in control of the

15  company.  Deutsch, moreover, had reason to know that the distributors it notified would

16  republish the falsehood and that those republications would damage Renwood's reputation

17  further, in the eyes of wine industry leaders, vendors, distributors, potential equity investors,

18  shareholders, lenders and promoters of the public offering.

19    36. Deutsch's publication of the falsehood constitutes defamation per se.  The

20  falsehood is directed specifically at Renwood's ability to conduct its business with wine

21  distributors and retailers, now and in the future, and is only consistent with an effort to devalue

22  Renwood and to undermine its business.

23    37. In addition to the reputational damage suffered, Renwood's ability to re-

24  aggregate a distributor network after termination of the Agreement has been damaged in light of

25  the false impression that Renwood is no longer an independent, on-going concern.

26

27

28

9

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### FIFTH CAUSE OF ACTION

#### Interference with Prospective Economic Relations

38.    The Agreement provides that it will terminate either by mutual agreement or upon the occurrence of certain events.  In either case, the Agreement contemplates that at some point Deutsch will no longer serve as Renwood's exclusive marketer and distributor.

39.    Deutsch is acutely aware that the relationships formed between a winery and its distributors is valuable and critical to the well-being of the winery's business.  Deutsch knows of the relationships Renwood had with its distributors, currently has with other distributors via the Deutsch network, and could have with still others when the Agreement terminates.

40.    By its conduct as described herein, Deutsch intentionally, or at least negligently, has interfered with Renwood's ability to re-aggregate a distributor network for its wines.  Renwood's relations with its previous and potentially future wine distributors has been significantly damaged by Deutsch publishing the false statement that it purchased Renwood, by its failure to inform and educate distributors about the Renwood brand, by its failure to maintain Renwood's brand presence in the States where it previously had consumer recognition, by its threats and heavy-handed communications to distributors dissuading them from ordering direct from Renwood, and by its failure to use its best efforts to maintain sales of Renwood's wines throughout the country.    Further, the degraded sales performance combined with the defamatory statements has effectively derailed any public offering.

41.    As a direct result of Deutsch's interference with Renwood's prospective economic relations, Renwood has suffered damage to its business and to its Renwood brand in a monetary amount significantly greater than the amount Deutsch has paid to Renwood in cure payments.

1

### SIXTH CAUSE OF ACTION

2

**Unfair Business Practices**

3      42.      By its conduct as described herein, Deutsch engaged in common law unfair

4    competition and has violated Business & Professions Code section 17200 et seq.

5      43.      As a direct result of Deutsch's acts of unfair competition, Renwood suffered

6    actual and certain monetary losses and loss of shareholder value.

7

### SEVENTH CAUSE OF ACTION

8

**Fraud – Marketing Contributions**

9      44.      As of March 31, 2008, distributor Southern Wine & Spirits

10

reported to BDN the depletion of 50 cases of Red Label wines and 1,386 cases of Private Label

11   wines to BevMo.

12

13      45.      Deutsch pulled that depletion data from the BDN database

14

using its DIVER computer software package.

15

16      46.      Deutsch manipulated its DIVER report to combine the Red

17   Label and Private Label case depletion volume under only the Red Label sku's.

18

19      47.      On April 25, 2008, WJD sent its Quarterly Marketing

20   Contribution invoice to Renwood including the manipulated DIVER data, demanding marketing

21   allowances for Private Label wines for which they knew they could receive no marketing

22   contribution.

23

24      48.      On May 1, 2008, WJD employee Francois Magnant

25   (Renwood's Brand Manager) was not truthful when providing his e-mail response to Robert

26   Smerling of Renwood about the facts behind the spike in Red Label sales to BevMo;

27      49.      Later on May 1, 2008, WJD employee Francois again sent

28

11

the manipulated DIVER data to Renwood to explain the Red Label sales spike;

50.    On May 2, 2008, Robert Smerling sent correspondence to Peter and William Deutsch concerning the manipulated data and demanded an explanation.

51.    On May 5, 2008, Peter Deutsch sent correspondence to Robert Smerling tacitly admitting that WJD unilaterally decided to count the Private Label cases for performance purposes, but was silent on the issue of counting those cases for purposes of charging Renwood a marketing contribution.

52.    The difference between the marketing contribution demanded by WJD, and that which would be due had WJD not manipulated DIVER is $22,000.

53.    By counting those cases for depletion credit against the 80% depletion standard in the Services Agreement, WJD took depletion credits from Renwood of in excess of $140,000.

54.    By counting those cases for sales credit against the Sales Performance Standard, WJD took sales credit from Renwood of in excess of $140,000.

55.    WJD did manipulated the data in the same manner to defraud Renwood for the fourth calendar quarter of 2007. WJD's fraud cost Renwood not less than $2,000 in fraudulent marketing contributions that WJD collected, and sales/depletion credits according to proof. This caused a serious problem with Renwood largest customer Southern Wine & Spirits because of Peter's accusation that it was done on SWS behest and that Deutsch was innocent, when the data show that SWS is innocent and that Deutsch altered the data.

## EIGHTH CAUSE OF ACTION

### Declaratory Relief

56.    A controversy exists between the parties regarding the cure interval (i.e. monthly, quarterly, annually) and the amount by which Tiers 2 & 3 must be cured (i.e. 85% versus 100% with 15% of the cure coming from any tier).

57.    A controversy also exists regarding whether Deutsch must buy-out the remaining years of the sales guarantee due to their breach and non-performance of the Services Agreement.

58.    Renwood has performed all of its obligations under the Services Agreement, and Deutsch has not done so. They owe Renwood over $3,000,000 which is severely past due.

59.    Renwood therefore seeks a declaration of the rights and liabilities of the parties as follows:

　　　a.    That Deutsch has breached the contract and has failed to perform same by using its best efforts to sell and market Renwood wines;

　　　b.    That Deutsch has engaged in Unfair Business Practices as defined by California Business & Professionals Code section 17200 et. seq. by engaging in predatory business practices through manipulating sales data, using the cure procedure to delay payment; and by selling from its cure inventory before satisfying its sales performance guarantee under the Services Agreement.

　　　c.    That the Services Agreement is terminated due to the Breach of same by

Deutsch;

    **d.**    That Deutsch is responsible to buy-out the remaining years of the sales guarantee, according to proof, at a future value of not less than $37 million;

    **e.**    That Deutsch is responsible to satisfy all cures on a monthly basis to the date of termination;

    **f.**    That Deutsch is responsible to cure Tiers 2 & 3 at 100%, with 85% of the cure coming from purchases within those Tiers, from the date the contract was entered, to the date of termination;

    **g.**    That Deutsch is responsible to provide restitution to Renwood for the fraudulent marketing contributions at three times the amount taken in unearned marketing contributions.

**THEREFORE**, Renwood prays for the following relief;

1.    That Renwood be awarded all damages recoverable at law or in equity in an amount according to proof;

2.    That Renwood be awarded its attorneys' fees and costs;

3.    That Renwood be provided declaratory relief as set forth above;

4.    That Renwood be awarded treble damages for each fraudulent act it in which it engaged;

5.    That WJD be ordered to pay all cures owed to Renwood.

6.    That WJD be ordered to pay the reasonable value of all future guarantee payments, of no less than $37 million.

7.    That WJD be ordered to compensate Renwood for a loss of good will in Renwood Winery, Inc. at a valuation of not less than $40 million.

8.    That WJD be ordered to reimburse Renwood for all Marketing Contributions paid by Renwood that were improperly spent or held by WJD, an amount not less than $1 million.

ARBITRATION DEMAND OF RENWOOD WINERY, INC.

1         9.  For all other relief that is proper and just.

2

3    DATED:  June 2, 2008                    CHARTER DAVIS, LLP

4

5                                           _____

6                                           WHITNEY A. DAVIS, SBN #149523

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ARBITRATION DEMAND OF RENWOOD WINERY, INC.

1  CASE NAME:        Renwood Winery Inc. v. W.J. Deutsch & Sons, Ltd

2

3                              **PROOF OF SERVICE**

4       I am a citizen of the United States and am employed in the County of Sacramento.  I am
5  over the age of 18 years and not a party to the within cause; my business address is 1730 I
   Street, Suite 240, Sacramento, California 95814.

6       On the date below, I served the following document(s):

7

8  **DEMAND FOR ARBITRATION**

9  On all interested parties in said cause, by delivering a true copy as follows:

10 **XX**    **BY MAIL** I placed a true copy thereof enclosed in a sealed envelope with postage
          thereon fully prepaid.  I deposited said envelope in the United States mail in Sacramento,
11         California.  C.C.P. §1013(a)(b)

12        **BY PERSONAL SERVICE**  I placed a true copy thereof enclosed in a sealed envelope
   and delivered by hand via to the attorney listed below.  C.C.P. §1011(a)(b)
13

14

15 The envelope was addressed as follows:

16 **Attorney for W.J. Deutsch**
   James R. Parrinello
17 Nielsen Merksamer Parrinello, et al.
   591 Redwood Highway, #4000
18 Mill Valley, CA 94941-3039

19

20      I declare under penalty of perjury under the laws of the State of California, that the
   foregoing is true and correct, and that this declaration was executed on June 23, 2008, at
21 Sacramento, California.

22

23                              _Susan C Leon_

24                              SUSAN C. LEON

25

26

27

28

                              DEMAND FOR ARBITRATION